# Mississippi Electronic Courts
## Second Circuit Court District of Mississippi (Harrison Circuit Court - Biloxi)
### CIVIL DOCKET FOR CASE #: 24CI2:18-cv-00097

Chubb, as subrogee of Hunt Building Company, Ltd v. Heil Builders d/b/a Modu-Tech et al
Assigned to: Judge Roger T. Clark

Date Filed: 09/14/2018
Current Days Pending: 40
Total Case Age: 40
Jury Demand: None
Nature of Suit: 45 Breach of Contract

**Plaintiff**

**Chubb, as subrogee of Hunt Building Company, Ltd**
%Lloyd Gray Whitehead & Monroe
800 Montclair Road
Suite 100
Birmingham, AL 35213

represented by **Daniel Robert Pickett**
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James Coulson Gray**
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick Patronas**
Lloyd, Gray, Whitehead & Monroe, P.C.
880 Montclair Road
Suite 100
BIRMINGHAM, AL 35213
205-967-8822
Fax: 205-967-2380
Email: ppatronas@lgwmlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Heil Builders d/b/a Modu-Tech**

**Defendant**

**Ark-La-Tex Companies, Inc.**



| Date Filed | # | Docket Text |
|---|---|---|
| 09/14/2018 | 1 | COMPLAINT against Ark-La-Tex Companies, Inc., Heil Builders d/b/a Modu-Tech, filed by Chubb, as subrogee of Hunt Building Company, Ltd. (Attachments: # 1 Exhibit a, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet,) (Feeley, Reagan) (Entered: 09/14/2018) |
| 09/21/2018 | 3 | SUMMONS Issued to Heil Builders d/b/a Modu-Tech. (Feeley, Reagan) (Entered: 09/21/2018) |
| 09/21/2018 | 4 | SUMMONS Issued to Ark-La-Tex Companies, Inc.. (Feeley, Reagan) (Entered: 09/21/2018) |
| 10/01/2018 | 5 | APPLICATION for Admission of Counsel Pro Hac Vice for Daniel R. Pickett by Chubb, |

| | | |
|---|---|---|
| | | as subrogee of Hunt Building Company, Ltd. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B,) (Patronas, Patrick) (Entered: 10/01/2018) |
| 10/02/2018 | <u>6</u> | APPLICATION for Admission of Counsel Pro Hac Vice for James C. Gary III by Chubb, as subrogee of Hunt Building Company, Ltd. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B,) (Patronas, Patrick) (Entered: 10/02/2018) |
| 10/03/2018 | <u>7</u> | MISCELLANEOUS DOCUMENT: Return of Service of Complaint - Heil Builders d/b/a Modu-Tech re <u>1</u> Complaint by Chubb, as subrogee of Hunt Building Company, Ltd. (Patronas, Patrick) (Entered: 10/03/2018) |
| 10/10/2018 | <u>8</u> | ORDER GRANTING ADMISSION OF JAMES C. GRAY III AS COUNSEL PRO HAC VICE. Signed by Judge Roger T. Clark on 10/5/2018. (Feeley, Reagan) (Entered: 10/10/2018) |
| 10/10/2018 | <u>9</u> | ORDER GRANTING ADMISSION OF DANIEL R. PICKETT AS COUNSEL PRO HAC VICE. Signed by Judge Roger T. Clark on 10/5/2018. (Feeley, Reagan) (Entered: 10/10/2018) |
| 10/15/2018 | <u>10</u> | NOTICE OF SERVICE of Interrogatories Propounded to Heil Builders, Inc. d/b/a Modu-Tech, NOTICE OF SERVICE of Request for Production of Documents Propounded to Heil Builders, Inc. d/b/a Modu-Tech by Chubb, as subrogee of Hunt Building Company, Ltd. (Patronas, Patrick) (Entered: 10/15/2018) |

| MEC Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/24/2018 10:23:29 | | |
| **You will be charged $0.20 per page to view or print documents.** | | |
| **MEC Login:** cc10322M | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 24CI2:18-cv-00097 |
| **Billable Pages:** 2 | **Cost:** | 0.40 |

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI

SECOND JUDICIAL DISTRICT

CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,                                    PLAINTIFF

VERSUS                                          CAUSE NO.: A2402·18·97

                                                FILED
ARK-LA-TEX COMPANIES, INC.
                                                SEP 14 2018
HEIL BUILDERS, INC., d/b/a MODU-TECH,
                                                CONNIE LADNER
UNKNOWWN JOHN AND JANE DOES A                    CIRCUIT CLERK
THROUGH M, AND UNKNOWN CORPORATE                 BY: _____ D.C.
ENTITIES N THROUGH Z                                       DEFENDANTS

## COMPLAINT

### JURY TRIAL REQUESTED

COMES NOW Plaintiff, CHUBB, as subrogee of Hunt Building Company, Ltd., by and

through its counsel, Lloyd, Gray, Whitehead and Monroe, P.C., and files this Complaint against

Ark-la-Tex Companies, Inc., Heil Builders, Inc, d/b/a Modu-Tech, unknown John and Jane Does

A through M, and unknown corporate entities N through Z, and for its cause of action, states to

the Court the following, to wit:

### PARTIES

1.      Plaintiff, CHUBB, as subrogee of Hunt Building Company Limited ("Chubb") is

a foreign corporation, that provided insurance to Hunt Building Company, Ltd. ("Hunt

Building") for, among other things, the construction of 1,067 Family Housing Units ("FHU") at

Kessler Air Force Base ("Kessler AFB"), Biloxi, Mississippi, pursuant to Contract No.: FA8903-

04-D-8700-0004 ("the Project") between Hunt and the Department of the United States Air

Force ("USAF"). CHUBB is subrogated to Hunt Building for payment CHUBB made on behalf of Hunt Building for claims related to the alleged construction defects.

2.      Defendant, Ark-la-Tex Companies, Inc. ("Ark-la-Tex") is an Oklahoma corporation registered to do business in Mississippi, which can be served through its registered agent, Gary Teston, 6504 Highway 98, Suite E, Hattiesburg, Mississippi 39402. Ark-la-Tex's principle office is located in Covington, Louisiana.

3.      Defendant, Heil Builders, Inc, ("Heil") is a Texas corporation which was registered to do business in Mississippi at all times relevant to this cause. Heil can be served at its principle office located at 1200 E. Patapsco Avenue, Baltimore, Maryland 21225. At the times relevant to this cause, Heil did business as ("d/b/a") and/or operated under the trade name Modu-Tech ("Modu-Tech") in Mississippi.

4.      Other Unknown John and Jane Doe Defendants A through M are unknown Defendants who may be seasonably supplemented after discovery. John and Jane Doe Defendants A through M are fictitious persons whose real names and business addresses are unknown to Plaintiff at this time, but whose real names and addresses will be made part of this Complaint at such time as they become known to Plaintiffs, and at which time process of this Court may be served on such parties.   These Defendants negligently constructed portions of the Project which caused or contributed to the cause of Plaintiff's damage.

5.      Other Unknown John and Jane Does Defendants N through Z are unknown Defendants who may be seasonably supplemented after discovery. Unknown Corporate Entities N through Z are fictitious corporations or other business entities whose real names and business addresses are unknown to Plaintiff at this time, but whose real names and addresses will be made part of this Complaint at such time as they become known to Plaintiff, and at which time process

2

of this Court may be served on such parties.   These Defendants negligently constructed portions of the Project which caused or contributed to the cause of Plaintiff's damage.

## JURSIDICTION AND VENUE

6.      Because the acts giving rise to this action occurred in whole or in part in the Second Judicial District of Harrison County, Mississippi, and the structures at issue in this action are all located in the Second Judicial District of Harrison County, Mississippi, venue is proper in this Court pursuant to Miss. Code Ann. §11-11-3.

7.      This Court has jurisdiction over the subject matter pursuant to Art. 6 §156 of the Mississippi Constitution.

8.      All Defendants have sufficient contacts with the State of Mississippi to warrant the exercise of personal jurisdiction.

## FACTS

9.      This suit relates to the construction 1067 apartment/living units that lie within the boundaries of, and adjacent to, Keesler AFB in Biloxi, Mississippi.

10.     Hunt Building contracted with the Department of the USAF, pursuant to Contract No.: FA8903-04-D-8700-0004, to construct the Project at Kessler AFB, which consisted of 1067 FHUs.

11.     Hunt Building and W. G. Yates & Sons Construction Company ("Yates") formed Hunt Yates, LLC ("Hunt Yates"), a Mississippi limited liability company, which performed construction of the Project pursuant to a subcontract between Hunt Building and Hunt Yates.

12.     Hunt Yates entered into subcontracts with Ark-la-Tex and Heil, d/b/a Modu-Tech to perform certain construction work on the Project.

3

13.     Ark-la-Tex performed heating ventilation and air conditioning ("HVAC") construction on the Project. Modu-Tech performed carpentry and framing construction on the Project.

14.     After construction of the Project was complete, Forest City Southern Group, LLC ("Forrest City") was assigned the guarantees and warranties in the contract between USAF and Hunt Building and/or Hunt Yates.

15.     After Forest City took over ownership of the units constructed in the Project, Forest City began receiving complaints from residents regarding water infiltration and poor indoor air quality in the units.

16.     These complaints revealed alleged problems with the construction of the units and the performance of the HVAC systems.

17.     Repairs were made to the units to address the alleged problems; however, Forest City was not satisfied with the repairs.

18.     Additional investigation was performed by Forest City and others regarding the problems with the construction of the units and the HVAC systems which revealed several alleged problems with the construction performed by Ark-la-Tex, Modu-Tech, and Janes Does A through Z on the units. The problems identified include, but are not limited to, the following:

a.      unsealed ductwork connections between main trunk lines and branch supply saddles;

b.      the attic duct distribution layout was not per as-built drawings;

c.      numerous branch duct and main trunk runs were found to be unsupported and buried below the blown-in insulation in order to conceal the shoddy workmanship;

d.      flex ducts were found to be kinked and air flow was restricted;

4

e.      insulation wrap was insecure and torn;

f.      the insulation wrap was over compressed around the ducts and some connections were incomplete;

g.      some attic spaces were found to be un-insulated or inadequately insulated;

h.      improper materials were used;

i.      numerous unsealed electrical light fixtures, work boxes, and other penetrations were found and there are numerous openings that allow air to pass between the unconditioned attic space and the conditioned space in the structures;

j.      defective framing was performed throughout the units;

k.      sheathing to cover and seal the floor truss areas at the rear patios and front porches of the units were installed incorrectly;

l.      much of the work does not comply with applicable building codes.

19.     Forest City ultimately filed a lawsuit against Hunt Building, Hunt Yates, and Yates in the Circuit Court of Harrison County ("the Forest City lawsuit") asserting claims of negligence, breach of contract, and breach of express and implied warranties.

20.     Hunt Yates and Yates were dismissed from this lawsuit, and Forest City's claims against Hunt Building proceeded.

21.     Hunt Building provided notice to Ark-la-Tex and Modu-Tech and their insurers of the claims asserted against Hunt Building by Forest City in the Forest City lawsuit and demanded defense and indemnity of Hunt Building pursuant to the Subcontracts entered into between Ark-la-Tex and Modu-Tech and Hunt Yates for construction of the Project. The Subcontracts, in which Ark-la-Tex and Modu-Tech agreed to defend and indemnify Hunt Yates, are attached hereto as Exhibits A and B. (Ark-la-Tex/ Hunt Yates Subcontract, Section 11.00,

5

attached hereto as Exhibit A; Heil Building d/b/a Modu-Tech Subcontract, Section 11:00;

attached hereto as Exhibit B). Specifically, the indemnity provision states:

> To the fullest extent permitted by law, the Subcontractor covenants to defend, indemnify, hold harmless, protect, and exonerate both the Contractor and its affiliates, agents, employees, representative, and sureties and the owner, architect, and engineers, jointly and severally, from and against any and all liability, claims, damages, losses, suits, actions, demands, liens, arbitrations, administrative proceedings, awards, judgments, expenses, costs, and attorneys' fees pertaining to economic loss or damage, labor disputes, safety requirements, performance or non-performance of obligations, certifications, property rights of third parties, personal injury, bodily injury, sickness, disease, death, or damage to or destruction of property (including loss of use thereof) which (I) are caused in whole or in part by the Subcontractor (herein defined to include but not be limited to the Subcontractor's owners, employees, agents, representatives, subcontractors, suppliers, contractees, and invitees or other third parties connected with the Subcontract or the agents or employees of any of them), (II) arise from or occur in connection with work undertaken or to be performed by the Subcontractor, regardless of whether the same is within or beyond the scope of work, or (III) arise from or are connected with any other act or omission relating to the Subcontractor, this Subcontract, or the Subcontract work. It is the specific and express intent of this Subcontract for the foregoing covenants and indemnity obligations to apply to the fullest extent permitted by applicable law, regardless of whether the liability is caused in whole or in part by a party indemnified hereunder including, without limitation, whether or not the same be caused by, or arise out of, the joint, concurrent, or contributory negligence of a party indemnified hereunder.

(Subcontract 11.0).

22.    Ark-la-Tex and Modu-Tech declined to defend and indemnify Hunt Building from Forest City's claims or otherwise participate in the Forest City lawsuit.

23.    Hunt Building reached a confidential settlement with Forest City to resolve the claims against Hunt Building in the Forest City lawsuit.

24.    Following the settlement, Hunt Yates assigned all of its rights under the subcontracts with Ark-la-Tex and Modu-Tech to Hunt Building and authorized its insurer, CHUBB, to pursue any claims Hunt Yates has against Ark-la-Tex and Modu-Tech. A copy of

6

the Assignment between Hunt Yates and Hunt Building is attached hereto as Exhibit C. (Assignment from Hunt Yates to Hunt Building, attached hereto as Exhibit C).

25.    CHUBB, as insurer of Hunt Building, recently paid substantial sums of money to Hunt Building as a result of its settlement of the Forest City lawsuit. CHUBB did not make payment to Hunt Building voluntarily, rather CHUBB was compelled to do so based on its contractual agreements with Hunt Building and to protect CHUBB's interests.

26.    CHUBB is subrogated to Hunt Building for the amounts it paid to Hunt Building and is entitled to recover those amounts from Ark-la-Tex and Modu-Tech based on the indemnity provisions of the Subcontracts between Hunt Yates and Ark-la-Tex and Modu-Tech and the assignment of the rights under the Subcontracts to Hunt Building.

<u>COUNT ONE</u>

<u>CONTRACTUAL INDEMNITY</u>

27.    CHUBB incorporates by reference as if fully set forth herein its allegations contained in paragraphs 1-26 of this Complaint.

28.    CHUBB is subrogated to the rights of Hunt Building based on its payment of certain sums of money to Hunt Building as a result of the settlement of the Forest City lawsuit and to protect CHUBB's interests.

29.    Hunt Building was caused to settle the Forest City lawsuit due, in part to the faulty and defective construction performed by Ark-la-Tex, Modu-Tech and Jane Does A through Z on the Project, as described herein.

30.    Ark-la-Tex, Modu-Tech and Jane Does A through Z are required to indemnify Hunt Building and CHUBB, as Hunt Building's subrogee, for the amounts paid by CHUBB to Hunt Building to settle the Forest City lawsuit based on the indemnity provisions contained in

7

the Subcontracts between Hunt Yates and Ark-la-Tex and Modu-Tech, and the rights and obligations therein which were assigned by Hunt Yates to Hunt Building.

31.     As a direct and proximate cause of Ark-la-Tex's, Modu-Tech's and Jane Does A through Z's breach of their obligations under the Subcontracts, CHUBB has suffered contractual and consequential damages in the form of payments made to Hunt Building for damages to the Project and to settle the Forest City lawsuit, and all other consequential and foreseeable damages arising from the breach. The amount of damages incurred by CHUBB is not less than $4,000,000.00, the exact amount to be proven at trial.

## COUNT TWO

### BREACH OF CONTRACT

32.     CHUBB incorporates by reference as if fully set forth herein its allegations contained in paragraphs 1-31 of this Complaint.

33.     Ark-la-Tex and Modu-Tech entered into Subcontracts with Hunt Yates to perform certain construction work on the Project. (See Exhibits A and B).

34.     Hunt Yates assigned all of its rights under the Subcontracts with Ark-la-Tex and Modu-Tech to Hunt Building and authorized its insurer, CHUBB, to pursue any claims Hunt Yates has against Ark-la-Tex and Modu-Tech.

35.     The Subcontracts provide that all disputes relating to the Subcontracts or the Project shall be commenced in Harrison County, Mississippi. (Ark-la-Tex/ Hunt Yates Subcontract, Section 15.00, attached hereto as Exhibit A; Heil Building d/b/a Modu-Tech Subcontract, Section 15:00; attached hereto as Exhibit B).

8

36.    Ark-la-Tex and Modu-Tech breached the subcontracts by failing to properly perform the work on the Project, as described herein, and by failing to indemnify Hunt Yates as required by the Subcontracts.

37.    As a direct and proximate cause of Ark-la-Tex and Modu-Tech's breach of their obligations under the Subcontracts, CHUBB has suffered contractual and consequential damages in the form of payments made to Hunt Building for damages to the Project and to settle the Forest City lawsuit, and all other consequential and foreseeable damages arising from the breach. The amount of damages incurred by CHUBB is not less than $4,000,000.00, the exact amount to be proven at trial.

<div align="center">

**COUNT THREE**

**COMMON LAW INDEMNITY**

</div>

38.    CHUBB incorporates by reference as if fully set forth herein its allegations contained in paragraphs 1-37 of this Complaint.

39.    CHUBB is entitled to equitable indemnity as to the rights of Hunt Building based on its payment of certain sums of money to Hunt Building as a result of the settlement of the Forest City lawsuit and to protect CHUBB's interests.

40.    Hunt Building was caused to settle the Forest City lawsuit due, in part to the alleged faulty and defective construction performed by Ark-la-Tex, Modu-Tech and Jane Does A through Z on the Project, as described herein.

41.    Ark-la-Tex, Modu-Tech and Jane Does A through Z are required by equity and good conscience to indemnify Hunt Building and CHUBB, as Hunt Building's subrogee, for the amounts paid by CHUBB to Hunt Building to settle the Forest City lawsuit because the actions and inactions of Ark-la-Tex and Modu-Tech in constructing the Project in a defective manner,

<div align="center">9</div>

42.     As a direct and proximate cause of Ark-la-Tex's, Modu-Tech's, and Jane Does A through Z's breach of their obligations under the Subcontracts, CHUBB has suffered compensatory, contractual and consequential damages in the form of payments made to Hunt Building for damages to the Project and to settle the Forest City lawsuit, and all other consequential and foreseeable damages arising from the breach. The amount of damages incurred by CHUBB is not less than $4,000,000.00, the exact amount to be proven at trial.

**WHEREFORE, PREMISES CONSIDERED,** CHUBB demands that this Court enter judgment against the Defendants for actual compensatory, consequential and/or contractual damages in an amount not less than $4,000,000.00, the exact amount to be proven at trial, prejudgment interest, post-judgment interest, costs and attorney's fees incurred as a result of the Defendants' wrongful acts set forth herein and for any additional relief which the Court deems just and proper.

Dated this the 5th day of September, 2018.

## PLAINTIFF DEMANDS A TRIAL STRUCK BY JURY.

Respectfully Submitted,

CHUBB

X _____

Patrick Patronas (MS. Bar No. 4043)
Attorney for Plaintiff, CHUBB

**OF COUNSEL:**
LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35213
Telephone: (205) 967-8822
Email: ppatronas@lgwmlaw.com

10

**SERVE THE DEFENDANTS VIA CERTIFIED MAIL:**

Ark-la-Tex Companies, Inc.
c/o Gary Teston, Registered Agent
6504 Highway 98, Suite B
Hattiesburg, Mississippi 39402

Heil Builders, Inc, d/b/a Modu-Tech
c/o J. Scott Stevens
2617 Chestnut Woods Court
Reisterstown, Maryland 21136

11

# EXHIBIT A

## Ark-La-Tex/Hunt Yates Subcontract

# HUNT YATES LLC


**ORIGINAL**

170 Minden Road,  Biloxi, Mississippi 39530 * P O Box 5189, Biloxi, Mississippi 39534 * 228 374 1865

THIS AGREEMENT, MADE THIS 28th day of July 2007, by and between Ark-La-Tex Companies doing business as a incorporation with principal office at 19295 3rd Street, Ste #14 Covington, LA 70433, (hereinafter called the "SUBCONTRACTOR"), and HUNT YATES, LLC, (hereinafter called "CONTRACTOR"). WITNESSETH:

That the SUBCONTRACTOR and the CONTRACTOR, in consideration of the covenants and agreements herein contained, mutually agree as follows:

## 1. PROJECT, LOCATION AND OWNER

The SUBCONTRACTOR agrees to furnish all labor, material and equipment and perform all work described in Section 2 hereof for the construction of 1,028 Units of Family Housing located at Keesler Air Force Base, Biloxi, Mississippi for the Department of the Air Force in accordance with the terms of this Subcontract, and in accordance with the terms of the contract between CONTRACTOR and the Owner ("General Contract").

## 2. WORK TO BE DONE

THE FOLLOWING IS INTENDED AS AN ELABORATION, NOT A LIMITATION, OF THE SCOPE OF WORK TO BE INCLUDED AS PART OF THIS SUBCONTRACT.

This Subcontractor shall furnish all labor, supervision, tools, equipment, insurance, materials, and applicable taxes for a complete mechanical job, at all four sites, at Keesler A.F.B.

### A COMPLETE HVAC MECHANICAL JOB

Attachment A - WORK TO BE DONE - continued on Page 17

## 3. CONTRACT SUM

IN CONSIDERATION WHEREOF, the OWNER/CONTRACTOR agrees to pay this SUBCONTRACTOR for the full and faithful performance of his work the sum of NINE MILLION TWO HUNDRED TWENTY THOUSAND FOUR HUNDRED SEVENTY EIGHT DOLLARS AND ZERO CENTS ($9,220,478.00), including all taxes, in current funds, at the CONTRACTOR'S office at Keesler Air Force Base, Mississippi, subject to additions and deductions for changes as may be agreed upon in writing and subject to the other terms of this agreement.

The following have agreed to the terms of this Subcontract and have signed this Subcontract as officers of their respective organizations, having been duly authorized to do so.

SUBCONTRACTOR:                              CONTRACTOR:

ARK-LA-TEX COMPANIES, INC.                   HUNT-YATES, LLC

By:                                          By:

Title:                                       Title: Aaron Docsa, Project Manager

Federal ID. or SSN  73 - 1603681            Contract No:                    51551

Mississippi License Number

1

## ARTICLE I: GENERAL OBLIGATIONS

1.0    The Subcontractor shall be bound to the Contractor by all terms and conditions of this Subcontract and, except as otherwise provided herein, by all terms and conditions of the Prime Contract between the Owner and Contractor, which is incorporated by reference into this Subcontract and is an integral part of this Subcontract. The Prime Contract includes, but is not limited to, the Agreement between the Contractor and the Owner; all general, supplementary, special conditions; all drawings, specifications, details, and standards; all addenda, modifications, and revisions to any of the foregoing; and all other documents or requirements incorporated into or referenced by the foregoing. The Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the Contractor, by the Prime Contract, assumes toward the Owner. In the event of an ambiguity, inconsistency, or conflict in payment or other provisions between or among the Prime Contract, this Subcontract, any bond, and/or other agreement or instrument, this Subcontract shall govern. In no event shall the Subcontractor be entitled to greater rights, higher entitlements, or more relief against the Contractor than the Contractor actually obtains from the Owner on Subcontractor's behalf with respect to the Subcontract work.

1. 1    The Subcontractor shall perform its work in strict accordance with this Subcontract and with the Prime Contract. Anything pertaining to the Subcontractor's work that is mentioned in the specifications but not shown in the drawings, or shown in the drawings but not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. All work of the Subcontractor shall be subject to the approval of the Contractor, Architect, Owner, and any authorities having jurisdiction over the Subcontract work. The Subcontractor's work includes all work specifically set forth in this Subcontract and covered by parts of the Prime Contract applicable thereto, and it further includes everything reasonably necessary or customary for the proper execution, functioning, connection, and completion of all work referred to by this Subcontract. All provisions of this Subcontract and of all incorporated, referenced, and attached documents, including but not limited to the Prime Contract, shall be construed together and harmonized to the extent reasonable and consistent with the intent of this Subcontract for proper completion and functioning of the entire scope of work being subcontracted. If there is any conflict, ambiguity, or inconsistency within or between any such documents or a difference in interpretation, the matter shall be referred to the appropriate design professional whose decision the Subcontractor shall implement at no additional cost. If the design professional does not render a decision in a timely manner, the Subcontractor shall perform as directed by the Contractor at no additional cost.

1.2    Subcontractor shall promptly prepare and submit to Contractor such drawings, details, product data, samples, and other submittals as may be required by the Prime Contract or the Contractor. By submitting such drawings, details, product data, samples, and other submittals, Subcontractor represents that it has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Subcontract. The Subcontractor shall call specific attention in writing to the Contractor to any and all proposed deviations from the Prime Contract at the time of delivery of such drawings, details, product data, samples, and other submittals, and no deviation shall be permitted unless specifically requested in writing by Subcontractor and expressly approved in writing by an Authorized Representative of the Contractor. Contractor shall have no duty to discover any mistake, error, or deviation in any such drawings, details, product data, samples, and other submittals from the Prime Contract requirements, and Contractor's or Architect's approval thereof shall not relieve Subcontractor from responsibility or liability for any mistakes, error, or deviation, or of Subcontractor's obligation to perform its work in strict accordance with the Prime Contract.

1.3    The Subcontractor represents and warrants that it is fully qualified and experienced in every respect to perform the work and that it is properly licensed, equipped, organized and financed to perform such work. The Subcontractor further certifies that it has carefully examined the Subcontract and is fully familiar with all of the terms and conditions thereof and has fully acquainted itself with job site conditions that may affect the cost or timeliness of the Subcontractor's performance, that it has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the work and that it is not relying on any opinions or representations of Contractor; and, as between the parties hereto, Subcontractor will assume full and complete responsibility for all conditions relating to the work, the site and its surroundings, and all risks in connection therewith.

1.4    The Subcontractor is responsible for the proper location and layout of its work (including the responsibility for the accuracy and expense of engineering services related thereto), and the Subcontractor shall verify all previous and surrounding work and conditions to ensure that all work fits together and functions properly. Before beginning any portion of the work, the Subcontractor shall detect and report in writing any condition or problem caused by others which could affect Subcontractor's work; otherwise, Subcontractor shall accept full responsibility and cost for correcting or overcoming such conditions or problems.

1.5    The Subcontractor agrees and acknowledges that meetings will be held at the jobsite as called for by the Contractor or as otherwise required herein. Attendance by the Subcontractor is required at the meeting held immediately prior to the commencement of its work and each meeting thereafter until this Subcontract work is complete and accepted by the Owner, and at other times when deemed necessary by the Contractor. The Subcontractor shall have a representative present who shall have the authority to act and make binding decisions for the Subcontractor.

1.6    No temporary office building, storage trailer, sign, or other structure shall be placed on the jobsite by the Subcontractor unless approval in writing of the location, design and painting thereof has first been received from the Contractor.

1.7    The Subcontractor shall clean up and remove from the site and dispose of trash and debris on a daily basis or as often as directed by the Contractor. The Subcontractor shall also do its part in keeping the Project in a clean and neat condition and shall clean up any adjacent work soiled by his workmen and leave floors "broom clean", as directed by the Contractor. If

2

ARTICLE I: GENERAL OBLIGATIONS (continued)

Subcontractor fails to comply with this paragraph within twenty-four (24) hours after receipt of notice by Contractor, than Contractor may perform such necessary clean-up and deduct the costs from any amount(s) due the Subcontractor.

1.8     The Subcontractor shall provide sufficient, safe and proper facilities, equipment, and working conditions, which shall at all times be subject to inspection by Contractor, the Owner, or their representatives. The Subcontractor shall immediately proceed to take down and remove from the premises of the Project all portions of the work and all material, which the Contractor shall deem as unsound or improper or which fails to conform in any way to the Subcontract requirements. The Subcontractor shall make good all such disapproved work, equipment, and facilities and restore all other work damaged or destroyed in removing or making good such disapproved items, all at Subcontractor's sole risk and expense. However, Subcontractor shall not remove any other materials from the Project site without the written permission of an Authorized Representative of Subcontractor. Subcontractor agrees to abide by Contractor's decisions as to allotment of all storage and working space at the Project site and as to all other matters respecting the organization, flow, coordination, and sequencing of work.

1.9     If requested by Contractor, the Subcontractor shall provide the Contractor with a copy of all material suborders prior to commencing its work. The Subcontractor must provide monthly, or more often if required by the Contractor, a complete list and delivery status of all orders, progress schedules, and man-hour completion schedules satisfactory in form and content to the Contractor. Subcontractor also agrees to provide such "as-built" drawings, maintenance and operation manuals, etc., as may be required in the Subcontract. The Subcontractor shall also provide the Contractor daily reports indicating work performed and manpower for the previous day. These daily reports will be delivered to the jobsite office no later than 10:00 AM the following day after the work is performed.

1.10   The Subcontractor shall not start any part of its respective work until the Subcontractor has delivered to the Contractor at least two executed originals of this Subcontract, together with all other required documentation (specifically including, but not limited to, insurance certificates and, if required, performance and payment bonds). An executed Subcontract and acceptable insurance certificates in the Contractor's possession are conditions precedent to being paid any part or all of the Subcontract amount. Subcontractor shall perform no portion of the subcontract work requiring submittal and review of shop drawings, product data, samples or similar submittals until the respective submittal has been approved. Any work performed in violation of this section shall be at the Subcontractor's sole risk.

1.11   The Subcontractor's commencement of any part of its work or responsibilities, whether at the Project site or elsewhere, shall constitute the Subcontractor's agreement to all terms and conditions of this Subcontract, without limitations or modification, and shall further constitute the Subcontractor's acceptance of all conditions at the Project site. The Contractor and Subcontractor agree that the terms and conditions of this Subcontract, establish a course of dealing between them and shall apply to this and all other projects, unless before commencement of the Subcontractor's work on such project, either the Contractor or the Subcontractor gives written notice of objection to the terms and conditions of this Subcontract or the parties enter into a different written agreement with respect to such project. Otherwise, the Subcontractor's commencement of any performance of work on any project, including but not limited to the preparation of shop drawings and other submittals, shall constitute the agreement of both the Contractor and the Subcontractor that the terms and conditions of this Subcontract apply to such project and constitute a waiver by both parties of all objections to any of the terms and conditions of this Subcontract even if a Subcontract has not been fully executed at the time such work commences. Either the Contractor or Subcontractor will be entitled to specific performance of this provision with respect to future projects.

## ARTICLE II: BONDING OF SUBCONTRACTOR

2.0     If required by the Contractor prior to or during performance of this Subcontract, the Subcontractor shall furnish performance and payment bonds with a responsible surety acceptable to the Contractor, in a form and with terms acceptable to the Contractor. The Subcontractor's failure to deliver satisfactory bonds to the Contractor within ten (10) days after demand shall be a material breach of this Subcontract. If the Contractor requires a bond after the parties have agreed to a Subcontract price, the Subcontract price shall be equitably adjusted to include the reasonable cost of the bond, provided that the Subcontractor has previously notified the Contractor that the cost of the bond was not included in the Subcontract price.

2.1     In addition to the language of any bond, the Subcontractor and the Subcontractor's sureties agree that the protection and coverage of the Subcontractor's bonds shall extend at least to the entities protected and the type of claims covered by the Contractor's bonds with respect to the Subcontract work so that any claim that can be made against the Contractor's bond shall be also valid and recoverable against the Subcontractor's bond. Any increases in the Subcontract amount shall automatically increase the respective penal sums of the performance bond and of the payment bond furnished by the Subcontractor.

2.2     Any obligation of the Subcontractor under this Subcontract, including but not limited to warranty or other performance obligations extending beyond substantial completion, shall be equally the obligation of the surety for the Subcontractor's performance bond as if all terms and conditions of this Subcontract were set forth verbatim in the performance bond. The Subcontractor's surety's obligations shall not terminate upon substantial or final completion of either the Subcontract work or of

3

ARTICLE II: BONDING OF SUBCONTRACTOR (continued)

the Project as a whole but shall continue thereafter for so long as the Subcontractor has any obligations of whatever nature under this Subcontract. The Subcontractor's surety shall be bound by any judgment, arbitration award, settlement agreement, or other decision rendered against the Subcontractor with respect to the Subcontractor's obligations under this Subcontract.

ARTICLE III: RELATIONSHIP WITH CONTRACTOR

3.0    The Subcontractor shall have a competent and experienced superintendent at the Project at all times while the Subcontractor's work is or should be in progress and as otherwise necessary to ensure full performance of all obligations under this Subcontract. The Subcontractor's superintendent shall have the authority to act for and on behalf of the Subcontractor in all matters relating to the Subcontractor's work. The Subcontractor shall do, without additional charge, whatever is necessary in the performance of this Subcontract or whatever the Contractor directs to ensure harmonious labor relations at the Project and to prevent labor strikes, disputes, and violation of labor agreements, labor laws, and labor regulations.

3.1    The Subcontractor shall designate a quality control representative who shall have authority to act for and on behalf of the Subcontractor in all matters related to the quality of the Subcontractor's work.  The Subcontractor shall fully comply with the Contractor's quality assurance plan.

3.2    Subcontractor shall enforce strict discipline and good order among its employees. The Subcontractor shall report in writing to the Contractor within twenty-four (24) hours an injury to an employee or agent of the Subcontractor or any other liability claim whatsoever that occurred at the site or connected with the Subcontractor's work.

3.3    The Subcontractor is in all respects an independent contractor and is not an agent of the Contractor.  No personnel employed by Subcontractor shall be deemed under any circumstances to be agents, representatives or employees of Contractor. The Subcontractor shall have no authority to bind the Contractor by any representation, promise, or statement of any kind without first obtaining the Contractor's specific written consent and authorization.  The Subcontractor agrees not to enter into any other contract relating to the Project without the Contractor's prior written consent.

3.4    The Subcontractor shall not interfere with the Contractor's relationship with the Owner, and the Subcontractor shall not deal directly with either the Owner or the Architect without prior written authorization in each instance from an Authorized Representative of the Contractor. Specifically, without limiting the generality of the foregoing, the Subcontractor shall not negotiate directly with the Owner for any addition(s), deletion(s), or alteration(s) on the Project covered hereunder.

ARTICLE IV: TIME

4.0    Time is of the essence, and unless herein otherwise specifically provided, Subcontractor shall commence work when directed by the Contractor.  The Subcontractor recognizes that it may be working concurrently with the Contractor, Owner's forces, or other contractors or subcontractors. Subcontractor shall cooperate with the Contractor and prosecute the work diligently and so as to avoid delaying, conflicting, or interfering with the progress of Contractor, Owner's forces, or other contractors or subcontractors on other portions of the Project work. The Contractor has the right to require the Subcontractor, without cost or liability to the Contractor, to schedule work hereunder in such a manner as will minimize interference, delay and expense of work of others or for the best interests of the Project as the Contractor may determine. If so ordered by the Contractor, the Subcontractor shall prosecute certain portions of the Subcontract work in preference to other portions, at no increase in Subcontract price.  Subcontractor shall keep and maintain on the Project a sufficient number of properly qualified workmen and a sufficient quantity of materials, equipment and supplies to perform the work as required without delay. Should Subcontractor cause delay in the progress or completion of the Project, the damages resulting therefrom, including, but not limited to, liquidated and/or actual damages assessed by Owner and attributable thereto, shall be the obligation of Subcontractor.

4.1    Subcontractor shall reimburse the Contractor for any damages assessed by the Owner or other subcontractors, whether liquidated or otherwise, against the Contractor and for any damages otherwise incurred by or asserted against the Contractor as a result of delays or difficulties caused by or attributable to the Subcontractor. Furthermore, the Subcontractor shall pay the Contractor's acceleration costs, extended job site overhead, unabsorbed home office overhead, and all other direct and indirect expenses of whatever nature, including attorney's fees, caused in whole or in part by delays, disruptions, or other reasons attributable to the Subcontractor.

4.2    If the Subcontractor falls behind the Contractor's schedule for the Subcontractor work or if, in the opinion of the Contractor, the Subcontractor is otherwise not maintaining a satisfactory rate of progress as determined by the Contractor, the Contractor may direct the Subcontractor to take such action as the Contractor deems necessary or appropriate to improve the Subcontractor's rate of progress including, but not limited to, increasing the number of superintendents, foremen, skilled labor, and unskilled labor, increasing the number of crews, increasing the number of shifts, employing more or better equipment, working overtime, expediting delivery of materials, substituting materials, changing sequence of performance, prosecuting parts of the Subcontract work in preference to other parts, and any other increase or acceleration of effort, all of which shall be performed by the Subcontractor at no cost to the Contractor. In addition to the foregoing, the Contractor shall have the right, but not the obligation and without prejudice to any other right or remedy, to provide, either with Contractor's own forces or with others, any additional

4

**ARTICLE IV: TIME (continued)**

labor, materials, equipment, supervision, or other item and to take such further actions as the Contractor deems necessary or appropriate, which shall be at the Subcontractor's cost and which the Contractor shall be entitled to deduct from any payment, whether then due or thereafter to become due to the Subcontractor. The Contractor's administrative and overhead expenses will be included in this cost. The Contractor's decisions and directives under this paragraph shall be final and binding.

4.3     The Subcontract amount provided herein constitutes full and complete payment to the Subcontractor for all Subcontract work to be performed, for all loss or damage arising out of the nature of the work, for any unforeseen difficulties or obstructions which may arise or be encountered during prosecution of the work, for all risks of every description connected with the work, for all expense incurred by or in consequence of suspension, interference, disruption, hindrance, or discontinuation of the work. If the Subcontractor's work is delayed, hindered, suspended, disrupted, interfered with, rendered less efficient or more costly, or adversely affected in any way by any cause whatsoever whether such delays or hindrances are avoidable or unavoidable, anticipated or unanticipated, reasonable or unreasonable (including, but not limited to, acts or omissions of the Contractor or the Owner, the Architect or other subcontractors, by unusually severe weather, by acts of God, by unavoidable casualties, war, strikes, picketing, boycott, lockouts, or by any other reason beyond the Subcontractor's control and without fault or contribution by the Subcontractor), the sole and exclusive remedy of the Subcontractor shall be to receive from the Contractor an extension of time for each day of proven actual, excusable, and non-concurrent delay to the Subcontractor's work which, at the time of such delay, was on the Project's critical path. Notwithstanding anything to the contrary indicated in this Subcontract or in the Prime Contract, the Subcontractor shall have no claim for damages and shall have no right of additional compensation from the Contractor by reason of any delay, hindrance, disruption, suspension, interference, obstruction, inefficiency or any other adverse impact or increased expense to the Subcontractor's work, except for an extension of time as provided in this provision. Notwithstanding any other provision or notice requirement herein, an extension of time for delays under this section may be granted only upon written application(s) by the Subcontractor made within forty-eight (48) hours from the beginning of the claimed delay. Under no circumstances shall the time of completion be extended to a date which will prevent Contractor from completing the entire Project within the time allowed Contractor by Owner for such completion.

4.4     Contractor may, with or without cause, order Subcontractor to stop or suspend all or any part of the work under this Subcontract for such time as may be determined to be appropriate for the convenience of Contractor. Phased work or interruption of the Subcontract work for short periods of time shall not be considered a suspension. The preceding section shall apply in the event of suspension ordered by the Contractor and the Subcontractor shall be entitled to, as its sole and exclusive remedy, an extension of time as set forth above, but not an adjustment of Subcontract price. The Subcontract time shall not be adjusted for any suspension, to the extent that performance would have been suspended, due in whole or in part, to the fault or negligence of the Subcontractor or by a cause for which Subcontractor would have been responsible.

**ARTICLE V: TERMINATION**

5.0     The Subcontractor shall be deemed in default, if at any time, the Subcontractor shall, in the opinion of Contractor: (a) refuse or for any reason fail at any time to prosecute the Subcontract work in a diligent, timely, workmanlike, skillful, cooperative, safe, and careful manner, (b) fail to supply sufficient, adequate or competent supervision, (c) fail to furnish a sufficient number of properly skilled workmen, (d) fail to have at the Project sufficient materials and equipment of the proper quality and quantity, (e) fail to promptly correct defective work, (f) fail to promptly pay its bills and discharge its obligations on this Project or otherwise, (g) fail to perform any term or condition of any part of the Subcontract, all of which are material, or (h) otherwise delay the work of the Contractor or other subcontractors. The parties acknowledge that each of the forgoing is a material breach of the Subcontract. After notice to the Subcontractor to remedy such breach or breaches, Subcontractor shall immediately, and in no event longer than three (3) days, remedy such breach or breaches in such manner and with such diligence and promptness as may be required by the Contractor. Upon Subcontractor's failure to do so, the Contractor may terminate this Subcontract in whole or in part and may take possession of all drawings, materials, equipment, tools, and appliances belonging to the Subcontractor as may be deemed necessary or desirable to complete the Subcontract work.

5.1     If the Subcontractor institutes or has instituted against it a case under the United States Bankruptcy Code, such event is presumed to impair or frustrate the Subcontractor's ability to perform its obligations under the Subcontract. Within ten (10) days after Contractor's request, the Subcontractor (or its trustee, successor, or other party acting for the Subcontractor) shall deliver to Contractor adequate assurance of Subcontractor's ability to perform all material obligations under the Subcontract. Additionally, the Subcontractor shall file, at the earliest time permitted by law, an appropriate action for assumption or rejection of the Subcontract and the Subcontractor shall diligently pursue such action. If the Subcontractor fails to comply strictly with the foregoing obligations, the Contractor shall be entitled and is hereby authorized to request the Bankruptcy Court to reject the Subcontract, to declare the Subcontract terminated, and to permit the Contractor to pursue any other recourse or remedies available. The rights and remedies under this section are not intended and shall not be construed to limit any other rights and remedies of the Contractor under this Subcontract or as otherwise afforded by law, including the Contractor's entitlement to seek relief from any automatic stays under the Bankruptcy Code and from any order of a court of competent jurisdiction. In particular, the Contractor shall be entitled to assert all rights and remedies against any bond or policy of insurance furnished by the Subcontractor, notwithstanding any case instituted by or against the Subcontractor under the Bankruptcy Code.

5.2     Upon termination of this Subcontract in whole or part by the Contractor, the Subcontractor shall not be entitled to receive any further payments on this Project or any other project until the Subcontract work has been completed and accepted by the

5

**ARTICLE V; TERMINATION (continued)**

Contractor, Architect and Owner and not until final payment for same has been received by the Contractor. The Subcontractor shall be liable for all expense of completing the Subcontract work, including all performance costs of whatever nature plus reasonable allowances for overhead and profit and including all other damages, losses, expense, and costs, including attorneys fees, incurred by the Contractor as a result of any termination of this Subcontract and performance of Subcontract work and discharge of Subcontract obligations by any entity other than the Subcontractor. The Contractor's records will be the sole basis for computing the cost of this work, and the Contractor's administrative and overhead expenses (including items such as social security payments, unemployment taxes, insurance coverage, any attorney's fees associated with the default, etc.) will be included in this cost. If, upon final payment by Owner to Contractor, the unpaid Subcontract balance exceeds the damages, costs, and liability, including attorney's fees, incurred by Contractor in completing the Subcontract work and sustained by Contractor by reason of termination of the Subcontract, such excess shall be paid by Contractor to Subcontractor. If the Contractor's damages, costs, and liability, including attorneys' fees, exceed the unpaid Subcontract balance, Subcontractor shall pay the difference to the Contractor. In no event shall the Subcontractor be entitled to be paid or to recover from the Contractor more than the amount due under this Subcontract for the work completed at the date of termination of the Subcontract.

5.3    Inasmuch as the injury or damage to the Contractor by reason of any default hereunder by the Subcontractor is difficult to determine with any degree of certainty, it is agreed that in computing the expense of finishing the work as above provided, there shall be added to such expense a sum equal to ten (10%) percent of the costs incurred for such finishing, and said amount is hereby agreed upon, fixed, and determined by the parties hereto not as a penalty but as the liquidated damages that the Subcontractor will suffer by default. These liquidated damages are in addition to any actual or liquidated damages that may be imposed by the Owner as a result of time delays which the Subcontractor can caused. The Contractor shall not be liable or accountable to Subcontractor in any way for the manner in which it may complete the work, nor shall the remedies and rights given above be construed as a substitute for or a waiver of any of the legal rights of the Contractor against the Subcontractor.

5.4    The Contractor shall have the right to terminate this Subcontract without fault of the Subcontractor. Upon receipt of notice from the Contractor of the termination, the Subcontractor shall do only that work set forth in the Contractor's notice and shall preserve and protect the materials and equipment pertaining to the Subcontractor's work. In the event of such no fault termination, and subject to the conditions precedent to any payment to the Subcontractor set forth in this Subcontract, the Subcontractor shall be entitled to payment, as its sole and exclusive remedy, for the lesser of either (1) the Subcontract value of all work satisfactorily performed and for all materials and equipment satisfactorily stored on site or in transit, which are not saleable in the Subcontractor's ordinary course of business and which the Subcontractor can transfer to the Contractor free of any liens or encumbrances or (2) the reasonable, actual direct costs for such work plus a single allowance, not to exceed ten percent (10%), for both overhead (including job site and home office) and profit on such costs.

5.5    If the Contractor terminates the Subcontractor for default, and it is determined for any reason that the Subcontractor was not actually in default under this Subcontract at the time of termination, the Subcontractor shall be entitled to recover from the Contractor, as its sole and exclusive remedy, the same amount as the Subcontractor would be entitled to receive under a no fault termination.

5.6    Notwithstanding anything to the contrary herein and regardless of whether the termination is complete or partial, whether the termination is for default or for no fault, and whether the termination converted from default to no fault, the Subcontractor's sole and exclusive remedies for termination of this Subcontract shall be those expressly provided and under no circumstances, shall the Subcontractor be entitled to special, consequential, or punitive damages, anticipated or lost profit, or other recovery of any nature except for payment for Subcontract work properly performed and actually completed by the Subcontractor. In no event shall the Subcontractor be entitled to any compensation for Subcontract work not performed by the Subcontractor or for payment in excess of the Subcontract amount as may be adjusted by properly authorized written Change Orders.

**ARTICLE VI; COMPLIANCE WITH LAWS**

6.0    The Subcontractor shall perform the Subcontract work in a safe and proper manner and shall comply with all laws, ordinances, building codes, safety requirements, and regulations of whatever nature that apply to this Subcontract, including but not limited to OSHA. The Subcontractor shall give adequate notices pertaining to the work of the Subcontractor to proper authorities and secure and pay for all necessary licenses and permits to carry on Subcontractor's work. The Subcontractor is responsible for all inspection requirements and regulations of all governmental agencies and authorities, including OSHA, with respect to the Subcontractor's work and shall pay any fine(s) (including those which may be assessed against the Contractor) and other expenses (including, but not limited to Contractor's attorneys' fees) which may be attributable to the Subcontractor's failure to comply with any regulation.

6.1    The Subcontractor shall employ labor, make purchases and transact its business without discrimination as to race, color, gender, creed, or religion and also without discrimination as to whether employees of the Contractor, other subcontractors, material suppliers, or other entities involved in the Project are members or are not members of any labor union or other labor organization. The Subcontractor agrees to comply with all laws, including but not limited to, Executive Order 11246, if applicable. If required by Contractor or Owner, Subcontractor agrees to meet any minority goals.

6

## ARTICLE VI: COMPLIANCE WITH LAWS (continued)

6.2    The Subcontractor has full and exclusive liability for all contributions, taxes, deposits, and payments required of employers by federal, state, or local governments, with respect to wages, salaries, remuneration, or benefits paid or owed by the Subcontractor to any of Subcontractor's employees or others who perform work or render services for Subcontractor in connection with this Subcontract. The Subcontractor has exclusive liability for all income, gross receipts, sales, use, or other taxes applicable to the Subcontractor's work and to any item furnished or employed, any expense incurred, all work performed, and all revenue earned by the Subcontractor pursuant this Subcontract. In the event the Contractor is held liable to pay any such tax or contribution on behalf of the Subcontractor, the Subcontractor agrees to supply the Contractor with all records necessary to compute the same and to fully reimburse the Contractor upon demand for the amount thereof (including penalties and interest) paid by the Contractor; the Contractor shall have the further right to deduct any amount so paid, plus attorneys' fees and a reasonable overhead expense from any sums due the Subcontractor by the Contractor on this or any other project.

6.3    The Subcontractor bears full and exclusive responsibility and liability for the proper discovery, identification, reporting, handling, removal, and disposal, whether on site or off site, of all materials encountered, used, or generated in the performance of the Subcontract work which are defined or considered as hazardous by federal, state or local authorities having jurisdiction over the Project, and the Subcontractor shall comply with all laws, regulations, standards, and safety requirements with respect to such hazardous materials. If the Subcontractor fails to comply with its responsibilities under this paragraph, the Contractor may perform such work with Contractor's forces or through others at the expense of the Subcontractor.

## ARTICLE VII: PAYMENT

7.0    Subcontractor shall furnish such evidence as the Contractor may require as proof of payment of all obligations and claims in connection with this Subcontract including, but not limited to, sworn statements showing all parties who furnish labor, materials, or services, to the Subcontractor with their names, addresses, and amount due or to become due each. Like statements may be required of subcontractors, vendors, suppliers, etc. of Subcontractor. Contractor is not required to make any payment to Subcontractor unless Subcontractor shall previously have provided releases executed by all persons who might have mechanic's lien, stop notice or labor and material bond rights against the Project arising out of work performed under the Subcontract, using Contractor's forms. Contractor reserves the right to make payment by joint check or by direct check to Subcontractor and Subcontractor's suppliers or subcontractors or any person having a right of action against Contractor, its surety or Owner under any law. In the event that the Contractor wishes to furnish the equipment, materials and supplies, or portion thereof, necessary to effect performance of all or any portion of the Project described herein, the Subcontractor agrees to allow the Contractor, at the Contractor's option, to make payment directly to the manufacturer or vendor for some or all material required by the Subcontractor and to credit the value of the material so paid against the Subcontract sum. As a condition precedent to final payment to the Subcontractor, and in addition to the other conditions precedent to final payment to the Subcontractor set forth in this Subcontract, the Subcontractor shall furnish Contractor an affidavit of payment of all bills and obligations, a release of liens or other encumbrances respecting the Project, and a general release of claims, together with such other affidavits and other documents as may be required by the Contractor.

7.1    Subcontractor warrants that he has sufficient funds and credit to pay currently all bills incurred in the performance of the work hereunder without the necessity of resorting to earnings for work performed and agrees that failure to pay such bills shall be a breach of this Subcontract for which Contractor may, but shall not be required to, withhold all sums otherwise payable hereunder for past and future earnings until Subcontractor presents satisfactory evidence of payment. In case any such bill or related claim is disputed by Subcontractor, Contractor may, for the purposes of this section, consider the same to be valid until discharged and released or until satisfactory security is given for Contractor's indemnification. At Contractor's option, Contractor may, but shall not be required to, pay any such bill or claim and recover the same from Subcontractor or any Surety or deduct the same from any payments otherwise due to Subcontractor. Any and all payments made on good faith in the belief that Contractor is liable, whether liable or not, shall be conclusive of Contractor's right to reimbursement and a sworn itemized statement thereof or the checks or other evidence of payment shall be prima facie evidence of the fact and extent of Subcontractor's liability. Notwithstanding the foregoing, the Contractor shall not have a duty to determine or adjust any claims or disputes between those parties furnishing labor, materials, equipment or other things hereunder, or to withhold any money for their protection; nor shall Contractor be liable for its failure to do so.

7.2    The Subcontractor agrees that the Contractor has the right, but not the obligation, to withhold payments otherwise owed to Subcontractor on this or any other subcontracts or projects and to pay any bills or past due obligations of the Subcontractor arising on this or other projects, including backcharges owed to the Contractor. If the Contractor is exposed to liability by any act or omission of the Subcontractor, the Contractor shall be entitled to withhold or offset against any amounts the Contractor owes to the Subcontractor, whether on this or other projects, equal to the full extent of the Contractor's exposure to liability attributable to the Subcontractor. Without limiting the generality of the foregoing, payments otherwise payable hereunder may be withheld in whole or in part by Contractor on account of: (1) defective materials or work not remedied, missing materials not furnished or cleanup not performed; (2) claims filed or reasonable evidence indicating potential filing of claims by unpaid suppliers of labor, materials or equipment to Subcontractor; (3) failure of Subcontractor to make payments properly to its subcontractors, or for labor, materials or equipment, transportation or shipping costs, taxes, fees or other claims arising out of Subcontractor's work; (4) reasonable doubt that Subcontractor can complete the scope of work to be performed within the time required or for the balance of the Subcontract price then unpaid; (5) damage to another subcontractor, Owner and/or Contractor; (6) unsatisfactory prosecution of the work by the Subcontractor; (7) failure to deliver any required "as-built" drawings, operation or maintenance manuals, written

7

**ARTICLE VII: PAYMENT (continued)**

guarantees or warranties; (8) failure to obtain the approvals required by any authority having jurisdiction over Subcontractor's work; (9) failure to provide certificates or other evidence of insurance or Subcontract bonds acceptable to Contractor; or (10) failure of Subcontractor to cure any default or to perform in accordance with this Subcontract. If the foregoing conditions are removed to Contractor's satisfaction, the withheld payments shall promptly be made. If such conditions are not so removed, Contractor may take such steps as in its judgment may be required to rectify the same and all costs and expenses incurred by Contractor therefore shall be paid by Subcontractor or be credited against payments otherwise payable to Subcontractor.

7.3     The Subcontractor agrees to submit to the Contractor applications for payment in a form acceptable to the Contractor and in such reasonable time as to enable the Contractor to apply for payment as provided in the Prime Contract. Subject to the terms and conditions of this Subcontract, the Contractor agrees to send payment less retainage for the approved Subcontractor's application for payment within five (5) working days after the Contractor receives payment from the Owner for the Contractor's application. Should the Subcontractor's portion of the Contractor's application be reduced or denied for any reason, the Contractor's payment to the Subcontractor will be reduced or denied accordingly. Notwithstanding anything to the contrary in this Subcontract, in the Prime Contract or in any bond or other document, the Owner's approval of the Subcontract work for which payment is requested and the Contractor's actual receipt of each progress payment, final payment or any other payment from the Owner shall each be an absolute condition precedent to any obligation of Contractor to make any progress payment, final payment or any other payment whatsoever to Subcontractor, including but not limited to the obligation to pay for extra or changed work or any claim for additional compensation or damages claimed by reason of acts or omissions of Owner. Both progress payments and final payment to the Subcontractor shall be made only out of funds actually received by the Contractor from the Owner for progress payments or for final payment of the Prime Contract and only to the extent said progress payments or final payment reflect Subcontract work which has been satisfactorily performed by Subcontractor in strict accordance with this Subcontract and which has been approved and paid by Owner. Subcontractor hereby expressly warrants and agrees that Subcontractor is relying upon the credit, solvency and financial stability of the Owner and not the Contractor for payments of work performed under this Subcontract.

7.4     The Contractor, may, at its option, withhold up to ten (10%) percent retainage for payment otherwise due and payable to the Subcontractor until final payment. Final payment and release of retainage shall be made at the completion of the work covered by this Subcontract, but only: (1) upon written acceptance thereof by the Contractor; (2) after Subcontractor has provided documentation required by this Subcontract or as otherwise reasonably required by the Contractor or Owner; and (3) as a condition precedent, the Owner has made final payment and has released retainage to the Contractor. The Subcontractor's acceptance of final payment constitutes the Subcontractor's general release of the Contractor, the Contractors surety and the Owner from all claims and all claims and liabilities of whatever nature. No payment, including final payment, shall be construed as acceptance of defective or incomplete work, and the Subcontractor shall remain responsible and liable for performance of its work in strict compliance with this Subcontract. In the event the Contractor's retainage is reduced, the Contractor will reduce the Subcontractor's retainage in like percentage but only if the Subcontractor has provided a bond hereunder, satisfactorily completed at least 50% of its scope of work, the Subcontractor's work is on schedule, and the Subcontractor is in compliance with all terms and conditions of the Subcontract.

**ARTICLE VIII: LIENS**

8.0     Subcontractor, for itself, its subcontractors, its suppliers, and all parties acting through or under it, hereby covenants and agrees not to file any lien or make any claim against the Project or the premises related thereto or any part thereof or against any building or buildings or other improvements erected or made to be erected or made thereon, or file any lien, make any claim, or issue any stop payment notice against any monies due or to become due to Contractor, in accordance with any statute, state or federal, for any cause whatsoever.

8.1     Subcontractor shall promptly pay or discharge in full or provide adequate security for the payment of all claims of any persons, firms or corporations furnishing or claiming to have furnished labor, materials, tools, equipment, or incidentals used in, upon, or for the work, whether or not as to any such claim a lien or right of enforcement is established or attempted to be established upon or against the work, the real property upon which the work is situated, upon any bond furnished by Contractor or upon any monies payable to Contractor by Owner.

8.2     Further, in case suit on any such claims is brought, Subcontractor shall defend said suit at his own cost and expense, and will pay and satisfy any such lien or judgment as may be established by the decision of the court in said suit. Subcontractor agrees within ten (10) days after written demand, to cause the effect of any suit, lien or stop notice to be removed from the premises, and in the event Subcontractor shall fail to do so, Contractor is authorized to use whatever means in its discretion it may deem appropriate to cause said suit, stop notice or lien to be removed or dismissed and the cost thereof shall be immediately due and payable to Contractor by Subcontractor. Subcontractor may litigate any lien or suit above described provided Subcontractor causes the effect thereof to be removed promptly, in advance, from the premises and shall further do such things as may be necessary to cause Owner not to withhold any monies due to Contractor from Owner by reason of such liens or suits.

8.3     Subcontractor agrees and covenants that monies received for performance under this Agreement shall be used solely for the benefit of persons and firms supplying labor, materials, supplies, tools, machines, equipment, plant or services exclusively for this Project in connection with this Subcontract and having the right to assert liens or other claims against the land, improvements or funds involved in this Project or against any bond or other security posted by Contractor or Owner, and that any monies paid to Subcontractor pursuant to this Subcontract shall immediately become and constitute a trust fund for the benefit of said persons

8

**ARTICLE VIII: LIENS (continued)**

and firms and shall not in any instance be directed by Subcontractor to any other purpose until all obligations arising hereunder have been fully discharged and all claims arising therefrom have been fully paid.

8.4 The SUBCONTRACTOR shall furnish the CONTRACTOR with such partial releases and waivers of lien by SUBCONTRACTOR, his material-men and creditors as the CONTRACTOR may require from time to time on labor, material, Mississippi State Taxes and/or other claims, and final releases and waivers of lien at the time of final payment on this Subcontract. The SUBCONTRACTOR agrees to furnish such sworn affidavits as may be required by the CONTRACTOR attesting to the SUBCONTRACTOR'S financial condition as relates to this Subcontract indicating amounts paid and owing for labor, materials, Mississippi State Taxes and other expenses. Such waivers and affidavits shall be a condition precedent to partial and final payments.

**ARTICLE IX: INSURANCE**

9.0 Subcontractor shall obtain, before commencement of work, and shall maintain until final acceptance of the Prime Contract work, full insurance coverage, including as a minimum the same types of insurance at the same policy limits which are specified by the Prime Contract or which the Contractor requires for this Project, whichever are greater. The Subcontractor is hereby made responsible for determining and obtaining the types and extent of such additional insurance as may be necessary to give adequate and complete protection to the Subcontractor, the Contractor, and the Owner from claims for property damage and from claims for bodily injury, including death, which may arise from or be connected with this Subcontract, whether such claims relate to acts or omissions of Subcontractor, of any of its subcontractors or suppliers, or anyone directly or indirectly employed by any of them. The Subcontractor shall name the Contractor as a named additional insured (but not subject to premium terms or liability) on all insurance policies and coverages, and the Subcontractor's insurance shall be primary as to any other valid insurance available to the Contractor and shall contain a standard cross-liability endorsement, severability of interests clause, and a waiver of all rights of subrogation by Subcontractor's insurer as against the Contractor. This waiver of subrogation and additional insured endorsement shall also appear on the Certificate of Insurance furnished by the Subcontractor (but failure to appear on the Certificate of Insurance as required shall not affect the obligation hereunder). The insurance protection and coverage provided hereunder by the Subcontractor for the Contractor's benefit shall not be solely restricted to the Subcontractor's indemnity obligations but are intended to extend to all claims, liability, or loss of whatever nature arising from or relating to the Subcontractor, to the Subcontract work, or to this Subcontract, regardless of the alleged liability or fault of any party indemnified under this Subcontract.

9.1 If the Contractor or the Owner carries builders' risk or other insurance which may apply to the Subcontract work or which may otherwise inure to the benefit of the Subcontractor, the Subcontractor shall be responsible for all deductibles and for any inadequacy or absence of coverage, and the Subcontractor shall have no claim or other recourse against the Contractor or against the Owner for any costs or loss attributable to such deductibles or to coverage limitations, exclusions, or unavailability.

9.2 Before beginning any Subcontract work, the Subcontractor shall deliver to the Contractor three (3) copies of Certificates of Insurance, certifying the types and the amounts of coverage, certifying that said insurance was in force before Subcontractor started work, certifying that said insurance applies to the Subcontract work and to all activities and liability of the Subcontractor pursuant to this Subcontract, and certifying that the Contractor is a named additional insured on Subcontractor's policies of insurance by endorsement in a form acceptable to Contractor. The Subcontractor shall, if requested by the Contractor, deliver to the Contractor one duplicate original of the entire insurance policy.

9.3 No policy of insurance may be canceled, materially modified or reduced during the period of construction, and the Subcontractor shall obtain an endorsement to its policies providing substantially as follows: *"Insurer may not cancel this policy, modify or amend its terms or reduce coverage for a period of thirty (30) days after Hunt Yates LLC has acknowledged receipt of written notice of the insurer's intention to cancel, modify, amend or reduce the coverage."* The foregoing notice must appear on the Certificates of Insurance furnished by the Subcontractor.

9.4 The insurance and indemnity obligations of this Subcontract are non-delegable. The Subcontractor shall not sublet nor subcontract any part of this Subcontract without retaining absolute responsibility for requiring similar insurance from its subcontractors and suppliers. The Subcontractor's failure to maintain complete insurance as required by this Subcontract shall be a material breach authorizing the Contractor, at the Contractor's sole election and without prejudice to any other right or remedy, either to terminate this Subcontract for default or to provide appropriate insurance coverage at the Subcontractor's sole expense.

9.5 The Subcontractor shall be responsible for payment of all premiums for insurance required by this Subcontract, but the Subcontractor's obligations shall not be limited by or to the purchase of insurance. The Subcontractor shall indemnify and hold harmless the Contractor for all damages, as described in this Subcontract, irrespective of whether said insurance was actually obtained.

9.6 The Subcontractor shall be solely responsibility for all loss or damage to vans, sheds, trailers, machinery, tools, materials, equipment (rented or owned) and all property of the Subcontractor, and its Subcontractors, their agents, servants and employees, not destined to become a part of the work, it being understood that the Subcontractor may at its own expense carry any insurance which may be required to provide necessary protection against such loss, damage or liability resulting therefrom.

## ARTICLE X: PROTECTION OF WORK

10.0   Subcontractor shall effectually secure and protect the work done hereunder and shall assume full responsibility for any and all risk of loss or damage to the work and all materials, tools, equipment, or incidentals until final acceptance thereof and release of responsibility therefor by Owner. Subcontractor shall protect the work, workmen, materials, tools, equipment and property of Subcontractor, Owner, Contractor and others on the Project against injury or damage in any way arising out of or connected with the operations conducted by Subcontractor hereunder or anyone acting under its direction or control, or on its behalf.

10.1   If Subcontractor damages the work of another subcontractor or the equipment or property of Owner, Contractor will issue a backcharge to Subcontractor for an adjustment in the Subcontract price to reflect the costs to correct the damage. If the subcontractor which caused the damage to an area of the Project cannot be identified, all subcontractors which performed work in the area of the damage within the time frame in which the damage occurred will be backcharged a pro-rata share of the cost of repair, which such pro-rata share shall be determined solely by Contractor.

10.2   The Subcontractor shall sequence and coordinate its work with the work of Contractor and other contractors in a manner to protect the work of Contractor and other contractors and the Project's interior from weather damage and water intrusion. The Subcontractor's obligation hereunder to protect the work includes protecting its own work and materials as well as the work and materials of Contractor and other contractors and the Project's interior from weather damage and water intrusion. In the event that water intrusion occurs from weather or any other cause due to Subcontractor's failure to carry out its obligations hereunder, Subcontractor shall be responsible for the cost to remedy all damages caused thereby, including, but not limited to, the cost of remediation of mold and mold spores and the testing for such mold and mold spores before and after remediation occurs. To the fullest extent permitted by law, Subcontractor agrees to defend, indemnify, hold harmless, protect, and exonerate the Contractor (its affiliates, parents, and subsidiaries) and the Owner from and against all liability, claims, damages, losses, suits, actions, demands, arbitrations, administrative proceedings, awards, judgments, attorneys' fees, costs, and expenses of whatever kind or nature, including but not limited to property damage and personal injury to any and all persons, related to or arising out of weather damage, water intrusion, or mold growth.

## ARTICLE XI: INDEMNIFICATION

11.0   TO THE FULLEST EXTENT PERMITTED BY LAW, THE SUBCONTRACTOR COVENANTS TO DEFEND, INDEMNIFY, HOLD HARMLESS, PROTECT, AND EXONERATE BOTH THE CONTRACTOR AND ITS AFFILIATES, AGENTS, EMPLOYEES, REPRESENTATIVE, AND SURETIES AND THE OWNER, ARCHITECT, AND ENGINEERS, JOINTLY AND SEVERALLY, FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, DAMAGES, LOSSES, SUITS, ACTIONS, DEMANDS, LIENS, ARBITRATIONS, ADMINISTRATIVE PROCEEDINGS, AWARDS, JUDGMENTS, EXPENSES, COSTS, AND ATTORNEYS' FEES PERTAINING TO ECONOMIC LOSS OR DAMAGE, LABOR DISPUTES, SAFETY REQUIREMENTS, PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS, CERTIFICATIONS, PROPERTY RIGHTS OF THIRD PARTIES, PERSONAL INJURY, BODILY INJURY, SICKNESS, DISEASE, DEATH, OR DAMAGE TO OR DESTRUCTION OF PROPERTY (INCLUDING LOSS OF USE THEREOF) WHICH (i) ARE CAUSED IN WHOLE OR IN PART BY THE SUBCONTRACTOR (HEREIN DEFINED TO INCLUDE BUT NOT BE LIMITED TO THE SUBCONTRACTOR'S OWNERS, EMPLOYEES, AGENTS, REPRESENTATIVES, SUBCONTRACTORS, SUPPLIERS, CONTRACTORS, AND INVITEES OR OTHER THIRD PARTIES CONNECTED WITH THE SUBCONTRACT OR THE AGENTS OR EMPLOYEES OF ANY OF THEM), (ii) ARISE FROM OR OCCUR IN CONNECTION WITH WORK UNDERTAKEN OR TO BE PERFORMED BY THE SUBCONTRACTOR, REGARDLESS OF WHETHER THE SAME IS WITHIN OR BEYOND THE SCOPE OF WORK, OR (iii) ARISE FROM OR ARE CONNECTED WITH ANY OTHER ACT OR OMISSION RELATING TO THE SUBCONTRACTOR. THIS SUBCONTRACT, OR THE SUBCONTRACT WORK. IT IS THE SPECIFIC AND EXPRESS INTENT OF THIS SUBCONTRACT FOR THE FOREGOING COVENANTS AND INDEMNITY OBLIGATIONS TO APPLY TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, REGARDLESS OF WHETHER THE LIABILITY IS CAUSED IN WHOLE OR IN PART BY A PARTY INDEMNIFIED HEREUNDER INCLUDING, WITHOUT LIMITATION, WHETHER OR NOT THE SAME BE CAUSED BY, OR ARISE OUT OF, THE JOINT, CONCURRENT, OR CONTRIBUTORY NEGLIGENCE OF A PARTY INDEMNIFIED HEREUNDER.

11.1   With respect to any matter to which the Subcontractor's defense obligations apply, Subcontractor, at Contractor's sole discretion, either shall defend the Contractor at Subcontractor's sole expense or shall pay for the Contractor's defense. The Contractor may make its election and may change its election at any time, without prejudice to any rights hereunder, including Subcontractor's obligation to pay all costs of defense. If the Contractor elects to undertake its own defense with attorneys and other personnel of Contractor's choosing or if the Contractor incurs expenses in connection with a defense undertaken by the Subcontractor, Subcontractor shall reimburse Contractor for all attorneys' fees and other expense related to the preparation and defense obligations to Contractor, with such payment required of the Subcontractor within five (5) days of Subcontractor's receipt of a statement of such fees and expenses from the Contractor. The Subcontractor shall cooperate and secure the cooperation of its employees, agents, servants, and others in asserting any and all defenses available to the Contractor. The Subcontractor's obligations to defend the Contractor shall be independent of and in addition to Subcontract provisions for indemnity and shall apply to the fullest extent permitted by applicable law.

10

ARTICLE XI: INDEMNIFICATION (continued)

11.2   The Subcontractor's liability insurance policies shall each contain contractual liability coverage (including, but not limited to, products liability and completed operations) so as to effectuate Subcontractor's indemnity and defense obligations and to protect fully Subcontractor, Contractor, and Owner.

11.3   Subcontractor's indemnification obligations under this Subcontract shall in no way be limited by the limitation on amount or type of damages, compensation or benefits payable by or for Subcontractor, or any of its subcontractors, under any workers' compensation act, employer liability act, disability act or other employee benefit act. The Subcontractor's indemnity obligations under this Subcontract further shall not be restricted to amounts available under insurance, whether actually obtained or which should have been obtained, but shall extend to the fullest extent, as set forth in this Subcontract. The indemnification provisions of this Subcontract shall survive final payment and/or termination of this Subcontract.

## ARTICLE XII: CHANGES

12.0   Subcontractor shall make any and all changes in the work described in the Subcontract as directed by an Authorized Representative of Contractor in writing. Such change or written direction shall not invalidate this Subcontract. Changes may be additive or deductive. The Subcontractor shall have no claim or entitlement to payment for any change in the Subcontractor's work unless, prior to performance, the Subcontractor receives a written change order for such work at an agreed price from an Authorized Representative of the Contractor. If there is a dispute as to whether the work at issue is a change in the Subcontractor's work or there is a dispute as to the value of such change, the Contractor shall be entitled to issue a directive to the Subcontractor to perform the work in question and the Subcontractor shall be obligated to proceed with and complete performance of such work, without either party waiving its respective rights. No time extension shall be granted to the Subcontractor because a change order has been issued, unless it is expressly stated therein. No separate claim shall be made for delay or additional costs based on the number, nature, or extent of the changes made.

12.1   The Contractor, without invalidating this Subcontract or any bonds or security furnished hereunder, and without notice to the sureties, if any, may, at any time after the execution of this Subcontract, reduce or omit the Subcontractor's scope of work. The Contractor shall order such reductions or omissions by giving notice to the Subcontractor prior to the start of the work that has been reduced or omitted was scheduled to begin. When work is omitted or reduced, in whole or in part, the Contractor shall pay, subject to the provisions of this Subcontract, for all cost of work actually properly performed. Subcontractor is not entitled to compensation or damages for any losses, including loss of profit or overhead relating to the unperformed portion of reduced or omitted work.

12.2   Subcontractor shall not make any changes in the work described in this Subcontract or in any way cause or allow the work to deviate from the Subcontract without written direction from Contractor. If Subcontractor makes any changes in the work described in the Subcontract without written direction from an Authorized Representative of Contractor, then such change constitutes an agreement by Subcontractor that it need not be paid for that changed work, even if it received verbal direction from Contractor or any form of direction, written or otherwise, from Owner or any other person or entity. In addition, Subcontractor shall be liable for any and all losses, costs, expenses, damages, and liability of any nature whatsoever associated with or in any way arising out of any such change it makes without written direction from an Authorized Representative of Contractor.

12.3   In the manner and form and in such detail as required by the Prime Contract, Subcontractor shall give written notice of any changes, cost reimbursement, additive or deductive adjustment in Subcontract time or amount, additional compensation, or other claim of any nature (for the purposes of Sections 12.3 and 12.4, collectively referred to as "claim"), at least five (5) working days before the time the Prime Contract requires the Contractor to give notice of same to the Owner and at least one week before the work related to such claim begins. This provision shall not be interpreted to give the Subcontractor a right to any remedy for claims covered by Section 4.3 (except as provided therein) or otherwise disallowed by the provisions of this Subcontract. Timely notice as required above is an absolute condition precedent to the Subcontractor receiving any relief whatsoever for any such claim. The Subcontractor shall not begin the work related to the claim until authorized in writing by an Authorized Representative of the Contractor. The Subcontractor's recovery for any claim shall be limited to the extent of any amounts and time extensions that the Contractor, on behalf of the Subcontractor, actually receives from the Owner for such claim. Such price increase shall not exceed the Subcontractor's pro rata share of the total increase as determined by the Contractor and as approved and paid by the Owner.

12.4   The Subcontractor agrees that any claim shall be based upon the Subcontractor's actual direct costs and actual time incurred or saved with respect to the work or other subject matter of such claim. The Subcontractor shall maintain current, accurate, complete, and verifiable records and data, on a contemporaneous basis as costs and delay are being incurred with respect to such claim. Subcontractor shall identify, segregate, separately code, and fully substantiate with such contemporaneous records and data any actual direct costs and any actual time claimed, and Subcontractor shall be entitled to relief, if otherwise permitted herein, only for such costs and time proven to result solely from the subject matter of the claim and from no other factor. In no event shall the Subcontractor be entitled to receive compensation or time adjustment for any claim on a "total cost" or "total time" basis, or any variation thereof. Except to the extent further restricted or disallowed by other provisions of this Subcontract, Subcontractor's monetary relief for any claim shall be limited to the Subcontractor's actual direct and reasonable costs as provided above and a single markup on such actual costs not to exceed ten percent (10%) for all supervision, overhead, profit, indirect costs, and other damages of every kind or nature.

11

ARTICLE XII: CHANGES (continued)

12.5   The Subcontractor shall disclose only to the Contractor any price or quotation on the cost of contemplated changes in the work. If the Owner requires certification of any claim or the submission of cost or pricing data respecting any change or alteration, the Subcontractor covenants and agrees to furnish the Contractor with a certification of any and all of Subcontractor's claims and of Subcontractor's cost or pricing data. The Subcontractor's certification shall be in a form satisfactory to the Contractor. The Subcontractor shall give the Contractor, including the Contractor's designated representatives, access at all reasonable times and the right to examine, reproduce, and audit the Subcontractor's books, records, documents, information and data which are related to the Subcontractor's costs or time of performance or which are necessary or appropriate, in the Contractor's sole judgment, to evaluate any claim made by the Subcontractor or any defense or offset asserted by the Subcontractor to any claim made by the Contractor with respect to the Subcontract work. Contractor shall bear the cost of such examination or audit unless the Subcontractor's records or data are not complete, current, accurate, and verifiable in which case Subcontractor shall bear such costs. The Subcontractor shall indemnify, defend, exonerate, and hold harmless the Contractor from any losses, claims, damages, or expenses which Contractor may suffer or incur, including attorney's fees and related costs, as a result of Subcontractor's failure or inability to support any part of its claim or as a result of Subcontractor's failure to provide complete, current, and accurate cost or pricing data.

12.6   No change, alteration, or modification to or deviation from the work described in this Subcontract, whether made in the manner provided in this section or not, shall release or exonerate, in whole or in part, any bond or any surety on any bond given in connection with this Subcontract, and no notice is required to be given to such surety of any such change, alteration, modification, or deviation. Any increases in the Subcontract price shall automatically increase the respective penal sums of the performance bond and of the payment bond furnished by the Subcontractor; however, the penal sum shall not decrease in the event of a decrease in Subcontract price.

ARTICLE XIII: SAFETY REQUIREMENTS AND LABOR PROVISIONS

13.1   The SUBCONTRACTOR agrees to abide by and comply with all FEDERAL, STATE, and LOCAL labor, occupational, safety and health laws and the safety programs prescribed by the OWNER and/or the CONTRACTOR including FAR 36.513 and alternate 1 which includes the latest version of the U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, in effect on the date of this solution.

13.2   The SUBCONTRACTOR shall insure that all machines are properly equipped with the manufacturer's recommended guards and safety devices, are in safe condition, and operated in the prescribed manner.

13.3   The SUBCONTRACTOR agrees to comply with all Labor Standard Provisions, and all Equal Opportunity, non-discrimination clauses of the General Contract which by reference are incorporated herein.  In the absence of any labor provisions in the General Contract, the SUBCONTRACTOR agrees to be bound by regulations prescribed by law in the locality of the job site, including but not limited to, the Fair Labor Standard Act, the Civil Rights Act of 1964, and the Occupational Safety and Health Act of 1970. SUBCONTRACTOR shall be liable to CONTRACTOR for any damages or delays resulting from SUBCONTRACTOR'S failure to comply with such laws and/or requirements. In the prosecution of the Work, SUBCONTRACTOR agrees to recognize and comply with all agreements of the CONTRACTOR with local trade councils and/or separate unions concerning labor and working conditions and otherwise applicable to this work, insofar as these agreements do not conflict with or violate any LOCAL, STATE or FEDERAL laws or properly constituted orders or regulations pertaining to this project. SUBCONTRACTOR is familiar with the applicable Local, State and/or Federal laws in relation to wages and hours, and where such laws apply to the Work, the SUBCONTRACTOR shall comply with the terms and provisions thereof and shall hold the CONTRACTOR harmless from any loss, liability, and expense arising out of any violations of the same by the SUBCONTRACTOR.
13.4   No one in the CONTRACTOR'S employ has any right to grant the SUBCONTRACTOR or his agents, contractors or employees, the right to use or ride on CONTRACTOR'S material hoists or other equipment, except the project manager or an executive officer of the CONTRACTOR, and then only in writing. The use by SUBCONTRACTOR of any of CONTRACTOR'S facilities including hoisting equipment, material, personnel, or services whether given, loaned, or rented to SUBCONTRACTOR and whether or not operated by CONTRACTOR is subject to SUBCONTRACTOR'S covenant to use any of the aforementioned at SUBCONTRACTOR'S risk, and to take the same as is, and only after SUBCONTRACTOR is satisfied as to the condition thereof, and SUBCONTRACTOR does hereby agree to indemnify and hold harmless CONTRACTOR from and against any and all claims, damages, liabilities, losses, cost, and expenses (including but not restricted to costs of litigation) arising out of or claimed to have arisen out of death, injuries, or damages to any and all persons and to any and all property in any way directly or indirectly caused or connected with such use of equipment, material, personnel, or services.

ARTICLE XIV: WARRANTY

14.0   The Subcontractor hereby guarantees and warrants its work shall comply strictly with this Subcontract and with all parts of the Prime Contract applicable to the Subcontractor's work, and the Subcontractor further guarantees and warrants its work to be of good material and workmanship, free from defects, fit, safe, merchantable, and sufficient for the purposes intended. The Subcontractor further guarantees and warrants that the Subcontractor has good title to all such work, material, and equipment covered by this Subcontract, and Subcontractor shall deliver and install same free from any liens, security interest, or encumbrance. In addition to Subcontractor's warranties and guarantees as provided by the Prime Contract and by this Subcontract, the Subcontractor shall also have the obligation to correct any Subcontract work which does not fully satisfy and comply strictly with the requirements of this Subcontract, including the foregoing warranties and guarantees, and this period of

12

## ARTICLE XIV: WARRANTY (continued)

mandatory correction shall extend for the same period as the Contractor's correction of work and/or call-back obligations under the Prime Contract or for two years after final payment to the Subcontractor or final payment by Owner to Contractor, whichever is longer. The warranties and guarantees set forth herein are in addition to any other warranties or guarantees required by the Prime Contract, provided by law, or set forth by separate agreement. Any Subcontract work not conforming to the requirements of this Subcontract, including substitutions not properly authorized, shall be considered defective and shall be promptly replaced or **corrected as directed by the Contractor.**

14.1  If at any time during the warranty period, any part of the materials or workmanship furnished by the Subcontractor shall become defective or not be in conformance with the plans and specifications as determined by the Contractor, the Subcontractor will, upon notice to that effect from the Contractor, repair or replace within three (3) hours items that are deemed as "Emergency Response" items and three (3) days on all other warranty items to the satisfaction of and without cost to the Contractor. The Subcontractor's warranty is in addition to and not in lieu of any warranty afforded the Owner under applicable law. The terms and conditions of this Subcontract shall apply to any and all modification, repair and replacement of the work, whether within the warranty period or thereafter.

14.2  The Subcontractor shall be responsible for its own quality control of the work performed by it pursuant to this agreement. No action or inaction of the Contractor will be deemed to excuse or relieve the Subcontractor for its own quality control or for any defective work performed or non-conforming materials furnished by the Subcontractor.  In the event the scope of work includes installation of materials or equipment furnished by others or work to be performed in areas to be constructed or prepared by others, it shall be the responsibility of Subcontractor to examine and accept, at the time of delivery or first access, the items so provided and thereupon handle, store and install the items with such skill and care as to insure a satisfactory completion of the work. Use of such items or commencement of work by Subcontractor in such areas shall be deemed to constitute acceptance thereof by Subcontractor.

## ARTICLE XV: DISPUTE RESOLUTION

15.0  This Subcontract shall be deemed entered into in Biloxi, Mississippi, upon execution by the parties. The laws of the state of Mississippi govern this Subcontract and all actions or proceedings instituted by or against the Contractor upon any claim or cause of action arising out of or relating to this Subcontract or this Project shall be commenced in Harrison County, Mississippi, subject to Section 14.2. The Subcontractor shall be liable for all damages, costs, expenses, including attorney's fees, incurred by the Contractor in enforcing the terms and conditions of this Subcontract.

15.1  Claims, disputes, and other matters in controversy between the Contractor and the Subcontractor (including any affiliates, agents, employees, representatives, and sureties of either of them) arising out of or relating to this Subcontract shall be decided by binding arbitration in accordance with the current and applicable rules and procedures of the American Arbitration Association, except if the Contractor in good faith believes that any claim, dispute, or matter in controversy with the Subcontractor also involves rights or liabilities of the Owner, Architect, or other third party, then, at the Contractor's sole election, the Subcontractor agrees to resolve such issues in the same forum or proceeding, including arbitration, court, or administrative authority, which has jurisdiction over some or all claims, disputes, and matters in controversy involving the Owner, Architect, or other third party so as to promote economy and avoid inconsistent results. This also applies to any claim, dispute, or matter(s) in controversy or in question between the Subcontractor and any of the Contractor's employees or agents of the Contractor's affiliated businesses or their employees or agents. The agreement to arbitrate contained herein shall be specifically enforceable under the prevailing arbitration law.

15.2  The Contractor and Subcontractor intend and agree that the foregoing dispute resolution provisions and rights of election given to the Contractor are not independent of or severable from the remainder of the Subcontract and that such provisions and election rights are supported by the consideration and mutuality of the Subcontract as a whole. The locale for any arbitration or litigation involving the Subcontractor and the Contractor shall be Biloxi, Mississippi, unless the Contractor agrees to designate another locale to facilitate joinder of parties, to consolidate claims, or for any other reason. To the full extent permitted by law, the parties hereby expressly and knowingly waive any right to a jury trial they may have for all causes, claims, and issues in any way relating to or directly, indirectly, wholly, or in part, arising from this Subcontract.

15.3  Should the Contractor through litigation, arbitration, or other means seek to recover on any surety bond given by the Subcontractor under this Subcontract, the Subcontractor and its surety, jointly and severally, agree to pay Contractor for all its costs, expenses, and attorneys' fees incurred in the investigation preparation, and trial or hearing of such matters and otherwise reasonably related thereto.

15.4  If the Contractor and the Subcontractor litigate or arbitrate a monetary claim, not otherwise prohibited by this Subcontract, the party found liable in such proceedings will pay the other party's reasonable and necessary attorneys' fees.

15.5  No claim, dispute, or matter in controversy or question shall interfere with the progress of construction, and the Subcontractor shall proceed diligently with performance of this Subcontract, notwithstanding the existence of any claim, dispute, or matter in controversy or question.

13

**ARTICLE XV: DISPUTE RESOLUTION (continued)**

15.6   The Subcontractor's remedies against the Contractor arising from or in connection with this Subcontract, whether framed in contract, negligence, other tort, or otherwise, shall be limited to the remedies set forth in this Subcontract.  Notwithstanding anything contained herein to the contrary, the Subcontractor hereby waives all rights it might otherwise have to recover special, consequential, or punitive damages from the Contractor arising from or relating to this Subcontract.

**ARTICLE XVI: NOTICES**

16.0   Any notice provided for herein to the Subcontractor may be given in writing by United States mail, and shall be considered as given when addressed to the last known address of the Subcontractor and deposited in the United States mail, and shall be effective for all purposes, as of the time of such deposit, whether actually received by the Subcontractor or not. Notice by any other means shall be effective when communicated to or received by the Subcontractor.

16.1   Any notice provided for herein to the Contractor shall be given to an Authorized Representative of Contractor via facsimile and in duplicate to Hunt Yates, LLC , by United States mail, return receipt requested, at  170 Minden Road, Biloxi, MS  39530

16.2   Subcontractor shall notify Contractor within seven (7) days of any change in the ownership of Subcontractor.

**ARTICLE XVII: ASSIGNMENT**

17.0   The Subcontractor shall not subcontract nor assign any part of this Subcontract without first obtaining the written consent and approval of the Contractor (which may be withheld in its sole discretion). Assignments of Subcontract proceeds are permissible but only if written notice of same is received and acknowledged in writing by an Authorized Representative of Contractor at least thirty (30) days before the assigned proceeds are due and payable to the Subcontractor. The Subcontractor and the Subcontractor's assignee shall ensure that the assignment of Subcontract proceeds does not adversely affect the performance of this Subcontract, including the full and timely payment of all bills and obligations owed by the Subcontractor. To the extent Subcontractor proceeds are paid to the Subcontractor's assignee the Subcontractor and the Subcontractor's assignee hereby agree to indemnify, defend, save harmless, and exonerate the Contractor from any loss, liability, or expense (including attorney's fees) which the Contractor incurs or which is claimed against either the Contractor or the Contractor's surety as a result of the Subcontractor's failure to perform work in accordance with the Subcontract or as a result of the Subcontractor's failure to pay its bills and discharge its obligations relating to this Subcontract. Any assignments of Subcontract proceeds and any payments made pursuant to assignments shall be subject to and conditioned upon the Subcontractor's compliance with all terms and conditions of this Subcontract and any payments under such assignments are expressly conditioned upon and restricted to the amount actually collected by the Contractor from the Owner for work performed by the Subcontractor and accepted by the Owner, less retainage, backcharges, or other offsets which are chargeable by the Contractor against the Subcontractor, whether on this Project or otherwise. Acknowledgment, acceptance or approval of an assignment by the Contractor does not constitute any representation or agreement by the Contractor that the Subcontractor is owed the amount assigned or any  specific amount whatsoever.

**ARTICLE XVIII: INTERPRETATION**

18.0   This Subcontract, and all documents incorporated by reference herein, represent the entire and integrated agreement between the parties and supersede all prior negotiations, representations, proposals, stipulations, or agreements, either written or oral. All prior or contemporaneous agreements to be included in this Subcontract are expressly identified herein. No agent or representative of either party has authority to make, and the parties shall not be bound by nor liable for, any statement, representation, promise or agreement not set forth herein.

18.1   The terms and provisions of this Subcontract will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; *provided* that if any provision of this Subcontract, as applied to any party or to any circumstance, is adjudged by a court or arbitrator not to be enforceable in accordance with its terms, the parties hereto agree that it is their desire that that the court or arbitrator making such determination modify the provision, including, without limitation, deleting specific words or phrases, in a manner consistent with its objectives, and in its modified form, such provision will then be enforceable and will be enforced.  It is the intent of the parties hereto that the court or arbitrator, in determining any such enforceable modified provision, recognize that it is their intent that the provisions hereof be imposed and maintained to the greatest extent possible.

18.2   The terms and conditions hereof shall inure to and be binding upon the parties hereto, their successors, assigns, executors, administrators and legal representatives.

18.3   This Subcontract cannot be amended, changed, modified or altered except in writing signed by an Authorized Representative of Contractor.

18.4   No waiver or failure by the Contractor to exercise rights under this Subcontract shall limit any of the Contractor's rights as to any subsequent or continuing failure by the Subcontractor to comply strictly with all terms and conditions of this Subcontract.

14

## ARTICLE XVIII: INTERPRETATION (continued)

18.5   In the event of any mistake, ambiguity, or conflict with this Subcontract, neither party shall be considered the author of the Subcontract, and no mistake, ambiguity, or conflict shall be construed more strongly against or more favorably toward either party hereto.

18.6   Headings used in this Subcontract are inserted only as a matter of convenience and for reference, and the in no way define, limit or describe the scope or intent of this contract, nor do they in any way affect this contract.

18.7   Nothing in this Subcontract is intended nor shall be construed to create any rights for or to the benefit of any third parties.

## ARTICLE XIX: ADDITIONAL TERMS AND CONDITIONS

19.1   All work performed under this subcontract as shown on the applicable drawings and specifications as shown on page one of this Subcontract as well as the following:

1.   Request for Proposal FA8903—04-D-8700-0004, including all amendments, dated 22 September 2006, is made an integral part of this Subcontract.

2.   As specifically required by the General Contract, refer to Task Order Clauses, of the RFP. These clauses are made an integral part of this Subcontract. This Subcontractor shall pay particular attention to the following clauses:

  1) H087 GOVERNMENT FURNISHED PROPERTY
  2) PKVH-H001  HOURS OF WORK
  3) PKVH-H004  DAVIS-BACON REQUIREMENTS (MAR 2003)
  4) PKVH-HOO5 WAGE DETERMINATION (IAW FAR 22.1012-1) (MAR 2003)
  5) PKVH-H009  UTILITY OUTAGES (MAR 2003)
  6) PKVH-H010  SAFETY BARRICADES AND WARNING SIGNS (MAR 2003)
  7) PKVH-H011  RECORD DRAWINGS (MAR 2003)
  8) FAR 52.211-12  LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000)
  9) FAR 42.223-11  OZONE DEPLETING SUBSTANCES (MAY 2001)

3.   GENERAL (wage) DECISION NUMBER MS030018 and MS030027 are hereby inserted into and made an integral part of this Subcontract; and is contained in Attachment B to this Subcontract.

4.   The Subcontractor shall provide written notification to the Contractor of any construction tier subcontract award at any level within five (5) working days following award, and in no case later than seven (7) days prior to the start of tier subcontractor's activities on the project. The notification shall list the:

  a.   Name, address, employer identification number, and telephone number of the tier Subcontractor;
  b.   Estimated dollar amount of the tier subcontract;
  c.   Estimated starting and completion dates of the tier subcontract; and
  d.   Scope of work that the tier subcontract will be performing.

All certification, affidavits, reports, submittals, and certificates required by this contract for tier subcontracts shall be delivered to Contractor five (5) working days prior to the start of tier subcontractor's activities on the project. Certified payrolls for tier subcontractors must be delivered to the Contractor within seven (7) calendar days from the end of each pay period.

5.   Pursuant to Public Law 99-561, Section 1207 "Subcontracting Plan for Small and Small Disadvantaged Business Concerns", if the Subcontractor is a large business and this subcontract amount is equal to or greater than one million dollars, the following percentage goals (expressed in terms of a percentage of total planned subcontracting dollars) are applicable to this subcontract:
  a.   Small Business Concerns: 40% of total planned subcontracting dollars under this subcontract will go to subcontractors who are small business concerns.
  b.   Small Disadvantaged Business Concerns: 7.5% of total planned subcontracting dollars under this Subcontract will go to subcontractors who are small business concerns owned and controlled by socially and economically disadvantaged individuals.
  c.   Woman Owned Business Concerns: 7.5% of total planned subcontracting dollars under this subcontract will go to subcontractors who are small business concerns owned and controlled by women.
  d.   HUBZone: 3.5% of total planned subcontracting dollars under this subcontract will go to subcontractors who are owned and controlled by U.S. citizens and 35% of its employees reside in a HUBZone.
  e.   Veteran Owned Business Concerns: 3.5% of total planned subcontracting dollars under this subcontract will go to subcontractors who are small business concerns owned and controlled by veterans.

15

ARTICLE XIX: ADDITIONAL TERMS AND CONDITIONS (continued)

    f.   Small Disadvantaged Veteran Owned Business Concerns: 3.5% of total planned sub contracting dollars under this subcontract will go to subcontractors who are small business concerns owned and controlled by disadvantaged veterans.

6. This Subcontractor shall sign and return Statement of Compliance (Item #4) with the Certified Payroll (Item #5). Subcontractor shall sign all three Statement & Acknowledgement (#8) and return with executed contracts. All other attachments are for your information.

| ITEM # | NAME | FORM NO. | ATTACHMENT |
|---|---|---|---|
| 1. | Scope of Work (continued from page 1) | | A |
| 2 | General Wage Determination | | B |
| 3. | Certificate of Insurance (sample) | | C |
| 4. | Statement of Compliance | DD879 | D |
| 5. | Certified Payroll (submit weekly) | 44-R1093 | E |
| 6 | Sample Payroll Certified Payroll | 44-R1093 | F |
| 7. | Instruction for Payroll Form | WH-347 | G |
| 8. | Statement & Acknowledgement | Form 1413 | H |
| 9. | Basic Pilot Program – Employee Verification | | I |

This Subcontractor shall insert this clause #6 into each tier subcontract awarded at any level

ARTICLE XX: AUTHORIZED REPRESENTATIVES

The Contractor's Authorized Representatives shall be:

Aaron Docas - Project Manager    (228) 374-1865, ext.108    aaron.docas@huntyates.com
Paul Musick- Project Manger    (228) 374-1865, ext. 104    paul.musick@huntyates.com
Marty Class – General Superintendent    (228) 374-1865, ext. 119    marty.class@huntyates.com
Michael Davis- CQC Director    (228) 374-1865, ext. 123    michael.davis@huntyates.com

The Subcontractor's Authorized Representative for the Project shall be:

JEFF PATTERSON

ONLY AN OFFICER OF THE CONTRACTOR OR PROJECT MANAGERS, AS SET FORTH ABOVE, MAY MAKE BINDING COMMITMENTS ON BEHALF OF THE CONTRACTOR.

<div align="center">EQUAL OPPORTUNITY EMPLOYER<br>M/F    H/V</div>

<div align="center">16</div>

Attachment A – WORK TO BE DONE (continued from page 1)

THE FOLLOWING IS INTENDED AS AN ELABORATION, NOT LIMITATIONS, OF THE SCOPE OF WORK TO BE INCLUDED AS PART OF THIS SUBCONTRACT.

1.   This Subcontractor shall furnish all labor, supervision, tools, equipment, insurance, materials, and applicable taxes for a complete installation of a complete installation of the mechanical system. This shall include, but may not be limited to, ductwork rough-in, equipment install & start-up, trim-out, and testing and balancing, with two year warranty, at Keesler A.F.B. Work shall be performed at the four project sites: Thrower Park, West Falcon, East Falcon and Bayridge, respectively. This Subcontractor is aware that these four sites are further broken down into six phases: 1) Thrower Park, 2) Northwest Falcon, 3) Maltby Hall/Shadowlawn, 4) Southwest Falcon, 5) East Falcon, 6) Bayridge East. He also understands that there will be demobilization between each of the phases and remobilization and He has confirmed that his final price is inclusive of this.

2.   Except as hereinafter excluded, this work shall be in strict compliance with the plans, specifications, this subcontract, all state and local laws, codes, ordinances and regulations and applicable standards in effect on the date of this Subcontract. The above referenced items are supplementary to each other but in the event of a conflict and/or omission, if any, the more stringent requirement shall govern. This Subcontractor shall provide workman's compensation for all workers as required by the State of Mississippi. It is agreed that the Subcontractor's on-site supervision must meet the satisfaction of the project General Superintendent

The following description of work to be done by this Subcontractor is not intended to establish a limit on the scope of work, but to outline the main scope of work included in this subcontract.
   a.  All work shall be built in conformance to:
      1)  Local, State, and Federal regulations,
      2)  "Replace 1028 Military Family Housing Units", Approved for Construction Civil drawings and specifications dated, 11APR07
      3)  "Replace 1028 Military Family Housing Units", 100% Building Design Submittal, dated 11JUN07.
      4)  Hunt Yates Project schedules,
      5)  Hunt Yates Safety Plan, and
      6)  Hunt Yates Quality Control Plan.

3.   This Subcontractors work shall include but shall not be limited to product submittals, daily reports, certified payrolls, and a safety plan to include a site specific Hurricane Action Plan. This Subcontractor shall provide all equipment and tools needed to carry out His scope of work.

This Subcontractor shall perform a preliminary inspection of the site to verify that existing conditions match those shown on the drawings. Any variations from the conditions whether encountered during the preliminary inspection or during the course of the work will be brought to the immediate attention of the Contractor.

This Subcontractor shall protect from damage all existing trees, streets, utilities, silt fencing and other erosion control items. This Subcontractor shall replace any damaged areas caused by His firm, including silt fencing, back to original condition, at His cost.

HBC FORM C205 7/2005

1

**FAU & THERMOSTAT**
This Subcontractor shall furnish and install all materials as per the specifications and the Hunt technical proposal. He shall assist Hunt-Yates in thorough review of the current mechanical drawings and re-design of the duct sizes and layouts. This Subcontractor understands that any modifications to the aforementioned drawings, must be approved by both the architect, engineer and the Government prior to fabrication and installation. This Subcontractor shall furnish and install a "Trane" model, direct-vent forced air unit with an AFUE rating of no less than 90. These units will be provided and installed complete with Energy Star labels and a pigtails. This Subcontractor shall provide and install all thermostats equal to the specifications and the Hunt proposal. Thermostats shall be programmable, Energy Star labeled, micro-processor based with built in key pad for scheduling day and night temperature settings. Thermostats shall have replaceable battery to maintain the timing and maintain the schedule in memory for 1 year and shall have a means for temporary and manual override of the program schedule. This Subcontractor shall provide all low voltage wiring as required to complete His work.

This Subcontractor shall install all equipment pursuant to the Hunt-Yates superintendent's schedule, but at no time will the furnaces be operational until after the interior paint is complete. Immediately upon completion of the painting activity, furnaces shall be put into operational mode so as to help acclimatize the interior space for subsequent materials.

**A.C. CONDENSING UNIT**
This Subcontractor shall furnish and install a "Trane" model condensing unit, with a minimum SEER of 13.0. This unit shall be complete with compressor, condenser guards and protector fins. This Subcontractor shall bolt the compressor/condenser to the concrete pads. This Subcontractor shall connect the furnace for use after painting and unit finish out once electrical service to the unit is available. This Subcontractor shall furnish and install two sets of filters at for the FAU unit. One to be installed during construction and the other prior to the Owner's final acceptance of the units. This Subcontractor shall run the condensation drain and secondary drain of the FAU to an area hub drain, near the FAU, that will be provided by the plumber. This Subcontractor shall make the final connection for the furnace condensation drain.

**DUCTWORK & INSTALL**
This Subcontractor shall provide all rigid and flex supply & return ducts, jumper ducts, range hood rigid duct, exhaust fan Alumiflex duct, grills and registers with OBD balancing dampers, fire dampers, water heater b-venting, clothes dryer booster fans and furnace venting.

This Subcontractor shall furnish and install all straps and nail plates, pursuant to the IRC2006, as required to complete His work. All metal duct shall be sealed with mastic pursuant to the specifications. Duct mastic shall conform to UL181A or UL181B. This Subcontractor shall insulate all ductwork, including duct in the second floor attic, to prevent duct leakage and condensation build up, pursuant to the specifications. All ducts shall be metal, except for the last 10', which can be flex. This Subcontractor shall take great care to prevent his flex duct from being damaged during installation and shall insure that all connections of metal-to-flex are performed in a professional manner, to prevent displacement, separation or air loss. He shall monitor his installed work after installation and up to the point of drywall installation, to further insure that no other trades have damaged his work. He shall immediately notify the Hunt-Yates General Superintendent of damages from other trades.

KBC FORM C205 7/2005

2

This Subcontractor shall hang all attic metal and/or flex ductwork from roof truss web members, to ensure that the insulator does not crush or damage His materials. When running ductwork, whether flex or metal, into those attic areas where roof over-builds occur, He shall take extreme care in insuring that the ductwork is not damaged. Any costs associated with damaged ductwork due to this Subcontractor's negligence will be borne solely by Him.

This Subcontractor shall provide and install all dryer venting, water heater B-venting and combustion air venting. It is understood that there may be unit types where booster fans are necessary on dryer venting and as such, pricing has been provided by this Subcontractor and is included in the Options portion of this Subcontract. This Subcontractor has included all necessary access panels for these booster fans in this optional pricing. It is understood that wiring will be by others. He shall coordinate with Hunt-Yates and the other trades in regards to routing, obstructions and other issues for installing these two types of vents.

This Subcontractor has included all jumper ducts and registers as shown on the revised mechanical drawings. It is understood that to minimize sound transmission and maintain aesthetical appearance in the hallways, these ducts will be connected in the attics through the use of a delta box, then down to a single register in the hallways.

This Subcontractor shall include cutting, notching, blocking and drilling for penetrations associated with his work in accordance with the IRC. He shall take great care when cutting or notching framing members during his work. Any costs associated with the replacement of lumber due to this Subcontractors negligence during cutting and notching operations will be borne directly by him. He understands that his second floor ductwork will be placed in the attics, while his first floor ductwork will be placed in a combination of fur-downs and truss bays. In fur-downs abutting 1-hour fire walls, he shall take care in protecting any and all fire wall penetrations. This Subcontractor shall not use chain saws for ease of cutting.

This Subcontractor shall provide and install the proper caulking or sealant which includes fire caulking, and insulation, or sealant, around b-vent penetrations, as per code. His penetrations shall be protected per current codes to maintain the integrity of all walls and floors (to include the integrity of the fire rating). He shall provide gaskets or caulking at all registers pursuant to the Hunt proposal criteria. This Subcontractor shall provide the proper wall and roof jacks and flashing against the roof deck for a sealed weather-tight roof, at all roof penetrations. If this Subcontractor penetrates the wall, proper wall flashing shall be provided by this Subcontractor. .

This Subcontractor is aware that fiber cement board, lapped siding and masonry brick will be installed on the exteriors of the buildings. He shall coordinate with the siding and masonry subcontractors as to penetrations effecting both these trades.

<u>RANGE HOODS & EXHAUST FANS</u>
This Subcontractor shall furnish and install rigid vented range hoods. The range hoods shall be provided with electrical pigtails, washable filters and light bulbs. He has included in His price range hoods that meet the Hunt proposal for both the enlisted and command quarters. It is understood, however, that the range hoods specified, do not carry an Energy Star label and thus, a waiver must be sought by the Government. Hunt-Yates will work directly with this Subcontractor to seek this relief waiver. Any necessary adjustments to this Subcontract will be contingent upon approval and acceptance by the Government. This Subcontractor shall furnish and install all range backsplashes.

This Subcontractor shall provide and install all vented bathroom exhaust fans with sufficient motors capable of being hardwired to the lighting circuit. He has included in His price bathroom exhaust fans that meet the Hunt proposal for both the enlisted and command quarters. All exhaust fans will be 50cfm minimum, four sones. All exhaust fans must carry an Energy Star label unless relief of this requirement is provided by the Government. It is understood that

KBC FORM C205 7/2005

3

current exhaust fans meeting the Energy Star criteria are two sones and this Subcontractor has not included 2 sone fans in His price. Hunt Yates will work with this Subcontractor in solidifying the exhaust fan criteria and acceptance by the Government. Any necessary adjustments to this Subcontractor will be contingent upon approval and acceptance by the Government. He shall include all water heater flues, back-draft dampers and rigid dryer vents with removable t-caps.

This Subcontractor shall test and balance the HVAC system as required by the specifications for a quality and constant air flow to each room. He shall adjust all registers and install all air filters as required. He shall mark each register damper control to the setting necessary to meet balancing requirements. This Subcontractor has agreed to perform duct leakage testing on those units where the specifications require testing and balancing of the system. $\sim$ N A $\theta \theta$  B-3-2007

This Subcontractor is fully aware that this project is located on a military installation and that each of his employees will be required to provide identification to receive access badges. He understands that any employee that does not have sufficient identification to receive said badges will not be allowed on the installation.   This Subcontractor also is aware that security measures, i.e. checkpoints, may be established by the Government as they see fit, whereby requiring that his employees have their access badges on their persons at all times.  He further understands that delays may be expected in the event the Government increases the security status and that reimbursements for time loss due to delays will be at his expense.  In addition, it is a requirement of this Subcontract for this Subcontractor to implement and utilize the Government's Basic Pilot Program -- Employee Verification.

This Subcontractor expressly agrees that the quality of his work will meet or exceed the standards for which the CQC and the Owner will accept for this Subcontractor's work. He also agrees to furnish manpower, equipment and materials in quantities sufficient to meet the Contractor's current production schedule. Contiguous production is necessary for timely completion of this project and as such, this Subcontractor will work closely with the Hunt-Yates production staff to ensure that daily production levels are achieved by this Subcontractor and the other trades.

This Subcontractor shall provide qualified, full time supervision of his work. Qualified personnel experienced in their trade shall accomplish all of the work performed under this subcontract in a workmanlike manner.  This Subcontractor has agreed to designate a single individual as His quality control representative.  This individual will be responsible for ensuring compliance with this Subcontract, the plans and specifications and will be responsible for providing daily inspection reports indicating such.  He shall complete the units in proper sequence and in a timely manner to maintain production in accordance with the Contractor's current project schedule.

This Subcontractor will be required to clean up all spoils, excess material, trash and debris caused from his work on a daily basis and remove Hunt-Yates provided dumpsters. He shall leave the finished units in a clean, swept out condition upon completion of His work.

This Subcontractor agrees to complete a minimum of 3 proto-type units prior to production under-slab pretreatment. An additional mobilization may be required prior to production plumbing.

This Subcontractor shall provide his manpower drinking water and cups. No communicable use cups allowed. Trash pick-up associated with drinking water and lunch trash will be the responsibility of this Subcontractor.

This Subcontractor shall be responsible for continually maintaining two (2) sets of accurate "red-lined/as-built" drawings in the Hunt-Yates field office.

NSC FORM C205 7/2005

4

4.  At this time, the work outlined in this Subcontract is not located on the base. If access to the base is required, or if the base requires employees to have base passes, each Subcontractor employee working on this project will be required to complete and submit background and vehicle information to the Contractor and Department of the Air Force for approval. Individuals are required to follow on-base rules and regulations to keep their access from being revoked. All mobile phone use when driving on base must be "hands free".

    a)  <u>Wages</u>: All workers employed on this project must be paid not less than the prevailing wage and fringe rate for their classification as listed on the wage decision (MS030018 6/13/2003 MS18). Certified payrolls will be submitted weekly to the Hunt Yates field office.

    b)  <u>Taxes</u>: This project is NOT tax exempt. This Subcontract includes all applicable taxes for the work provided including all applicable Mississippi State Taxes.

    c)  <u>Buy American Act/NAFTA</u>: All materials on this Project shall comply with Buy American Act to include all Free Trade Agreements.

    d)  <u>Traffic Control</u>: This Subcontractor shall supply and maintain all Safety and Traffic Control needed to satisfy current City, State, and Federal regulations for his work.

    e)  <u>Permits</u>: Subcontractor is responsible to obtain all applicable permits for his work as required by the State of Mississippi and the City of Biloxi. It will be the responsibility of this Subcontractor to insure applicable permits are in place prior to the start of their respective work.

    f)  <u>Construction water</u> will be available to the subcontractor at the points of connection as identified by the Contractor for the water at no charge. This Subcontractor shall be responsible for providing any taps, hook ups, back-flow preventers, materials for hook ups, standpipes, tanks, etc. for his own construction water.

    g)  <u>Temporary power</u> will be supplied by this Subcontractor in the form of electric generators for his own work. All electrical generators shall be properly grounded and have Ground Fault Protection. If final electrical power is connected, this power may be used by this Subcontractor in lieu of the generators.

    h)  <u>Quality Control Plan Testing</u>: The subgrade, asphalt and concrete testing will be performed by Others. It will be the responsibility of this Subcontractor to insure applicable testing is performed in the frequencies required by Hunt Yates Quality Control Plan and or other applicable regulatory agencies. Any retesting required due to the failing of these initial tests will be paid for by this Subcontractor.

    i)  <u>Safety</u>: This Subcontractor shall abide by Hunt Yates Safety Manual, State and Federal safety codes for all work performed. He shall furnish a list of all materials and chemicals used in the performance of his work and furnish copies of material data safety sheets to employees and the project office prior to starting work. The intent is to fully comply with the current OSHA Safety Regulations, Air Force Safety Regulations and acknowledge that all laborers and mechanics have received the data sheets. Backup alarms shall be mandatory on all equipment. Hard hats, long pants and sleeved shirts shall be required at all times. This Subcontractor shall furnish a fall protection program prior to starting work that complies with OSHA and the Hunt-Yates safety plan.

    j)  <u>Cleanup</u> shall be performed daily by this Subcontractor for his work. Each Subcontractor will be responsible for insuring his equipment does not damage or litter any roadways (paved or gravel base) with soil or mud during his work or while transporting equipment to or from the site. In the event roads or streets are soiled from this Subcontractor's equipment, he will be

HBC FORM C205 7/2005

5

required to immediately clean these roadways to the satisfaction of the Project Superintendent. The RV approach area is a highly visible area and exposed to the public and thus, this Subcontractor will make sure that His work area is clean, tidy and safe at the end of each business day. Any and all costs associated with any clean-up operations performed by Hunt-Yates on behalf of this Subcontractor will be borne by Him.

k) <u>Communication:</u> This Subcontractor's Site Superintendent will carry on his person a Nextel mobile phone with the ability to direct connect at all times he is performing work on the site. The Nextel mobile phone to be furnished by this Subcontractor and the DC number provided to Hunt-Yates immediately upon mobilization.

l) <u>Deliveries:</u> This Subcontractor shall coordinate for his deliveries and provide forklifts as needed to unload his own material. He shall take great care to avoid damages to other trades, existing landscaping, existing trees, and/or any other appurtenance. Any and all costs associated with the repair of damages caused by this Subcontractor and or His suppliers or vendors will be borne by Him.

m) <u>Scheduling:</u> It is understood that this Subcontractor will cooperate with the Project Superintendent or Project Manager (s) in scheduling his installations to avoid unnecessary delays to other trades. Time is of the essence regarding this scope of work and this Subcontractor shall exercise due diligence in expediting the work.

n) <u>Punch Work:</u> This Subcontractor shall provide their own full-time Quality Control manager to ensure work is completed pursuant to the plans and specifications. This Subcontractor shall also be responsible for completing all punch list work in a timely manner keeping this portion of his work on schedule just as he is required to do for all other phases of this contract. This item includes establishing a punch list crew and completing the punch lists for each building as prepared by the Quality Control Director and his inspectors, as well as the Government inspection firm.

o) <u>Submittals – Material:</u> This Subcontractor shall submit for approval shop drawings, brochures, certificates, licenses, etc., for all materials, fixtures, and equipment intended for use on the project using the manufacturers listed in the plans and specifications. All shop drawings and submittal literature shall be submitted together and not "piece mealed". Six (6) original copies shall be provided to Hunt-Yates. Submittals shall be provided in a neat, organized fashion so as to expedite the review and approval process. This shall be done in a prompt and timely manner so as not to delay the project construction schedule. Shop drawings must be approved by the Quality Control Director prior to this Subcontractor beginning work.

It is also understood that all material required for the O & M Manuals will be submitted to the CQC Director within ninety (90) days of approved submittals.

p) <u>Waivers:</u> Hunt Yates will require Waivers of Lien from this Subcontractor's material suppliers and Subcontractors as evidence of this Subcontractor having paid for all his material and labor with all taxes and fringes required thereto. These waivers will be required with each progress payment. No payment will be released until these waivers are properly executed and turned into the Hunt Yates field office.

q) <u>Hurricane Readiness:</u> Contractors shall submit a "Hurricane Action Plan" prior to starting work. Plan will be reviewed and approved by the Contractor and discussed at the preparatory meeting. In general, upon receipt by the Contractor of a severe weather warning with anticipated winds of +40mph, at Keesler Air Force Base, this Subcontractor will implement His action plan. At a minimum, He will be responsible for tying-down, removal, protection and/or securing all His materials, closing doors and windows in units, and

MBC FORM C205 7/2005

6

evacuation of the area, as determined by Federal and Local authorities. The Contractor will inspect the material protection work performed by this Subcontractor in order to reasonable assure that property owned by the Contractor or the Air Force will not be damaged. If this Subcontractor fails or refuses to implement their action plan and/or refuses to secure their materials, the Contractor will perform this work on His behalf and charge the cost of this work to this Subcontractor pursuant to this Subcontract.

5.  The cost breakdown below will be used for payment purposes. It is understood that the contract amount of $9,220,478.00 includes all Mississippi state taxes. Pay requests shall be submitted to the Hunt Yates field office no later than the 20th of every month, estimated for work completed through the 25th for payment on or about the 20th of the following month when the Contractor is paid by the AIR FORCE. The retention amount referenced earlier in this subcontract is amended to be 10% of monthly progress labor billings until the contract is 50% complete. With the approval of the Project Manager, the retention will be stopped and or reduced. Retention will be released upon acceptance of this Subcontractors work by the Owner and the Contractor. This acceptance will include but shall not be limited to all as-built drawings, submittals, waivers, approved certified payrolls, etc.

Payment requests will only be accepted on the preprinted form as supplied by the Contractor and will be paid for as approved by the Project Superintendent. Retention will be released upon acceptance of this Subcontractors work by the Owner and the Contractor. This acceptance will include but shall not be limited to all as-built drawings, submittals, waivers, approved certified payrolls, etc.

OPTIONS:
1.  Add for PVC D.V. venting of the water heaters - $290/unit
2.  Add for 14 SEER condensing unit upgrade - $260/unit
3.  Add for dryer booster fans w/ panels - $175/unit
4.  Add for duct leakage testing on 10% - $85/unit

SCHEDULE OF VALUES:

| Work Item | Quantity | Unit Cost | Total Cost |
|---|---|---|---|
| HVAC Mobilization | 1 ls | | $ 41,120.00 |
| Pre-fab Duct | 1028 un | $401 | $ 412,228.00 |
| Rough-in(Freon/PVC/duct) | 1028 un | $2774 | $2,851,672.00 |
| Exhaust Fan Rough-in | 1028 un | $192 | $ 197,376.00 |
| Vent Water Heater | 1028 un | $437 | $ 449,236.00 |
| Set Furnace | 1028 un | $214 | $ 219,992.00 |
| Set AC Units | 1028 un | $153 | $ 157,284.00 |
| Trim-out | 1028 un | $295 | $ 303,260.00 |
| Start-up | 1028 un | $240 | $ 246,720.00 |
| Punch-out | 1028 un | $107 | $ 109,996.00 |
| HVAC Materials | 1 ls | | $4,190,474.00 |
| HVAC Demobilization | 1 ls | | $ 41,120.00 |
| **Contract Amount** | | | **$ 9,220,478.00** |

A COMPLETE AND PROFESSIONAL JOB IS INTENDED!

HBC FORM C205 7/2005

7

****** END OF SUBCONTRACT *****

BBC FORM 0205 7/2005

8

# EXHIBIT B

## Heil Building d/b/a Modu-Tech Subcontract

# H( NT YATES LLC

**ORIGINAL**

AUG 1 7 2007

170 Minden Road, Biloxi, Mississippi 39530 * P O Box 5189, Biloxi, Mississippi 39534 * 228 374 1865

THIS AGREEMENT, MADE THIS _7th_ day of _July 2007_, by and between _Modu-Tech_ doing business as a _Incorporation_ with principal office at _1200 E. Patapsco Ave. Baltimore, MD 21225_, (hereinafter called the "SUBCONTRACTOR"), and HUNT YATES, LLC. (hereinafter called ("CONTRACTOR"). WITNESSETH:

That the SUBCONTRACTOR and the CONTRACTOR, in consideration of the covenants and agreements herein contained, mutually agree as follows:

## 1. PROJECT, LOCATION AND OWNER

The SUBCONTRACTOR agrees to furnish all labor, material and equipment and perform all work described in Section 2 hereof for the construction of 1,026 Units of Family Housing located at Keesler Air Force Base, Biloxi, Mississippi for the Department of the Air Force in accordance with the terms of this Subcontract, and in accordance with the terms of the contract between CONTRACTOR and the Owner ("General Contract").

## 2. WORK TO BE DONE

THE FOLLOWING IS INTENDED AS AN ELABORATION, NOT A LIMITATION, OF THE SCOPE OF WORK TO BE INCLUDED AS PART OF THIS SUBCONTRACT.

This Subcontractor shall furnish all labor, supervision, tools, equipment, insurance, materials, and applicable taxes for a complete framing job, at all four sites, at Keesler A.F.B.

### A COMPLETE FRAMING JOB

Attachment A - WORK TO BE DONE - continued on Page 17

## 3. CONTRACT SUM

IN CONSIDERATION WHEREOF, the OWNER/CONTRACTOR agrees to pay this SUBCONTRACTOR for the full and faithful performance of his work the sum of TWELVE MILLION FIVE HUNDRED FIFTY THOUSAND DOLLARS AND ZERO CENTS ($12,550,000.00), including all taxes, in current funds, at the CONTRACTOR'S office at Keesler Air Force Base, Mississippi, subject to additions and deductions for changes as may be agreed upon in writing and subject to the other terms of this agreement.
The following have agreed to the terms of this Subcontract and have signed this Subcontract as officers of their respective organizations, having been duly authorized to do so.

ATTACHMENT #4 IS PART OF THIS CONTRACT S S AD
→ "AS NOTED" AD

SUBCONTRACTOR:                              CONTRACTOR:

MODU-TECH, INC.                            HUNT-YATES, LLC

By: _____               By: _____

Title: _PRESIDENT_                         Title: _Aaron Docsa, Project Manager_

Federal ID. or SSN _76 0 20 9647_          Contract No: _____ 51027

Mississippi License Number _MR_

1

## ARTICLE I: GENERAL OBLIGATIONS

1.0    The Subcontractor shall be bound to the Contractor by all terms and conditions of this Subcontract and, except as otherwise provided herein, by all terms and conditions of the Prime Contract between the Owner and Contractor, which is incorporated by reference into this Subcontract and is an integral part of this Subcontract. The Prime Contract includes, but is not limited to, the Agreement between the Contractor and the Owner; all general, supplementary, special conditions; all drawings, specifications, details, and standards; all addenda, modifications, and revisions to any of the foregoing; and all other documents or requirements incorporated into or referenced by the foregoing. The Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the Contractor, by the Prime Contract, assumes toward the Owner. In the event of an ambiguity, inconsistency, or conflict in payment or other provisions between or among the Prime Contract, this Subcontract, any bond, and/or other agreement or instrument, this Subcontract shall govern. In no event shall the Subcontractor be entitled to greater rights, higher entitlements, or more relief against the Contractor than the Contractor actually obtains from the Owner on Subcontractor's behalf with respect to the Subcontract work.

1. 1    The Subcontractor shall perform its work in strict accordance with this Subcontract and with the Prime Contract. Anything pertaining to the Subcontractor's work that is mentioned in the specifications but not shown in the drawings, or shown in the drawings but not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. All work of the Subcontractor shall be subject to the approval of the Contractor, Architect, Owner, and any authorities having jurisdiction over the Subcontract work. The Subcontractor's work includes all work specifically set forth in this Subcontract and covered by parts of the Prime Contract applicable thereto, and it further includes everything reasonably necessary or customary for the proper execution, functioning, connection, and completion of all work referred to by this Subcontract. All provisions of this Subcontract and of all incorporated, referenced, and attached documents, including but not limited to the Prime Contract, shall be construed together and harmonized to the extent reasonable and consistent with the intent of this Subcontract for proper completion and functioning of the entire scope of work being subcontracted. If there is any conflict, ambiguity, or inconsistency within or between any such documents or a difference in interpretation, the matter shall be referred to the appropriate design professional whose decision the Subcontractor shall implement at no additional cost. If the design professional does not render a decision in a timely manner, the Subcontractor shall perform as directed by the Contractor at no additional cost.

1.2    Subcontractor shall promptly prepare and submit to Contractor such drawings, details, product data, samples, and other submittals as may be required by the Prime Contract or the Contractor. By submitting such drawings, details, product data, samples, and other submittals, Subcontractor represents that it has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Subcontract. The Subcontractor shall call specific attention in writing to the Contractor to any and all proposed deviations from the Prime Contract at the time of delivery of such drawings, details, product data, samples, and other submittals, and no deviation shall be permitted unless specifically requested in writing by Subcontractor and expressly approved in writing by an Authorized Representative of the Contractor. Contractor shall have no duty to discover any mistake, error, or deviation in any such drawings, details, product data, samples, and other submittals from the Prime Contract requirements, and Contractor's or Architect's approval thereof shall not relieve Subcontractor from responsibility or liability for any mistakes, error, or deviation, or of Subcontractor's obligation to perform its work in strict accordance with the Prime Contract.

1.3    The Subcontractor represents and warrants that it is fully qualified and experienced in every respect to perform the work and that it is properly licensed, equipped, organized and financed to perform such work. The Subcontractor further certifies that it has carefully examined the Subcontract and is fully familiar with all of the terms and conditions thereof and has fully acquainted itself with job site conditions that may affect the cost or timeliness of the Subcontractor's performance, that it has made all investigations essential to a full understanding of the difficulties which may be encountered in performing the work and that it is not relying on any opinions or representations of Contractor; and, as between the parties hereto, Subcontractor will assume full and complete responsibility for all conditions relating to the work, the site and its surroundings, and all risks in connection therewith.

1.4    The Subcontractor is responsible for the proper location and layout of its work (including the responsibility for the accuracy and expense of engineering services related thereto), and the Subcontractor shall verify all previous and surrounding work and conditions to ensure that all work fits together and functions properly. Before beginning any portion of the work, the Subcontractor shall detect and report in writing any condition or problem caused by others which could affect Subcontractor's work; otherwise, Subcontractor shall accept full responsibility and cost for correcting or overcoming such conditions or problems.

1.5    The Subcontractor agrees and acknowledges that meetings will be held at the jobsite as called for by the Contractor or as otherwise required herein. Attendance by the Subcontractor is required at the meeting held immediately prior to the commencement of its work and each meeting thereafter until this Subcontract work is complete and accepted by the Owner, and at other times when deemed necessary by the Contractor. The Subcontractor shall have a representative present who shall have the authority to act and make binding decisions for the Subcontractor.

1.6    No temporary office building, storage trailer, sign, or other structure shall be placed on the jobsite by the Subcontractor unless approval in writing of the location, design and painting thereof has first been received from the Contractor.

1.7    The Subcontractor shall clean up and remove from the site and dispose of trash and debris on a daily basis or as often as directed by the Contractor. The Subcontractor shall also do its part in keeping the Project in a clean and neat condition and shall clean up any adjacent work soiled by his workmen and leave floors "broom clean", as directed by the Contractor. If

2

ARTICLE I: GENERAL OBLIGATION (continued)

Subcontractor fails to comply with this paragraph within twenty-four (24) hours after receipt of notice by Contractor, then Contractor may perform such necessary clean-up and deduct the costs from any amount(s) due the Subcontractor.

1.8     The Subcontractor shall provide sufficient, safe and proper facilities, equipment, and working conditions, which shall at all times be subject to inspection by Contractor, the Owner, or their representatives. The Subcontractor shall immediately proceed to take down and remove from the premises of the Project all portions of the work and all material, which the Contractor shall deem as unsound or improper or which fails to conform in any way to the Subcontract requirements. The Subcontractor shall make good all such disapproved work, equipment, and facilities and restore all other work damaged or destroyed in removing or making good such disapproved items, all at Subcontractor's sole risk and expense. However, Subcontractor shall not remove any other materials from the Project site without the written permission of an Authorized Representative of Subcontractor. Subcontractor agrees to abide by Contractor's decisions as to allotment of all storage and working space at the Project site and as to all other matters respecting the organization, flow, coordination, and sequencing of work.

1.9     If requested by Contractor, the Subcontractor shall provide the Contractor with a copy of all material suborders prior to commencing its work. The Subcontractor must provide monthly, or more often if required by the Contractor, a complete list and delivery status of all orders, progress schedules, and man-hour completion schedules satisfactory in form and content to the Contractor. Subcontractor also agrees to provide such "as-built" drawings, maintenance and operation manuals, etc., as may be required in the Subcontract. The Subcontractor shall also provide the Contractor daily reports indicating work performed and manpower for the previous day. These daily reports will be delivered to the jobsite office no later than 10:00 AM the following day after the work is performed.

1.10   The Subcontractor shall not start any part of its respective work until the Subcontractor has delivered to the Contractor at least two executed originals of this Subcontract, together with all other required documentation (specifically including, but not limited to, insurance certificates and, if required, performance and payment bonds), An executed Subcontract and acceptable insurance certificates in the Contractor's possession are conditions precedent to being paid any part or all of the Subcontract amount. Subcontractor shall perform no portion of the subcontract work requiring submittal and review of shop drawings, product data, samples or similar submittals until the respective submittal has been approved. Any work performed in violation of this section shall be at the Subcontractor's sole risk.

1.11   The Subcontractor's commencement of any part of its work or responsibilities, whether at the Project site or elsewhere, shall constitute the Subcontractor's agreement to all terms and conditions of this Subcontract, without limitations or modification, and shall further constitute the Subcontractor's acceptance of all conditions at the Project site. The Contractor and Subcontractor agree that the terms and conditions of this Subcontract, establish a course of dealing between them and shall apply to this and all other projects, unless before commencement of the Subcontractor's work on such project, either the Contractor or the Subcontractor gives written notice of objection to the terms and conditions of this Subcontract or the parties enter into a different written agreement with respect to such project. Otherwise, the Subcontractor's commencement of any performance of work on any project, including but not limited to the preparation of shop drawings and other submittals, shall constitute the agreement of both the Contractor and the Subcontractor that the terms and conditions of this Subcontract apply to such project and constitute a waiver by both parties of all objections to any of the terms and conditions of this Subcontract even if a Subcontract has not been fully executed at the time such work commences. Either the Contractor or Subcontractor will be entitled to specific performance of this provision with respect to future projects.

## ARTICLE II: BONDING OF SUBCONTRACTOR

2.0     If required by the Contractor prior to or during performance of this Subcontract, the Subcontractor shall furnish performance and payment bonds with a responsible surety acceptable to the Contractor, in a form and with terms acceptable to the Contractor. The Subcontractor's failure to deliver satisfactory bonds to the Contractor within ten (10) days after demand shall be a material breach of this Subcontract. If the Contractor requires a bond after the parties have agreed to a Subcontract price, the Subcontract price shall be equitably adjusted to include the reasonable cost of the bond, provided that the Subcontractor has previously notified the Contractor that the cost of the bond was not included in the Subcontract price.

2.1     In addition to the language of any bond, the Subcontractor and the Subcontractor's sureties agree that the protection and coverage of the Subcontractor's bonds shall extend at least to the entities protected and the type of claims covered by the Contractor's bonds with respect to the Subcontract work so that any claim that can be made against the Contractor's bond shall be also valid and recoverable against the Subcontractor's bond. Any increases in the Subcontract amount shall automatically increase the respective penal sums of the performance bond and of the payment bond furnished by the Subcontractor.

2.2     Any obligation of the Subcontractor under this Subcontract, including but not limited to warranty or other performance obligations extending beyond substantial completion, shall be equally the obligation of the surety for the Subcontractor's performance bond as if all terms and conditions of this Subcontract were set forth verbatim in the performance bond. The Subcontractor's surety's obligations shall not terminate upon substantial or final completion of either the Subcontractor work or of

3

**ARTICLE II: BONDING OF SUBCON    .CTOR (continued)**

the Project as a whole but shall continue thereafter for so long as the Subcontractor has any obligations of whatever nature under this Subcontract. The Subcontractor's surety shall be bound by any judgment, arbitration award, settlement agreement, or other decision rendered against the Subcontractor with respect to the Subcontractor's obligations under this Subcontract.

**ARTICLE III: RELATIONSHIP WITH CONTRACTOR**

3.0    The Subcontractor shall have a competent and experienced superintendent at the Project at all times while the Subcontractor's work is or should be in progress and as otherwise necessary to ensure full performance of all obligations under this Subcontract. The Subcontractor's superintendent shall have the authority to act for and on behalf of the Subcontractor in all matters relating to the Subcontractor's work. The Subcontractor shall do, without additional charge, whatever is necessary in the performance of this Subcontract or whatever the Contractor directs to ensure harmonious labor relations at the Project and to prevent strikes, disputes, and violation of labor agreements, labor laws, and labor regulations.

3.1    The Subcontractor shall designate a quality control representative who shall have authority to act for and on behalf of the Subcontractor in all matters related to the quality of the Subcontractor's work. The Subcontractor shall fully comply with the Contractor's quality assurance plan.

3.2    Subcontractor shall enforce strict discipline and good order among its employees. The Subcontractor shall report in writing to the Contractor within twenty-four (24) hours an injury to an employee or agent of the Subcontractor or any other liability claim whatsoever that occurred at the site or connected with the Subcontractor's work.

3.3    The Subcontractor is in all respects an independent contractor and is not an agent of the Contractor.  No personnel employed by Subcontractor shall be deemed under any circumstances to be agents, representatives or employees of Contractor. The Subcontractor shall have no authority to bind the Contractor by any representation, promise, or statement of any kind without first obtaining the Contractor's specific written consent and authorization. The Subcontractor agrees not to enter into any other contract relating to the Project without the Contractor's prior written consent.

3.4    The Subcontractor shall not interfere with the Contractor's relationship with the Owner, and the Subcontractor shall not deal directly with either the Owner or the Architect without prior written authorization in each instance from an Authorized Representative of the Contractor.  Specifically, without limiting the generality of the foregoing, the Subcontractor shall not negotiate directly with the Owner for any addition(s), deletion(s), or alteration(s) on the Project covered hereunder.

**ARTICLE IV: TIME**

4.0    Time is of the essence, and unless herein otherwise specifically provided, Subcontractor shall commence work when directed by the Contractor.  The Subcontractor recognizes that it may be working concurrently with the Contractor, Owner's forces, or other contractors or subcontractors. Subcontractor shall cooperate with the Contractor and prosecute the work diligently and so as to avoid delaying, conflicting, or interfering with the progress of Contractor, Owner's forces, or other contractors or subcontractors on other portions of the Project work. The Contractor has the right to require the Subcontractor, without cost or liability to the Contractor, to schedule work hereunder in such a manner as will minimize interference, delay and expense of work of others or for the best interests of the Project as the Contractor may determine. If so ordered by the Contractor, the Subcontractor shall prosecute certain portions of the Subcontract work in preference to other portions, at no increase in Subcontract price.  Subcontractor shall keep and maintain on the Project a sufficient number of properly qualified workmen and a sufficient quantity of materials, equipment and supplies to perform the work as required without delay. Should Subcontractor cause delay in the progress or completion of the Project, the damages resulting therefrom, including, but not limited to, liquidated and/or actual damages assessed by Owner and attributable thereto, shall be the obligation of Subcontractor.

4.1    Subcontractor shall reimburse the Contractor for any damages assessed by the Owner or other subcontractors, whether liquidated or otherwise, against the Contractor and for any damages otherwise incurred by or asserted against the Contractor as a result of delays or difficulties caused by or attributable to the Subcontractor. Furthermore, the Subcontractor shall pay the Contractor's acceleration costs, extended job site overhead, unabsorbed home office overhead, and all other direct and indirect expenses of whatever nature, including attorney's fees, caused in whole or in part by delays, disruptions, or other reasons attributable to the Subcontractor.

4.2    If the Subcontractor falls behind the Contractor's schedule for the Subcontractor work or if, in the opinion of the Contractor, the Subcontractor is otherwise not maintaining a satisfactory rate of progress as determined by the Contractor, the Contractor may direct the Subcontractor to take such action as the Contractor deems necessary or appropriate to improve the Subcontractor's rate of progress including, but not limited to, increasing the number of superintendents, foremen, skilled labor, and unskilled labor, increasing the number of crews, increasing the number of shifts, employing more or better equipment, working overtime, expediting delivery of materials, substituting materials, changing sequence of performance, prosecuting parts of the Subcontract work in preference to other parts, and any other increase or acceleration of effort, all of which shall be performed by the Subcontractor at no cost to the Contractor. In addition to the foregoing, the Contractor shall have the right, but not the obligation and without prejudice to any other right or remedy, to provide, either with Contractor's own forces or with others, any additional

4

ARTICLE IV: TIME (continued)

labor, materials, equipment, supervision, or other item and to take such further actions as the Contractor deems necessary or appropriate, which shall be at the Subcontractor's cost and which the Contractor shall be entitled to deduct from any payment, whether then due or thereafter to become due to the Subcontractor. The Contractor's administrative and overhead expenses will be included in this cost. The Contractor's decisions and directives under this paragraph shall be final and binding.

4.3     The Subcontract amount provided herein constitutes full and complete payment to the Subcontractor for all Subcontract work to be performed, for all loss or damage arising out of the nature of the work, for any unforeseen difficulties or obstructions which may arise or be encountered during prosecution of the work, for all risks of every description connected with the work, for all expenses incurred by or in consequence of suspension, interference, disruption, hindrance, or discontinuation of the work. If the Subcontractor's work is delayed, hindered, suspended, disrupted, interfered with, rendered less efficient or more costly, or adversely affected in any way by any cause whatsoever whether such delays or hindrances are avoidable or unavoidable, anticipated or unanticipated, reasonable or unreasonable (including, but not limited to, acts or omissions of the Contractor or the Owner, the Architect or other subcontractors, by unusually severe weather, by acts of God, by unavoidable casualties, war, strikes, picketing, boycott, lockouts, or by any other reason beyond the Subcontractor's control and without fault or contribution by the Subcontractor), the sole and exclusive remedy of the Subcontractor shall be to receive from the Contractor an extension of time for each day of proven actual, excusable, and non-concurrent delay to the Subcontractor's work which, at the time of such delay, was on the Project's critical path. Notwithstanding anything to the contrary indicated in this Subcontract or in the Prime Contract, the Subcontractor shall have no claim for damages and shall have no right of additional compensation from the Contractor by reason of any delay, hindrance, disruption, suspension, interference, obstruction, inefficiency or any other adverse impact or increased expense to the Subcontractor's work, except for an extension of time as provided in this provision. Notwithstanding any other provision or notice requirement herein, an extension of time for delays under this section may be granted only upon written application(s) by the Subcontractor made within forty-eight (48) hours from the beginning of the claimed delay. Under no circumstances shall the time of completion be extended to a date which will prevent Contractor from completing the entire Project within the time allowed Contractor by Owner for such completion.

4.4     Contractor may, with or without cause, order Subcontractor to stop or suspend all or any part of the work under this Subcontract for such time as may be determined to be appropriate for the convenience of Contractor. Phased work or interruption of the Subcontract work for short periods of time shall not be considered a suspension. The preceding section shall apply in the event of suspension ordered by the Contractor and the Subcontractor shall be entitled to, as its sole and exclusive remedy, an extension of time as set forth above, but not an adjustment of Subcontract price. The Subcontract time shall not be adjusted for any suspension, to the extent that performance would have been suspended, due in whole or in part, to the fault or negligence of the Subcontractor or by a cause for which Subcontractor would have been responsible.

ARTICLE V: TERMINATION

5.0     The Subcontractor shall be deemed in default, if at any time, the Subcontractor shall, in the opinion of Contractor: (a) refuse or for any reason fail at any time to prosecute the Subcontract work in a diligent, timely, workmanlike, skillful, cooperative, safe, and careful manner, (b) fail to supply sufficient, adequate or competent supervision, (c) fail to furnish a sufficient number of properly skilled workmen, (d) fail to have at the Project sufficient materials and equipment of the proper quality and quantity, (e) fail to promptly correct defective work, (f) fail to promptly pay its bills and discharge its obligations on this Project or otherwise, (g) fail to perform any term or condition of any part of the Subcontract, all of which are material, or (h) otherwise delay the work of the Contractor or other subcontractors. The parties acknowledge that each of the forgoing is a material breach of this Subcontract. After notice to the Subcontractor to remedy such breach or breaches, Subcontractor shall immediately, and in no event longer than three (3) days, remedy such breach or breaches in such manner and with such diligence and promptness as may be required by the Contractor. Upon Subcontractor's failure to do so, the Contractor may terminate this Subcontract in whole or in part and may take possession of all drawings, materials, equipment, tools, and appliances belonging to the Subcontractor as may be deemed necessary or desirable to complete the Subcontract work.

5.1     If the Subcontractor institutes or has instituted against it a case under the United States Bankruptcy Code, such event is presumed to impair or frustrate the Subcontractor's ability to perform its obligations under the Subcontract. Within ten (10) days after Contractor's request, the Subcontractor (or its trustee, successor, or other party acting for the Subcontractor) shall deliver to Contractor adequate assurance of Subcontractor's ability to perform all material obligations under the Subcontract. Additionally, the Subcontractor shall file, at the earliest time permitted by law, an appropriate action for assumption or rejection of the Subcontract and the Subcontractor shall diligently pursue such action. If the Subcontractor fails to comply strictly with the foregoing obligations, the Contractor shall be entitled and is hereby authorized to request the Bankruptcy Court to reject the Subcontract, to declare the Subcontract terminated, and to permit the Contractor to pursue any other recourse or remedies available. The rights and remedies under this section are not intended and shall not be construed to limit any other rights and remedies of the Contractor under this Subcontract or as otherwise afforded by law, including the Contractor's entitlement to seek relief from any automatic stays under the Bankruptcy Code and from any order of a court of competent jurisdiction. In particular, the Contractor shall be entitled to assert all rights and remedies against any bond or policy of insurance furnished by the Subcontractor, notwithstanding any case instituted by or against the Subcontractor under the Bankruptcy Code.

5.2     Upon termination of this Subcontract in whole or part by the Contractor, the Subcontractor shall not be entitled to receive any further payments on this Project or any other project until the Subcontract work has been completed and accepted by the

5

## ARTICLE V: TERMINATION (contin...₃)

Contractor, Architect and Owner and not until final payment for same has been received by the Contractor. The Subcontractor shall be liable for all expense of completing the Subcontract work, including all performance costs of whatever nature plus reasonable allowances for overhead and profit and including all other damages, losses, expense, and costs, including attorneys fees, incurred by the Contractor as a result of any termination of this Subcontract and performance of Subcontract work and discharge of Subcontract obligations by any entity other than the Subcontractor. The Contractor's records will be the sole basis for computing the cost of this work, and the Contractor's administrative and overhead expenses (including items such as social security payments, unemployment taxes, insurance coverage, any attorney's fees associated with the default, etc.) will be included in this cost. If, upon final payment by Owner to Contractor, the unpaid Subcontract balance exceeds the damages, costs, and liability, including attorney's fees, incurred by Contractor in completing the Subcontract work and sustained by Contractor by reason of termination of the Subcontract, such excess shall be paid by Contractor to Subcontractor. If the Contractor's damages, costs, and liability, including attorneys' fees, exceed the unpaid Subcontract balance, Subcontractor shall pay the difference to the Contractor. In no event shall the Subcontractor be entitled to be paid or to recover from the Contractor more than the amount due under this Subcontract for the work completed at the date of termination of the Subcontract.

5.3    Inasmuch as the injury or damage to the Contractor by reason of any default hereunder by the Subcontractor is difficult to determine with any degree of certainty, it is agreed that in computing the expense of finishing the work as above provided, there shall be added to such expense a sum equal to ten (10%) percent of the costs incurred for such finishing, and said amount is hereby agreed upon, fixed, and determined by the parties hereto not as a penalty but as the liquidated damages that the Subcontractor will suffer by default. These liquidated damages are in addition to any actual or liquidated damages that may be imposed by the Owner as a result of time delays Subcontractor has caused. The Contractor shall not be liable or accountable to Subcontractor in any way for the manner in which it may complete the work, nor shall the remedies and rights given above be construed as a substitute for or a waiver of any of the legal rights of the Contractor against the Subcontractor.

5.4    The Contractor shall have the right to terminate this Subcontract without fault of the Subcontractor. Upon receipt of notice from the Contractor of the termination, the Subcontractor shall do only that work set forth in the Contractor's notice and shall preserve and protect the materials and equipment pertaining to the Subcontractor's work. In the event of such no fault termination, and subject to the conditions precedent to any payment to the Subcontractor set forth in this Subcontract, the Subcontractor shall be entitled to payment, as its sole and exclusive remedy, for the lesser of either (1) the Subcontract value of all work satisfactorily performed and for all materials and equipment satisfactorily stored on site or in transit, which are not saleable in the Subcontractor's ordinary course of business and which the Subcontractor can transfer to the Contractor free of any liens or encumbrances or (2) the reasonable, actual direct costs for such work plus a single allowance, not to exceed ten percent (10%), for both overhead (including job site and home office) and profit on such costs.

5.5    If the Contractor terminates the Subcontractor for default, and it is determined for any reason that the Subcontractor was not actually in default under this Subcontract at the time of termination, the Subcontractor shall be entitled to recover from the Contractor, as its sole and exclusive remedy, the same amount as the Subcontractor would be entitled to receive under a no fault termination.

5.6    Notwithstanding anything to the contrary herein and regardless of whether the termination is complete or partial, whether the termination is for default or for no fault, and whether the termination converted from default to no fault, the Subcontractor's sole and exclusive remedies for termination of this Subcontract shall be those expressly provided and under no circumstances, shall the Subcontractor be entitled to special, consequential, or punitive damages, anticipated or lost profit, or other recovery of any nature except for payment for Subcontract work properly performed and actually completed by the Subcontractor. In no event shall the Subcontractor be entitled to any compensation for Subcontract work not performed by the Subcontractor or for payment in excess of the Subcontract amount as may be adjusted by properly authorized written Change Orders.

## ARTICLE VI: COMPLIANCE WITH LAWS

6.0    The Subcontractor shall perform the Subcontract work in a safe and proper manner and shall comply with all laws, ordinances, building codes, safety requirements, and regulations of whatever nature that apply to this Subcontract, including but not limited to OSHA. The Subcontractor shall give adequate notices pertaining to the work of the Subcontractor to proper authorities and secure and pay for all necessary licenses and permits to carry on Subcontractor's work. The Subcontractor is responsible for all inspection requirements and regulations of all governmental agencies and authorities, including OSHA, with respect to the Subcontractor's work and shall pay any fine(s) (including those which may be assessed against the Contractor) and other expenses (including, but not limited to Contractor's attorneys' fees) which may be attributable to the Subcontractor's failure to comply with any regulation.

6.1    The Subcontractor shall employ labor, make purchases and transact its business without discrimination as to race, color, gender, creed, or religion and also without discrimination as to whether employees of the Contractor, other subcontractors, material suppliers, or other entities involved in the Project are members or are not members of any labor union or other labor organization. The Subcontractor agrees to comply with all laws, including but not limited to, Executive Order 11246, if applicable. If required by Contractor or Owner, Subcontractor agrees to meet any minority goals.

6

ARTICLE VI: COMPLIANCE WITH L_____.S (continued)

6.2    The Subcontractor has full and exclusive liability for all contributions, taxes, deposits, and payments required of employers by federal, state, or local governments, with respect to wages, salaries, remuneration, or benefits paid or owed by the Subcontractor to any of Subcontractor's employees or others who perform work or render services for Subcontractor in connection with this Subcontract. The Subcontractor has exclusive liability for all income, gross receipts, sales, use, or other taxes applicable to the Subcontractor's work and to any item furnished or employed, any expense incurred, all work performed, and all revenue earned by the Subcontractor pursuant this Subcontract. In the event the Contractor is held liable to pay any such tax or contribution on behalf of the Subcontractor, the Subcontractor agrees to supply the Contractor with all records necessary to compute the same and to fully reimburse the Contractor upon demand for the amount thereof (including penalties and interest) paid by the Contractor; the Contractor shall have the further right to deduct any amount so paid, plus attorneys' fees and a reasonable overhead expense from any sums due the Subcontractor by the Contractor on this or any other project.

6.3    The Subcontractor bears full and exclusive responsibility and liability for the proper discovery, identification, reporting, handling, removal, and disposal, whether on site or off site, of all materials encountered, used, or generated in the performance of the Subcontract work which are defined or considered as hazardous by federal, state or local authorities having jurisdiction over the Project, and the Subcontractor shall comply with all laws, regulations, standards, and safety requirements with respect to such hazardous materials. If the Subcontractor fails to comply with its responsibilities under this paragraph, the Contractor may perform such work with Contractor's forces or through others at the expense of the Subcontractor.

ARTICLE VII : PAYMENT

7.0    Subcontractor shall furnish such evidence as the Contractor may require as proof of payment of all obligations and claims in connection with this Subcontract including, but not limited to, sworn statements showing all parties who furnish labor, materials, or services, to the Subcontractor with their names, addresses, and amount due or to become due each. Like statements may be required of subcontractors, vendors, suppliers, etc. of Subcontractor. Contractor is not required to make any payment to Subcontractor unless Subcontractor shall previously have provided releases executed by all persons who might have mechanic's lien, stop notice or labor and material bond rights against the Project arising out of work performed under the Subcontract, using Contractor's forms. Contractor reserves the right to make payment by joint check or by direct check to Subcontractor and Subcontractor's suppliers or subcontractors or any person having a right of action against Contractor, its surety or Owner under any law. In the event that the Contractor wishes to furnish the equipment, materials and supplies, or portion thereof, necessary to effect performance of all or any portion of the Project described herein, the Subcontractor agrees to allow the Contractor, at the Contractor's option, to make payment directly to the manufacturer or vendor for some or all material required by the Subcontractor and to credit the value of the material so paid against the Subcontract sum. As a condition precedent to final payment to the Subcontractor, and in addition to the other conditions precedent to final payment to the Subcontractor set forth in this Subcontract, the Subcontractor shall furnish Contractor an affidavit of payment of all bills and obligations, a release of liens or other encumbrances respecting the Project, and a general release of claims, together with such other affidavits and other documents as may be required by the Contractor.

7.1    Subcontractor warrants that he has sufficient funds and credit to pay currently all bills incurred in the performance of the work hereunder without the necessity of resorting to earnings for work performed and agrees that failure to pay such bills shall be a breach of this Subcontract for which Contractor may, but shall not be required to, withhold all sums otherwise payable hereunder for past and future earnings until Subcontractor presents satisfactory evidence of payment. In case any such bill or related claim is disputed by Subcontractor, Contractor may, for the purposes of this section, consider the same to be valid until discharged and released or until satisfactory security is given for Contractor's indemnification. At Contractor's option, Contractor may, but shall not be required to, pay any such bill or claim and recover the same from Subcontractor or any Surety or deduct the same from any payments otherwise due to Subcontractor. Any and all payments made on good faith in the belief that Contractor is liable, whether liable or not, shall be conclusive of Contractor's right to reimbursement and a sworn itemized statement thereof or the checks or other evidence of payment shall be prima facie evidence of the fact and extent of Subcontractor's liability. Notwithstanding the foregoing, the Contractor shall not have a duty to determine or adjust any claims or disputes between those parties furnishing labor, materials, equipment or other things hereunder, or to withhold any money for their protection; nor shall Contractor be liable for its failure to do so.

7.2    The Subcontractor agrees that the Contractor has the right, but not the obligation, to withhold payments otherwise owed to Subcontractor on this or any other subcontracts or projects and to pay any bills or past due obligations of the Subcontractor arising on this or other projects, including backcharges owed to the Contractor. If the Contractor is exposed to liability by any act or omission of the Subcontractor, the Contractor shall be entitled to withhold or offset against any amounts the Contractor owes to the Subcontractor, whether on this or other projects, equal to the full extent of the Contractor's exposure to liability attributable to the Subcontractor. Without limiting the generality of the foregoing, payments otherwise payable hereunder may be withheld in whole or in part by Contractor on account of: (1) defective materials or work not remedied, missing materials not furnished or cleanup not performed; (2) claims filed or reasonable evidence indicating potential filing of claims by unpaid suppliers of labor, materials or equipment to Subcontractor; (3) failure of Subcontractor to make payments properly to its subcontractors, or for labor, materials or equipment, transportation or shipping costs, taxes, fees or other claims arising out of Subcontractor's work; (4) reasonable doubt that Subcontractor can complete the scope of work to be performed within the time required or for the balance of the Subcontract price then unpaid; *(5)* damage to another subcontractor, Owner and/or Contractor; (6) unsatisfactory prosecution of the work by the Subcontractor; (7) failure to deliver any required "as-built" drawings, operation or maintenance manuals, written

7

ARTICLE VII : PAYMENT (continue. ,

guarantees or warranties; (8) failure to obtain the approvals required by any authority having jurisdiction over Subcontractor's work; (9) failure to provide certificates or other evidence of insurance or Subcontract bonds acceptable to Contractor; or (10) failure of Subcontractor to cure any default or to perform in accordance with this Subcontract. If the foregoing conditions are removed to Contractor's satisfaction, the withheld payments shall promptly be made. If such conditions are not so removed, Contractor may take such steps as in its judgment may be required to rectify the same and all costs and expenses incurred by Contractor therefore shall be paid by Subcontractor or be credited against payments otherwise payable to Subcontractor.

7.3    The Subcontractor agrees to submit to the Contractor applications for payment in a form acceptable to the Contractor and in such reasonable time as to enable the Contractor to apply for payment as provided in the Prime Contract. Subject to the terms and conditions of this Subcontract, the Contractor agrees to send payment less retainage for the approved Subcontractor's application for payment within five (5) working days after the Contractor receives payment from the Owner for the Contractor's application. Should the Subcontractor's portion of the Contractor's application be reduced or denied for any reason, the Contractor's payment to the Subcontractor will be reduced or denied accordingly. Notwithstanding anything to the contrary in this Subcontract, in the Prime Contract or in any bond or other document, the Owner's approval of the Subcontract work for which payment is requested and the Contractor's actual receipt of each progress payment, final payment or any other payment from the Owner shall each be an absolute condition precedent to any obligation of Contractor to make any progress payment, final payment or any other payment whatsoever to Subcontractor, including but not limited to the obligation to pay for extra or changed work or any claim for additional compensation or damages claimed by reason of acts or omissions of Owner. Both progress payments and final payment to the Subcontractor shall be made only out of funds actually received by the Contractor from the Owner for progress payments or for final payment of the Prime Contract and only to the extent said progress payments or final payment reflect Subcontract work which has been satisfactorily performed by Subcontractor in strict accordance with this Subcontract and which has been approved and paid by Owner. Subcontractor hereby expressly warrants and agrees that Subcontractor is relying upon the credit, solvency and financial stability of the Owner and not the Contractor for payment of work performed under this Subcontract.

7.4    The Contractor, may, at its option, withhold up to ten (10%) percent retainage for payment otherwise due and payable to the Subcontractor until final payment. Final payment and release of retainage shall be made at the completion of the work covered by this Subcontract, but only: (1) upon written acceptance thereof by the Contractor; (2) after Subcontractor has provided documentation required by this Subcontract or as otherwise reasonably required by the Contractor or Owner; and (3) as a condition precedent, the Owner has made final payment and has released retainage to the Contractor. The Subcontractor's acceptance of final payment constitutes the Subcontractor's general release of the Contractor, the Contractors surety and the Owner from all claims and all claims and liabilities of whatever nature. No payment, including final payment, shall be construed as acceptance of defective or incomplete work, and the Subcontractor shall remain responsible and liable for performance of its work in strict compliance with this Subcontract.  In the event the Contractor's retainage is reduced, the Contractor will reduce the Subcontractor's retainage in like percentage but only if the Subcontractor has provided a bond hereunder, satisfactorily completed at least 50% of its scope of work, the Subcontractor's work is on schedule, and the Subcontractor is in compliance with all terms and conditions of the Subcontract.

ARTICLE VIII: LIENS

8.0    Subcontractor, for itself, its subcontractors, its suppliers, and all parties acting through or under it, hereby covenants and agrees not to file any lien or make any claim against the Project or the premises related thereto or any part thereof or against any building or buildings or other improvements erected or made to be erected or made thereon, or file any lien, make any claim, or issue any stop payment notice against any monies due or to become due to Contractor, in accordance with any statute, state or federal, for any cause whatsoever.

8.1    Subcontractor shall promptly pay or discharge in full or provide adequate security for the payment of all claims of any persons, firms or corporations furnishing or claiming to have furnished labor, materials, tools, equipment, or incidentals used in, upon, or for the work, whether or not as to any such claim a lien or right of enforcement is established or attempted to be established upon or against the work, the real property upon which the work is situated, upon any bond furnished by Contractor or upon any monies payable to Contractor by Owner.

8.2    Further, in case suit on any such claims is brought, Subcontractor shall defend said suit at his own cost and expense, and will pay and satisfy any such lien or judgment as may be established by the decision of the court in said suit. Subcontractor agrees within ten (10) days after written demand, to cause the effect of any suit, lien or stop notice to be removed from the premises, and in the event Subcontractor shall fail to do so, Contractor is authorized to use whatever means in its discretion it may deem appropriate to cause said suit, stop notice or lien to be removed or dismissed and the cost thereof shall be immediately due and payable to Contractor by Subcontractor. Subcontractor may litigate any lien or suit above described provided Subcontractor causes the effect thereof to be removed promptly, in advance, from the premises and shall further do such things as may be necessary to cause Owner not to withhold any monies due to Contractor from Owner by reason of such liens or suits.

8.3    Subcontractor agrees and covenants that monies received for performance under this Agreement shall be used solely for the benefit of persons and firms supplying labor, materials, supplies, tools, machines, equipment, plant or services exclusively for this Project in connection with this Subcontract and having the right to assert liens or other claims against the land, improvements or funds involved in this Project or against any bond or other security posted by Contractor or Owner, and that any monies paid to Subcontractor pursuant to this Subcontract shall immediately become and constitute a trust fund for the benefit of said persons

8

ARTICLE VIII; LIENS (continued)

and firms and shall not in any instance be directed by Subcontractor to any other purpose until all obligations arising hereunder have been fully discharged and all claims arising therefrom have been fully paid.

8.4      The SUBCONTRACTOR shall furnish the CONTRACTOR with such partial releases and waivers of lien by SUBCONTRACTOR, his material-men and creditors as the CONTRACTOR may require from time to time on labor, material, Mississippi State Taxes and/or other claims, and final releases and waivers of lien at the time of final payment on this Subcontract. The SUBCONTRACTOR agrees to furnish such sworn affidavits as may be required by the CONTRACTOR attesting to the SUBCONTRACTOR'S financial condition as relates to this Subcontract indicating amounts paid and owing for labor, materials, Mississippi State Taxes and other expenses.  Such waivers and affidavits shall be a condition precedent to partial and final payments.

ARTICLE IX: INSURANCE

9.0      Subcontractor shall obtain, before commencement of work, and shall maintain until final acceptance of the Prime Contract work, full insurance coverage, including as a minimum the same types of insurance at the same policy limits which are specified by the Prime Contract or which the Contractor requires for this Project, whichever are greater. The Subcontractor is hereby made responsible for determining and obtaining the types and extent of such additional insurance as may be necessary to give adequate and complete protection to the Subcontractor, the Contractor, and the Owner from claims for property damage and from claims for bodily injury, including death, which may arise from or be connected with this Subcontract, whether such claims relate to acts or omissions of Subcontractor, of any of its subcontractors or suppliers, or anyone directly or indirectly employed by any of them. The Subcontractor shall name the Contractor as a named additional insured (but not subject to premium terms or liability) on all insurance policies and coverages, and the Subcontractor's insurance shall be primary as to any other valid insurance available to the Contractor and shall contain a standard cross-liability endorsement, severability of interests clause, and a waiver of all rights of subrogation by Subcontractor's insurer as against the Contractor. This waiver of subrogation and additional insured endorsement shall also appear on the Certificate of Insurance furnished by the Subcontractor (but failure to appear on the Certificate of Insurance as required shall not affect the obligation hereunder). The insurance protection and coverage provided hereunder by the Subcontractor for the Contractor's benefit shall not be solely restricted to the Subcontractor's indemnity obligations but are intended to extend to all claims, liability, or loss of whatever nature arising from or relating to the Subcontractor, to the Subcontract work, or to this Subcontract, regardless of the alleged liability or fault of any party indemnified under this Subcontract.

9.1      If the Contractor or the Owner carries builders' risk or other insurance which may apply to the Subcontract work or which may otherwise inure to the benefit of the Subcontractor, the Subcontractor shall be responsible for all deductibles and for any inadequacy or absence of coverage, and the Subcontractor shall have no claim or other recourse against the Contractor or against the Owner for any costs or loss attributable to such deductibles or to coverage limitations, exclusions, or unavailability.

9.2      Before beginning any Subcontract work, the Subcontractor shall deliver to the Contractor three (3) copies of Certificates of Insurance, certifying the types and the amounts of coverage, certifying that said insurance was in force before Subcontractor started work, certifying that said insurance applies to the Subcontract work and to all activities and liability of the Subcontractor pursuant to this Subcontract, and certifying that the Contractor is a named additional insured on Subcontractor's policies of insurance by endorsement in a form acceptable to Contractor. The Subcontractor shall, if requested by the Contractor, deliver to the Contractor one duplicate original of the entire insurance policy.

9.3      No policy of insurance may be canceled, materially modified or reduced during the period of construction, and the Subcontractor shall obtain an endorsement to its policies providing substantially as follows: *"Insurer may not cancel this policy, modify or amend its terms or reduce coverage for a period of thirty (30) days after Hunt Yates LLC has acknowledged receipt of written notice of the insurer's intention to cancel, modify, amend or reduce the coverage."* The foregoing notice must appear on the Certificates of Insurance furnished by the Subcontractor.

9.4      The insurance and indemnity obligations of this Subcontract are non-delegable. The Subcontractor shall not sublet nor subcontract any part of this Subcontract without retaining absolute responsibility for requiring similar insurance from its subcontractors and suppliers. The Subcontractor's failure to maintain complete insurance as required by this Subcontract shall be a material breach authorizing the Contractor, at the Contractor's sole election and without prejudice to any other right or remedy, either to terminate this Subcontract for default or to provide appropriate insurance coverage at the Subcontractor's sole expense.

9.5      The Subcontractor shall be responsible for payment of all premiums for insurance required by this Subcontract, but the Subcontractor's obligations no shall be limited by or to the purchase of insurance. The Subcontractor shall indemnify and hold harmless the Contractor for all damages, as described in this Subcontract, irrespective of whether said insurance was actually obtained.

9.6      The Subcontractor shall be solely responsibility for all loss or damage to vans, sheds, trailers, machinery, tools, materials, equipment (rented or owned) and all property of the Subcontractor, and its Subcontractors, their agents, servants and employees, not destined to become a part of the work, it being understood that the Subcontractor may at its own expense carry any insurance which may be required to provide necessary protection against such loss, damage or liability resulting therefrom.

9

## ARTICLE X: PROTECTION OF WOR,

10.0   Subcontractor shall effectually secure and protect the work done hereunder and shall assume full responsibility for any and all risk of loss or damage to the work and all materials, tools, equipment, or incidentals until final acceptance thereof and release of responsibility therefor by Owner. Subcontractor shall protect the work, workmen, materials, tools, equipment and property of Subcontractor, Owner, Contractor and others on the Project against injury or damage in any way arising out of or connected with the operations conducted by Subcontractor hereunder or anyone acting under its direction or control, or on its behalf.

10.1   If Subcontractor damages the work of another subcontractor or the equipment or property of Owner, Contractor will issue a backcharge to Subcontractor for an adjustment in the Subcontract price to reflect the costs to correct the damage. If the subcontractor which caused the damage to an area of the Project cannot be identified, all subcontractors which performed work in the area of the damage within the time frame in which the damage occurred will be backcharged a pro-rata share of the cost of repair, which such pro-rata share shall be determined solely by Contractor.

10.2   The Subcontractor shall sequence and coordinate its work with the work of Contractor and other contractors in a manner to protect the work of Contractor and other contractors and the Project's interior from weather damage and water intrusion. The Subcontractor's obligation hereunder to protect the work includes protecting its own work and materials as well as the work and materials of Contractor and other contractors and the Project's interior from weather damage and water intrusion. In the event that water intrusion occurs from weather or any other cause due to Subcontractor's failure to carry out its obligations hereunder, Subcontractor shall be responsible for the cost to remedy all damages caused thereby, including, but not limited to, the cost of remediation of mold and mold spores and the testing for such mold and mold spores before and after remediation occurs. To the fullest extent permitted by law, Subcontractor agrees to defend, indemnify, hold harmless, protect, and exonerate the Contractor (its affiliates, parents, and subsidiaries) and the Owner from and against all liability, claims, damages, losses, suits, actions, demands, arbitrations, administrative proceedings, awards, judgments, attorneys' fees, costs, and expenses of whatever kind or nature, including but not limited to property damage and personal injury to any and all persons, related to or arising out of weather damage, water intrusion, or mold growth.

## ARTICLE XI: INDEMNIFICATION

11.0   TO THE FULLEST EXTENT PERMITTED BY LAW, THE SUBCONTRACTOR COVENANTS TO DEFEND, INDEMNIFY, HOLD HARMLESS, PROTECT, AND EXONERATE BOTH THE CONTRACTOR AND ITS AFFILIATES, AGENTS, EMPLOYEES, REPRESENTATIVE, AND SURETIES AND THE OWNER, ARCHITECT, AND ENGINEERS, JOINTLY AND SEVERALLY, FROM AND AGAINST ANY AND ALL LIABILITY, CLAIMS, DAMAGES, LOSSES, SUITS, ACTIONS, DEMANDS, LIENS, ARBITRATIONS, ADMINISTRATIVE PROCEEDINGS, AWARDS, JUDGMENTS, EXPENSES, COSTS, AND ATTORNEYS' FEES PERTAINING TO ECONOMIC LOSS OR DAMAGE, LABOR DISPUTES, SAFETY REQUIREMENTS, PERFORMANCE OR NON-PERFORMANCE OF OBLIGATIONS, CERTIFICATIONS, PROPERTY RIGHTS OF THIRD PARTIES, PERSONAL INJURY, BODILY INJURY, SICKNESS, DISEASE, DEATH, OR DAMAGE TO OR DESTRUCTION OF PROPERTY (INCLUDING LOSS OF USE THEREOF) WHICH (I) ARE CAUSED IN WHOLE OR IN PART BY THE SUBCONTRACTOR (HEREIN DEFINED TO INCLUDE BUT NOT BE LIMITED TO THE SUBCONTRACTOR'S OWNERS, EMPLOYEES, AGENTS, REPRESENTATIVES, SUBCONTRACTORS, SUPPLIERS, CONTRACTEES, AND INVITEES OR OTHER THIRD PARTIES CONNECTED WITH THE SUBCONTRACT OR THE AGENTS OR EMPLOYEES OF ANY OF THEM), (II) ARISE FROM OR OCCUR IN CONNECTION WITH WORK UNDERTAKEN OR TO BE PERFORMED BY THE SUBCONTRACTOR, REGARDLESS OF WHETHER THE SAME IS WITHIN OR BEYOND THE SCOPE OF WORK, OR (III) ARISE FROM OR ARE CONNECTED WITH ANY OTHER ACT OR OMISSION RELATING TO THE SUBCONTRACTOR, THIS SUBCONTRACT, OR THE SUBCONTRACT WORK. IT IS THE SPECIFIC AND EXPRESS INTENT OF THIS SUBCONTRACT FOR THE FOREGOING COVENANTS AND INDEMNITY OBLIGATIONS TO APPLY TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, REGARDLESS OF WHETHER THE LIABILITY IS CAUSED IN WHOLE OR IN PART BY A PARTY INDEMNIFIED HEREUNDER INCLUDING, WITHOUT LIMITATION, WHETHER OR NOT THE SAME BE CAUSED BY, OR ARISE OUT OF, THE JOINT, CONCURRENT, OR CONTRIBUTORY NEGLIGENCE OF A PARTY INDEMNIFIED HEREUNDER.

11.1   With respect to any matter to which the Subcontractor's defense obligations apply, Subcontractor, at Contractor's sole discretion, either shall defend the Contractor at Subcontractor's sole expense or shall pay for the Contractor's defense. The Contractor may make its election and may change its election at any time, without prejudice to any rights hereunder, including Subcontractor's obligation to pay all costs of defense. If the Contractor elects to undertake its own defense with attorneys and other personnel of Contractor's choosing or if the Contractor incurs expenses in connection with a defense undertaken by the Subcontractor, Subcontractor shall reimburse Contractor for all attorneys' fees and other expense related to the preparation and defense obligations to Contractor, with such payment required of the Subcontractor within five (5) days of Subcontractor's receipt of a statement of such fees and expenses from the Contractor. The Subcontractor shall cooperate and secure the cooperation of its employees, agents, servants, and others in asserting any and all defenses available to the Contractor. The Subcontractor's obligations to defend the Contractor shall be independent of and in addition to Subcontract provisions for indemnity and shall apply to the fullest extent permitted by applicable law.

10

ARTICLE XI: INDEMNIFICATION (c⌄ ..nued)

11.2   The Subcontractor's liability insurance policies shall each contain contractual liability coverage (including, but not limited to, products liability and completed operations) so as to effectuate Subcontractor's indemnity and defense obligations and to protect fully Subcontractor, Contractor, and Owner.

11.3   Subcontractor's indemnification obligations under this Subcontract shall in no way be limited by the limitation on amount or type of damages, compensation or benefits payable by or for Subcontractor, or any of its subcontractors, under any workers' compensation act, employer liability act, disability act or other employee benefit act.  The Subcontractor's indemnity obligations under this Subcontract further shall not be restricted to amounts available under insurance, whether actually obtained or which should have been obtained, but shall extend to the fullest extent, as set forth in this Subcontract. The indemnification provisions of this Subcontract shall survive final payment and/or termination of this Subcontract.

ARTICLE XII: CHANGES

12.0   Subcontractor shall make any and all changes in the work described in the Subcontract as directed by an Authorized Representative of Contractor in writing. Such change or written direction shall not invalidate this Subcontract. Changes may be additive or deductive. The Subcontractor shall have no claim or entitlement to payment for any change in the Subcontractor's work unless, prior to performance, the Subcontractor receives a written change order for such work at an agreed price from an Authorized Representative of the Contractor. If there is a dispute as to whether the work at issue is a change in the Subcontractor's work or there is a dispute as to the value of such change, the Contractor shall be entitled to issue a directive to the Subcontractor to perform the work in question and the Subcontractor shall be obligated to proceed with and complete performance of such work, without either party waiving its respective rights. No time extension shall be granted to the Subcontractor because a change order has been issued, unless it is expressly stated therein. No separate claim shall be made for delay or additional costs based on the number, nature, or extent of the changes made.

12.1   The Contractor, without invalidating this Subcontract or any bonds or security furnished hereunder, and without notice to the sureties, if any, may, at any time after the execution of this Subcontract, reduce or omit the Subcontractor's scope of work. The Contractor shall order such reductions or omissions by giving notice to the Subcontractor prior to when the work that has been reduced or omitted was scheduled to begin. When work is omitted or reduced, in whole or in part, the Contractor shall pay, subject to the provisions of this Subcontract, for all cost of work actually properly performed. Subcontractor is not entitled to compensation or damages for any losses, including loss of profit or overhead relating to the unperformed portion of reduced or omitted work.

12.2   Subcontractor shall not make any changes in the work described in this Subcontract or in any way cause or allow the work to deviate from the Subcontract without written direction from Contractor. If Subcontractor makes any changes in the work described in the Subcontract without written direction from an Authorized Representative of Contractor, then such change constitutes an agreement by Subcontractor that it need not be paid for that changed work, even if it received verbal direction from Contractor or any form of direction, written or otherwise, from Owner or any other person or entity. In addition, Subcontractor shall be liable for any and all losses, costs, expenses, damages, and liability of any nature whatsoever associated with or in any way arising out of any such change it makes without written direction from an Authorized Representative of Contractor.

12.3   In the manner and form and in such detail as required by the Prime Contract, Subcontractor shall give written notice of any changes, cost reimbursement, additive or deductive adjustment in Subcontract time or amount, additional compensation, or other claim of any nature (for the purposes of Sections 12.3 and 12.4, collectively referred to as "claim"), at least five (5) working days before the time the Prime Contract requires the Contractor to give notice of same to the Owner and at least one week before the work related to such claim begins. This provision shall not be interpreted to give the Subcontractor a right to any remedy for claims covered by Section 4.3 (except as provided therein) or otherwise disallowed by the provisions of this Subcontract. Timely notice as required above is an absolute condition precedent to the Subcontractor receiving any relief whatsoever for any such claim. The Subcontractor shall not begin the work related to the claim until authorized in writing by an Authorized Representative of the Contractor. The Subcontractor's recovery for any claim shall be limited to the extent of any amounts and time extensions that the Contractor, on behalf of the Subcontractor, actually receives from the Owner for such claim. Such price increase shall not exceed the Subcontractor's pro rata share of the total increase as determined by the Contractor and as approved and paid by the Owner.

12.4   The Subcontractor agrees that any claim shall be based upon the Subcontractor's actual direct costs and actual time incurred or saved with respect to the work or other subject matter of such claim. The Subcontractor shall maintain current, accurate, complete, and verifiable records and data, on a contemporaneous basis as costs and delay are being incurred with respect to such claim. Subcontractor shall identify, segregate, separately code, and fully substantiate with such contemporaneous records and data any actual direct costs and any actual time claimed, and Subcontractor shall be entitled to relief, if otherwise permitted herein, only for such costs and time proven to result solely from the subject matter of the claim and from no other factor.  In no event shall the Subcontractor be entitled to receive compensation or time adjustment for any claim on a "total cost" or "total time" basis, or any variation thereof.  Except to the extent further restricted or disallowed by other provisions of this Subcontract, Subcontractor's monetary relief for any claim shall be limited to the Subcontractor's actual direct and reasonable costs as provided above and a single markup on such actual costs not to exceed ten percent (10%) for all supervision, overhead, profit, indirect costs, and other damages of every kind or nature.

11

ARTICLE XII: CHANGES (continued)

12.5    The Subcontractor shall disclose only to the Contractor any price or quotation on the cost of contemplated changes in the work. If the Owner requires certification of any claim or the submission of cost or pricing data respecting any change or alteration, the Subcontractor covenants and agrees to furnish the Contractor with a certification of any and all of Subcontractor's claims and of Subcontractor's cost or pricing data. The Subcontractor's certification shall be in a form satisfactory to the Contractor. The Subcontractor shall give the Contractor, including the Contractor's designated representatives, access at all reasonable times and the right to examine, reproduce, and audit the Subcontractor's books, records, documents, information and data which are related to the Subcontractor's costs or time of performance or which are necessary or appropriate, in the Contractor's sole judgment, to evaluate any claim made by the Subcontractor or any defense or offset asserted by the Subcontractor to any claim made by the Contractor with respect to the Subcontract work. Contractor shall bear the cost of such examination or audit unless the Subcontractor's records or data are not complete, current, accurate, and verifiable in which case Subcontractor shall bear such costs. The Subcontractor shall indemnify, defend, exonerate, and hold harmless the Contractor from any losses, claims, damages, or expenses which Contractor may suffer or incur, including attorney's fees and related costs, as a result of Subcontractor's failure or inability to support any part of its claim or as a result of Subcontractor's failure to provide complete, current, and accurate cost or pricing data.

12.6    No change, alteration, or modification to or deviation from the work described in this Subcontract, whether made in the manner provided in this section or not, shall release or exonerate, in whole or in part, any bond or any surety on any bond given in connection with this Subcontract, and no notice is required to be given to such surety of any such change, alteration, modification, or deviation. Any increases in the Subcontract price shall automatically increase the respective penal sums of the performance bond and of the payment bond furnished by the Subcontractor; however, the penal sum shall not decrease in the event of a decrease in Subcontract price.

ARTICLE XIII: SAFETY REQUIREMENTS AND LABOR PROVISIONS

13.1    The SUBCONTRACTOR agrees to abide by and comply with all FEDERAL, STATE, and LOCAL labor, occupational, safety and health laws and the safety programs prescribed by the OWNER and/or the CONTRACTOR including FAR 36.513 and alternate 1 which includes the latest version of the U.S. Army Corps of Engineers Safety and Health Requirements Manual, EM 385-1-1, in effect on the date of this solution.

13.2    The SUBCONTRACTOR shall insure that all machines are properly equipped with the manufacturer's recommended guards and safety devices, are in safe condition, and operated in the prescribed manner.

13.3    The SUBCONTRACTOR agrees to comply with all Labor Standard Provisions, and all Equal Opportunity, non-discrimination and non-segregation clauses of the General Contract which by reference are incorporated herein. In the absence of any labor provisions in the General Contract, the SUBCONTRACTOR agrees to be bound by regulations prescribed by law in the locality of the job site, including but not limited to, the Fair Labor Standard Act, the Civil Rights Act of 1964, and the Occupational Safety and Health Act of 1970. SUBCONTRACTOR shall be liable to CONTRACTOR for any damages or delays resulting from SUBCONTRACTOR'S failure to comply with such laws and/or requirements. In the prosecution of the Work, SUBCONTRACTOR agrees to recognize and comply with all agreements of the CONTRACTOR with local trade councils and/or separate unions concerning labor and working conditions and otherwise applicable to this work, insofar as these agreements do not conflict with or violate any LOCAL, STATE or FEDERAL laws or properly constituted orders or regulations pertaining to this project. SUBCONTRACTOR is familiar with the applicable Local, State and/or Federal laws in relation to wages and hours, and where such laws apply to the Work, the SUBCONTRACTOR shall comply with the terms and provisions thereof and shall hold the CONTRACTOR harmless from any loss, liability, and expense arising out of any violations of the same by the SUBCONTRACTOR.
13.4    No one in the CONTRACTOR'S employ has any right to grant the SUBCONTRACTOR or his agents, contractors or employees, the right to use or ride on CONTRACTOR'S material hoists or other equipment, except the project manager or an executive officer of the CONTRACTOR, and then only in writing. The use by SUBCONTRACTOR of any of CONTRACTOR'S facilities including hoisting equipment, material, personnel, or services whether given, loaned, or rented to SUBCONTRACTOR and whether or not operated by CONTRACTOR is subject to SUBCONTRACTOR'S covenant to use any of the aforementioned at SUBCONTRACTOR'S risk, and to take the same as is, and only after SUBCONTRACTOR is satisfied as to the condition thereof, and SUBCONTRACTOR does hereby agree to indemnify and hold harmless CONTRACTOR from and against any and all claims, damages, liabilities, losses, cost, and expenses (including but not restricted to costs of litigation) arising out of or claimed to have arisen out of death, injuries, or damages to any and all persons and to any and all property in any way directly or indirectly caused or connected with such use of equipment, material, personnel, or services.

ARTICLE XIV: WARRANTY

14.0    The Subcontractor hereby guarantees and warrants its work shall comply strictly with this Subcontract and with all parts of the Prime Contract applicable to the Subcontractor's work, and the Subcontractor further guarantees and warrants its work to be of good material and workmanship, free from defects, fit, safe, merchantable, and sufficient for the purposes intended. The Subcontractor further guarantees and warrants that the Subcontractor has good title to all such work, material, and equipment covered by this Subcontract, and Subcontractor shall deliver and install same free from any liens, security interest, or encumbrance. In addition to Subcontractor's warranties and guarantees as provided by the Prime Contract and by this Subcontract, the Subcontractor shall also have the obligation to correct any Subcontract work which does not fully satisfy and comply strictly with the requirements of this Subcontract, including the foregoing warranties and guarantees, and this period of

12

ARTICLE XIV: WARRANTY (contin.   .)

mandatory correction shall extend for the same period as the Contractor's correction of work and/or call-back obligations under the Prime Contract or for two years after final payment to the Subcontractor or final payment by Owner to Contractor, whichever is longer. The warranties and guarantees set forth herein are in addition to any other warranties or guarantees required by the Prime Contract, provided by law, or set forth by separate agreement. Any Subcontract work not conforming to the requirements of this Subcontract, including substitutions not properly authorized, shall be considered defective and shall be promptly replaced or corrected as directed by the Contractor.

14.1   If at any time during the warranty period, any part of the materials or workmanship furnished by the Subcontractor shall become defective or not be in conformance with the plans and specifications as determined by the Contractor, the Subcontractor will, upon notice to that effect from the Contractor, repair or replace within three (3) hours items that are deemed as "Emergency Response" items and three (3) days on all other warranty items to the satisfaction of and without cost to the Contractor. The Subcontractor's warranty is in addition to and not in lieu of any warranty afforded the Owner under applicable law. The terms and conditions of this Subcontract shall apply to any and all modification, repair and replacement of the work, whether within the warranty period or thereafter.

14.2   The Subcontractor shall be responsible for its own quality control of the work performed by it pursuant to this agreement. No action or inaction of the Contractor will be deemed to excuse or relieve the Subcontractor for its own quality control or for any defective work performed or non-conforming materials furnished by the Subcontractor. In the event the scope of work includes installation of materials or equipment furnished by others or work to be performed in areas to be constructed or prepared by others, it shall be the responsibility of Subcontractor to examine and accept, at the time of delivery or first access, the items so provided and thereupon handle, store and install the items with such skill and care as to insure a satisfactory completion of the work. Use of such items or commencement of work by Subcontractor in such areas shall be deemed to constitute acceptance thereof by Subcontractor.

ARTICLE XV: DISPUTE RESOLUTION

15.0   This Subcontract shall be deemed entered into in Biloxi, Mississippi, upon execution by the parties. The laws of the state of Mississippi govern this Subcontract and all actions or proceedings instituted by or against the Contractor upon any claim or cause of action arising out of or relating to this Subcontract or this Project shall be commenced in Harrison County, Mississippi, subject to Section 14.2. The Subcontractor shall be liable for all damages, costs, expenses, including attorney's fees, incurred by the Contractor in enforcing the terms and conditions of this Subcontract.

15.1   Claims, disputes, and other matters in controversy between the Contractor and the Subcontractor (including any affiliates, agents, employees, representatives, and sureties of either of them) arising out of or relating to this Subcontract shall be decided by binding arbitration in accordance with the current and applicable rules and procedures of the American Arbitration Association, except if the Contractor in good faith believes that any claim, dispute, or matter in controversy with the Subcontractor also involves rights or liabilities of the Owner, Architect, or other third party, then, at the Contractor's sole election, the Subcontractor agrees to resolve such issues in the same forum or proceeding, including arbitration, court, or administrative authority, which has jurisdiction over some or all claims, disputes, and matters in controversy involving the Owner, Architect, or other third party so as to promote economy and avoid inconsistent results. This also applies to any claim, dispute, or matter(s) in controversy or in question between the Subcontractor and any of the Contractor's employees or agents of the Contractor's affiliated businesses or their employees or agents.   The agreement to arbitrate contained herein shall be specifically enforceable under the prevailing arbitration law.

15.2   The Contractor and Subcontractor intend and agree that the foregoing dispute resolution provisions and rights of election given to the Contractor are not independent of or severable from the remainder of the Subcontract and that such provisions and election rights are supported by the consideration and mutuality of the Subcontract as a whole. The locale for any arbitration or litigation involving the Subcontractor and the Contractor shall be Biloxi, Mississippi, unless the Contractor agrees to designate another locale to facilitate joinder of parties, to consolidate claims, or for any other reason.  To the full extent permitted by law, the parties hereby expressly and knowingly waive any right to a jury trial they may have for all causes, claims, and issues in any way relating to or directly, indirectly, wholly, or in part, arising from this Subcontract.

15.3   Should the Contractor through litigation, arbitration, or other means seek to recover on any surety bond given by the Subcontractor under this Subcontract, the Subcontractor and its surety, jointly and severally, agree to pay Contractor for all its costs, expenses, and attorneys' fees incurred in the investigation preparation, and trial or hearing of such matters and otherwise reasonably related thereto.

15.4   If the Contractor and the Subcontractor litigate or arbitrate a monetary claim, not otherwise prohibited by this Subcontract, the party found liable in such proceedings will pay the other party's reasonable and necessary attorneys' fees.

15.5   No claim, dispute, or matter in controversy or question shall interfere with the progress of construction, and the Subcontractor shall proceed diligently with performance of this Subcontract, notwithstanding the existence of any claim, dispute, or matter in controversy or question.

13

ARTICLE XV: DISPUTE RESOLUTI.   (continued)

15.6   The Subcontractor's remedies against the Contractor arising from or in connection with this Subcontract, whether framed in contract, negligence, other tort, or otherwise, shall be limited to the remedies set forth in this Subcontract. Notwithstanding anything contained herein to the contrary, the Subcontractor hereby waives all rights it might otherwise have to recover special, consequential, or punitive damages from the Contractor arising from or relating to this Subcontract.

ARTICLE XVI: NOTICES

16.0   Any notice provided for herein to the Subcontractor may be given in writing by United States mail, and shall be considered as given when addressed to the last known address of the Subcontractor and deposited in the United States mail, and shall be effective for all purposes, as of the time of such deposit, whether actually received by the Subcontractor or not. Notice by any other means shall be effective when communicated to or received by the Subcontractor.

16.1   Any notice provided for herein to the Contractor shall be given to an Authorized Representative of Contractor via facsimile and in duplicate to Hunt Yates, LLC , by United States mail, return receipt requested, at  170 Minden Road, Biloxi, MS  39530

16.2   Subcontractor shall notify Contractor within seven (7) days of any change in the ownership of Subcontractor.

ARTICLE XVII: ASSIGNMENT

17.0   The Subcontractor shall not subcontract nor assign any part of this Subcontract without first obtaining the written consent and approval of the Contractor (which may be withheld in its sole discretion). Assignments of Subcontract proceeds are permissible but only if written notice of same is received and acknowledged in writing by an Authorized Representative of Contractor at least thirty (30) days before the assigned proceeds are due and payable to the Subcontractor. The Subcontractor and the Subcontractor's assignee shall ensure that the assignment of Subcontract proceeds does not adversely affect the performance of this Subcontract, including the full and timely payment of all bills and obligations owed by the Subcontractor. To the extent Subcontractor proceeds are paid to the Subcontractor's assignee the Subcontractor and the Subcontractor's assignee hereby agree to indemnify, defend, save harmless, and exonerate the Contractor from any loss, liability, or expense (including attorney's fees) which the Contractor incurs or which is claimed against either the Contractor or the Contractor's surety as a result of the Subcontractor's failure to perform work in accordance with the Subcontract or as a result of the Subcontractor's failure to pay its bills and discharge its obligations relating to this Subcontract. Any assignments of Subcontract proceeds and any payments made pursuant to assignments shall be subject to and conditioned upon the Subcontractor's compliance with all terms and conditions of this Subcontract and any payments under such assignments are expressly conditioned upon and restricted to the amount actually collected by the Contractor from the Owner for work performed by the Subcontractor and accepted by the Owner, less retainage, backcharges, or other offsets which are chargeable by the Contractor against the Subcontractor, whether on this Project or otherwise. Acknowledgment, acceptance or approval of an assignment by the Contractor does not constitute any representation or agreement by the Contractor that the Subcontractor is owed the amount assigned or any  specific amount whatsoever.

ARTICLE XVIII: INTERPRETATION

18.0   This Subcontract, and all documents incorporated by reference herein, represent the entire and integrated agreement between the parties and supersede all prior negotiations, representations, proposals, stipulations, or agreements, either written or oral. All prior or contemporaneous agreements to be included in this Subcontract are expressly identified herein. No agent or representative of either party has authority to make, and the parties shall not be bound by nor liable for, any statement, representation, promise or agreement not set forth herein.

18.1   The terms and provisions of this Subcontract will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; *provided* that if any provision of this Subcontract, as applied to any party or to any circumstance, is adjudged by a court or arbitrator not to be enforceable in accordance with its terms, the parties hereto agree that it is their desire that that the court or arbitrator making such determination modify the provision, including, without limitation, deleting specific words or phrases, in a manner consistent with its objectives, and in its modified form, such provision will then be enforceable and will be enforced. It is the intent of the parties hereto that the court or arbitrator, in determining any such enforceable modified provision, recognize that it is their intent that the provisions hereof be imposed and maintained to the greatest extent possible.

18.2   The terms and conditions hereof shall inure to and be binding upon the parties hereto, their successors, assigns, executors, administrators and legal representatives.

18.3   This Subcontract cannot be amended, changed, modified or altered except in writing signed by an Authorized Representative of  Contractor.

18.4   No waiver or failure by the Contractor to exercise rights under this Subcontract shall limit any of the Contractor's rights as to any subsequent or continuing failure by the Subcontractor to comply strictly with all terms and conditions of this Subcontract.

14

ARTICLE XVIII: INTERPRETATION   ...tinued)

18.5   In the event of any mistake, ambiguity, or conflict with this Subcontract, neither party shall be considered the author of the Subcontract, and no mistake, ambiguity, or conflict shall be construed more strongly against or more favorably toward either party hereto.

18.6   Headings used in this Subcontract are inserted only as a matter of convenience and for reference, and the in no way define, limit or describe the scope or intent of this contract, nor do they in any way affect this contract.

18.7   Nothing in this Subcontract is intended nor shall be construed to create any rights for or to the benefit of any third parties.

ARTICLE XIX: ADDITIONAL TERMS AND CONDITIONS

19.1   All work performed under this subcontract as shown on the applicable drawings and specifications as shown on page one of this Subcontract as well as the following:

1.   Request for Proposal FA8903—04-D-8700-0004, including all amendments, dated 22 September 2006, is made an integral part of this Subcontract.

2.   As specifically required by the General Contract, refer to Task Order Clauses, of the RFP.  These clauses are made an integral part of this Subcontract.  This Subcontractor shall pay particular attention to the following clauses:

   1) H087 GOVERNMENT FURNISHED PROPERTY
   2) PKVH-H001  HOURS OF WORK
   3) PKVH-H004  DAVIS-BACON REQUIREMENTS (MAR 2003)
   4) PKVH-HOO5 WAGE DETERMINATION (IAW FAR 22.1012-1) (MAR 2003)
   5) PKVH-H009  UTILITY OUTAGES (MAR 2003)
   6) PKVH-H010  SAFETY BARRICADES AND WARNING SIGNS (MAR 2003)
   7) PKVH-H011  RECORD DRAWINGS (MAR 2003)
   8) FAR 52.211-12  LIQUIDATED DAMAGES – CONSTRUCTION (SEP 2000)
   9) FAR 42.223-11  OZONE DEPLETING SUBSTANCES (MAY 2001)

3.   GENERAL (wage) DECISION NUMBER MS030018 and MS030027 are hereby inserted into and made an integral part of this Subcontract; and is contained in Attachment 8 to this Subcontract.

4.   The Subcontractor shall provide written notification to the Contractor of any construction tier subcontract award at any level within five (5) working days following award, and in no case later than seven  (7) days prior to the start of tier subcontractor's activities on the project. The notification shall list the:

   a.   Name, address, employer identification number, and telephone number of the tier Subcontractor;
   b.   Estimated dollar amount of the tier subcontract;
   c.   Estimated starting and completion dates of the tier subcontract; and
   d.   Scope of work that the tier subcontractor will be performing.

   All certification, affidavits, reports, submittals, and certificates required by this contract for tier subcontracts shall be delivered to Contractor five (5) working days prior to the start of tier subcontractor's activities on the project. Certified payrolls for tier subcontractors must be delivered to the Contractor within seven (7) calendar days from the end of each pay period.

5.   Pursuant to Public Law 99-661, Section 1207 "Subcontracting Plan for Small and Small Disadvantaged Business Concerns", if the Subcontractor is a large business and this subcontract amount is equal to or greater than one million dollars, the following percentage goals (expressed in terms of a percentage of total planned subcontracting dollars) are applicable to this subcontract:
   a.   Small Business Concerns: 40% of total planned subcontracting dollars under this subcontract will go to subcontractors who are small business concerns.
   b.   Small Disadvantaged Business Concerns: 7.5% of total planned subcontracting dollars under this Subcontract will go to subcontractors who are small business concerns owned and controlled by socially and economically disadvantaged individuals.
   c.   Woman Owned Business Concerns: 7.5% of total planned subcontracting dollars under this subcontract will go to subcontractors who are small business concerns owned and controlled by women.
   d.   HUBZone: 3.5% of total planned subcontracting dollars under this subcontract will go to subcontractors who are owned and controlled by U.S. citizens and 35% of its employees reside in a HUBZone.
   e.   Veteran Owned Business Concerns: 3.5% of total planned subcontracting dollars under this subcontract will go to subcontractors who are small business concerns owned and controlled by veterans.

15

ARTICLE XIX: ADDITIONAL TERMS   D CONDITIONS (continued)

f.  Small Disadvantaged Veteran Owned Business Concerns:  3.5% of total planned sub contracting dollars under this subcontract will go to subcontractors who are small business  concerns owned and controlled by disadvantaged veterans.

6. This Subcontractor shall sign and return Statement of Compliance (item #4) with the Certified Payroll (item #5). Subcontractor shall sign all three Statement & Acknowledgement (#8) and return with executed contracts.  All other attachments are for your  information.

| ITEM # | NAME | FORM NO. | ATTACHMENT |
|---|---|---|---|
| 1. | Scope of Work (continued from page 1) | | A |
| 2 | General Wage Determination | | B |
| 3. | Certificate of Insurance (sample) | | C |
| 4. | Statement of Compliance | DD879 | D |
| 5. | Certified Payroll (submit weekly) | 44-R1093 | E |
| 6 | Sample Payroll Certified Payroll | 44-R1093 | F |
| 7. | Instruction for Payroll Form | WH-347 | G |
| 8. | Statement & Acknowledgement | Form 1413 | H |

This Subcontractor shall insert this clause #6 into each tier subcontract awarded at any level

ARTICLE XX: AUTHORIZED REPRESENTATIVES

The Contractor's Authorized Representatives shall be:

Aaron Docsa - Project Manager             (228) 374-1865, ext.106      aaron.docsa@huntyates.com
Paul Musick- Project Manger               (228) 374-1865, ext. 104     paul.musick@huntyates.com
Marty Class – General Superintendent      (228) 374-1865, ext. 119     marty.class@huntyates.com
Michael Davis- CQC Director               (228) 374-1865, ext. 123     michael.davis@huntyates.com

The Subcontractor's Authorized Representative for the Project shall be:

RICK HUGHES

ONLY AN OFFICER OF THE CONTRACTOR OR PROJECT MANAGERS, AS SET FORTH ABOVE, MAY MAKE BINDING COMMITMENTS ON BEHALF OF THE CONTRACTOR.

EQUAL OPPORTUNITY EMPLOYER
M/F      H/V

16

Attachment A – WORK TO BE DONE (continued from page 1)

THE FOLLOWING IS INTENDED AS AN ELABORATION, NOT LIMITATIONS, OF THE SCOPE OF WORK TO BE INCLUDED AS PART OF THIS SUBCONTRACT.

1. This Subcontractor shall furnish all labor, supervision, tools, equipment, insurance, materials, and applicable taxes for a complete installation of a complete installation of framing, ready on the interior for electrical, mechanical, plumbing, insulation and drywall and ready on the exterior for roofing, siding and brick. This shall include, but may not be limited to, erecting wall panels, setting roof and floor trusses, setting of pre-fabricated stairs, installation of all roof/floor decking, beams, Hardi Frames, blocking, bracing, framing of miscellaneous items and framing of the patio beams and columns, with two year warranty, at Keesler A.F.B. Work shall be performed at the four project sites: Thrower Park, West Falcon, East Falcon and Bayridge, respectively. This Subcontractor is aware that these four sites are further broken down into six phases: 1) Thrower Park, 2) Northwest Falcon, 3) Maltby Hall/Shadowlawn, 4) Southwest Falcon, 5) East Falcon, 6) Bayridge East. He also understands that there will be demobilization between each of the phases and remobilization and He has confirmed that his final price is inclusive of this.

2. Except as hereinafter excluded, this work shall be in strict compliance with the plans, specifications, this subcontract, all state and local laws, codes, ordinances and regulations and applicable standards in effect on the date of this Subcontract. The above referenced items are supplementary to each other but in the event of a conflict and/or omission, if any, the more stringent requirement shall govern. This Subcontractor shall provide workman's compensation for all workers as required by the State of Mississippi. It is agreed that the Subcontractor's on-site supervision must meet the satisfaction of the project General Superintendent

 The following description of work to be done by this Subcontractor is not intended to establish a limit on the scope of work, but to outline the main scope of work included in this subcontract.
  a. All work shall be built in conformance to:
   1) Local, State, and Federal regulations,
   2) "Replace 1028 Military Family Housing Units", Approved for Construction Civil drawings and specifications dated, 11APR07
   3) "Replace 1028 Military Family Housing Units", 100% Building Design Submittal, dated 11JUN07.
   4) Storm Water Pollution Prevent Plan(SWPPP), dated 15FEB07 and State of Mississippi Department of Environmental Quality Office of Pollution Control, coverage number MSR104498
   5) Hunt Yates Project schedules,
   6) Hunt Yates Safety Plan, and
   7) Hunt Yates Quality Control Plan.

3. This Subcontractors work shall include but shall not be limited to product submittals, daily reports, certified payrolls, and a safety plan to include a site specific Hurricane Action Plan. This Subcontractor shall provide all equipment and tools needed to carry out His scope of work.

 This Subcontractor shall perform a preliminary inspection of the site to verify that existing conditions match those shown on the drawings. Any variations from the conditions whether encountered during the preliminary inspection or during the course of the work will be brought to the immediate attention of the Contractor.

 This Subcontractor shall protect from damage all existing trees, streets, utilities, silt fencing and other erosion control items. This Subcontractor shall replace any damaged areas caused by His firm, including silt fencing, back to original condition, at His cost.

This Subcontractor shall provide labor and equipment necessary to receive, unload, distribute and properly store and protect from the weather all materials installed under this Subcontract. Materials shall include roof trusses, floor trusses, pre-fabricated wall panels, pre-fabricated stairs, Hardi-Frame panels, loose lumber, sheathing, windows, exterior doors, garage-to-unit doors, the garage-to-exterior doors and floor and roof decking. Material deliveries will be coordinated between this Subcontract, the Hunt-Yates General Superintendent and the component supplier. Unloading shall be performed in a timely manner with the appropriate equipment and manpower under the supervision of, and to the satisfaction of, the General Superintendent. Any wait time charges by delivery companies associated with this Subcontractor will be charged to this Subcontractor. He shall take every prudent precaution to preserve and protect all materials furnished by the Contractor. Windows will be delivered by the Contractor's window supplier, crated by building type, and set in the vicinity of the building to which they are to be installed. All doors and French style glass doors will be off-loaded into a storage container and distributed to the units. The trusses, floor trusses, wall panels, Hardi-Frames, top plate material, beams and sheathing will be off-loaded and loaded on the building by this Subcontractor. All roof and floor trusses will be off-loaded, handled and stored as per the manufactorer's guidelines. Trusses shall be placed on dunnage and at no time shall there be any trusses in the mud or placed directly on the ground. Dunnage shall be equally spaced so as to prevent sagging.

This Subcontractor shall perform all layout, erecting, bracing, plumbing and leveling, of the pre-fabricated wall panels, supplied by others. This Subcontractor shall provide and install the specified sill sealer during erection of the walls. He understands that the walls be shipped with a single top plate and it will be His responsibility to install the second plate. The second top plate and all beams will be shipped loose with the wall panels. This Subcontractor will install all interior and exterior OSB shear panel per the referenced drawings. He shall pay particular attention to the quality and consistency of the shear wall nailing and comply with the specified nailing requirements. He shall ensure that the pressure in His nail guns is appropriately set to prevent nail over penetration into the shear panels. He shall pay close attention to the OSB joints and ensure that in all cases that there is sufficient spacing between panels to allow for expansion. This Subcontractor will install any and all perimeter shear blocking such that all shear panel edges 'land' on a solid member. He shall install all beams and headers, including the patio/entry beams and garage overhead door beams. This Subcontractor will install the Hardi-Frame pre-fabricated shear walls, provided by others, as shown on the referenced drawings, including attachment to the concrete and attachment to the top plate. He shall provide the epoxy for the concrete attachment. This Subcontractor has agreed to install the 5/8" Dens-Glas material, provided by others, at the exterior walls of the one-hour rated wall separating a handicap unit to a two story unit.

He shall install the pre-fabricated wood stair systems, provided by others, and field frame the landings. This Subcontractor shall install all necessary and required blocking and/or hardware for the pre-fabricated stairs. For safety and access, the stairs will be installed prior to decking the floor above.

This Subcontractor shall field frame all chase walls, stair landings, and mechanical platforms as shown on the referenced drawings. He shall install blocking as required. Blocking shall include, but may not be limited to, draft stop & fire blocking, bird blocking, eave kicker blocking, soffit blocking, perimeter blocking for shear panel, all blocking or backing for the attic access, drywall installation, necessary structural blocking, flashing, fire, soffits, fascia (including 2x6 fascia), bathroom hardware, stair rail, ceiling fan, windows, cabinet, garage door opener and handicap blocking requirements. This Subcontractor will install any window, door and garage door trim, including the 2x10 wood buck around the garage overhead door opening.

This Subcontractor shall install all exterior doors and windows as part of His scope of work. This includes all front entry doors, patio doors, garage to exterior doors and mechanical room doors, with brick mold. He has included in his price to set the garage to unit door if the Contractor requires Him to do so. This

HBC FORM C205 7/2005

Subcontractor will install all exterior door thresholds pursuant to the manufacturer guidelines but in all cases the thresholds shall be sealed between it and the concrete, and mechanically fastened. This Subcontractor shall furnish and install flashing around all windows and patio doors pursuant to the referenced plans and specifications. This Subcontractor has committed to no deviations from the window flashing details in regards to materials and/or methods. This Subcontractor acknowledges that the windows are hurricane rated windows and as such, they are to be handled with care and installed per the manufacturer's recommendations to ensure that compliance with the IRC2006. He will install a bead of urethane caulking around the perimeter of the window prior to setting the nailing flange, will install the windows in the closed position and will nail all holes in the nailing flange. He shall immediately notify the Hunt-Yates General Superintendent regarding any windows to be found damaged or broken upon uncrating of the window deliveries. Failure to notify Hunt-Yates will make this Subcontractor liable for damages. All costs associated with replacing broken windows due to this Subcontractor's negligence during handling and setting of the windows will be borne solely by Him.

This Subcontractor shall install the floor trusses, exterior posts, headers and beams, prefabricated roof trusses, and roof over-builds. He shall install all floor and roof truss bracing as shown on the individual truss shop drawings, including such items as the 2x4 catwalk or continual strongbacks, lateral bracing, rim board and individual web bracing. This Subcontractor shall install the plan required shear panel on all main roof trusses, gable end trusses and over-build trusses. He shall field frame all gable end eave outriggers and kickers pursuant to the referenced drawings. He shall install all interior shear panel, rim board and/or ladder trusses while installing the floor trusses. This Subcontractor shall install all party-wall truss draft stopping material, i.e., drywall, during the installation of the roof trusses and shall nail said drywall as per the specified nailing schedule. Drywall materials will be supplied by others. He shall also construct all, or any, necessary backing or pony-walls in attic spaces to allow for secure connections of draft stopping or fire protection.

This Subcontractor will install all roof and floor deck materials. He shall pay close attention to and fully comply with the nailing schedules indicated in the referenced plans and specifications. All floor decking will be glued and screwed pursuant to the referenced plans. He shall provide backing and deck opening for all ridge venting, installed by others. This Subcontractor shall install cut-outs in the shear panel for all gable and roof vents. This Subcontractor is aware that is necessary for the Contractor to have the buildings 'dried in' immediately following the final decking inspection, and as such, He will supply sufficient truss and decking crews to ensure a complete and framed building ready for close-in.

This Subcontract includes supplying and installing all fasteners, nails, bolts, shims, shots, pins, strapping, wall bracing, clips, epoxy, sill sealants and sub floor adhesives. This Subcontractor has agreed to utilize the lumber to the utmost. He agrees to re-use wall bracing material for backing or future bracing.

This Subcontractor shall not have framing started on more than 30 units prior to finished framing (ready for sheetrock). Payments will not be made for more than 30 units ahead of finish framing. This Subcontractor shall complete all Punch-out work prior to insulation, brick and roofing. He agrees that all framing will be performed in a quality fashion with all walls, doors, windows, fur-downs and headers true and plumb. This Subcontractor is aware that the plumbing will be installed prior to any decking material and He agrees to work in unison with the plumbing subcontractor to ensure production rates are maintained. He further understands that Hunt-Yates Quality Control Staff will be performing framing punch lists on each and every unit, which whereby necessitates that his punch crews complete their work in a quality and expeditious manner. A good working line of communication will remain between this Subcontractor, the Contractor and the component supplier such that materials can be delivered on-time and a professional product provided in a timely manner.

This Subcontractor is fully aware that this project is located on a military installation and that each of his employees will be required to provide identification to receive access badges. He understands that any employee that does not have sufficient identification to receive said badges will not be allowed on the installation. This Subcontractor also is aware that security measures, i.e. checkpoints, may be established by the Government as they see fit, whereby requiring that his employees have their access badges on their

persons at all times. He further understands that delays may be expected in the event the Government increases the security status and that reimbursements for time loss due to delays will be at his expense. Although not currently mandatory, it is in this Subcontractor's best interest to take advantage of the Government's Basic Pilot Program.

This Subcontractor expressly agrees that the quality of his work will meet or exceed the standards for which the CQC and the Owner will accept for this Subcontractor's work. He also agrees to furnish manpower, equipment and materials in quantities sufficient to meet the Contractor's current production schedule. Contiguous production is necessary for timely completion of this project and as such, this Subcontractor will work closely with the Hunt-Yates production staff to ensure that daily production levels are achieved by this Subcontractor and the other trades.

This Subcontractor shall provide qualified, full time supervision of his work.  Qualified personnel experienced in their trade shall accomplish all of the work performed under this subcontract in a workmanlike manner.  This Subcontractor has agreed to designate a single individual as His quality control representative.  This individual will be responsible for ensuring compliance with this Subcontractor, the plans and specifications and will be responsible for providing daily inspection reports indicating such.  He shall complete the units in proper sequence and in a timely manner to maintain production in accordance with the Contractor's current project schedule.

This Subcontractor will be required to clean up all spoils, excess material, trash and debris caused from his work on a daily basis and remove Hunt-Yates provided dumpsters.  He shall leave the finished units in a clean, swept out condition upon completion of His work.

This Subcontractor agrees to complete a minimum of 3 proto-type units prior to production under-slab pretreatment.  An additional mobilization may be required prior to production plumbing.

This Subcontractor shall provide his manpower drinking water and cups. No communicable use cups allowed.  Trash pick-up associated with drinking water and lunch trash will be the responsibility of this Subcontractor.

This Subcontractor shall be responsible for continually maintaining two (2) sets of accurate "red-lined/as-built" drawings in the Hunt-Yates field office.

4.   At this time, the work outlined in this Subcontract is not located on the base. If access to the base is required, or if the base requires employees to have base passes, each Subcontractor employee working on this project will be required to complete and submit background and vehicle information to the Contractor and Department of the Air Force for approval. Individuals are required to follow on-base rules and regulations to keep their access from being revoked. All mobile phone use when driving on base must be "hands free".

   a) Wages: All workers employed on this project must be paid not less than the prevailing wage and fringe rate for their classification as listed on the wage decision (MS030018 6/13/2003 MS18). Certified payrolls will be submitted weekly to the  Hunt Yates field office.

   b) Taxes: This project is NOT tax exempt. This Subcontract includes all applicable taxes for the work provided including all applicable Mississippi State Taxes.

   c) Buy American Act/NAFTA: All materials on this Project shall comply with Buy American Act to include all Free Trade Agreements.

   d) Traffic Control: This Subcontractor shall supply and maintain all Safety and Traffic Control needed to satisfy current City, State, and Federal regulations for his work.

HBC FORM C205 7/2005

e) Permits: Subcontractor is responsible to obtain all applicable permits for his work as required by the State of Mississippi and the City of Biloxi. It will be the responsibility of this Subcontractor to insure applicable permits are in place prior to the start of their respective work.

f) Construction water will be available to the subcontractor at the points of connection as identified by the Contractor for the water at no charge. This Subcontractor shall be responsible for providing any taps, hook ups, back-flow preventers, materials for hook ups, standpipes, tanks, etc. for his own construction water.

g) Temporary power will be supplied by this Subcontractor in the form of electric generators for his own work. All electrical generators shall be properly grounded and have Ground Fault Protection. If final electrical power is connected, this power may be used by this Subcontractor in lieu of the generators.

h) Quality Control Plan Testing: The subgrade, asphalt and concrete testing will be performed by Others. It will be the responsibility of this Subcontractor to insure applicable testing is performed in the frequencies required by Hunt Yates Quality Control Plan and or other applicable regulatory agencies. Any retesting required due to the failing of these initial tests will be paid for by this Subcontractor.

i) Safety: This Subcontractor shall abide by Hunt Yates Safety Manual, State and Federal safety codes for all work performed. He shall furnish a list of all materials and chemicals used in the performance of his work and furnish copies of material data safety sheets to employees and the project office prior to starting work. The intent is to fully comply with the current OSHA Safety Regulations, Air Force Safety Regulations and acknowledge that all laborers and mechanics have received the data sheets. Backup alarms shall be mandatory on all equipment. Hard hats, long pants and sleeved shirts shall be required at all times. This Subcontractor shall furnish a fall protection program prior to starting work that complies with OSHA and the Hunt-Yates safety plan.

j) Cleanup shall be performed daily by this Subcontractor for his work. Each Subcontractor will be responsible for insuring his equipment does not damage or litter any roadways (paved or gravel base) with soil or mud during his work or while transporting equipment to or from the site. In the event roads or streets are soiled from this Subcontractor's equipment, he will be required to immediately clean these roadways to the satisfaction of the Project Superintendent. The RV approach area is a highly visible area and exposed to the public and thus, this Subcontractor will make sure that His work area is clean, tidy and safe at the end of each business day. Any and all costs associated with any clean-up operations performed by Hunt-Yates on behalf of this Subcontractor will be borne by Him.

k) Communication: This Subcontractor's Site Superintendent will carry on his person a Nextel mobile phone with the ability to direct connect at all times he is performing work on the site. The Nextel mobile phone to be furnished by this Subcontractor and the DC number provided to Hunt-Yates immediately upon mobilization.

l) Deliveries: This Subcontractor shall coordinate for his deliveries and provide forklifts as needed to unload his own material. He shall take great care to avoid damages to other trades, existing landscaping, existing trees, and/or any other appurtenance. Any and all costs associated with the repair of damages caused by this Subcontractor and or His suppliers or vendors will be borne by Him.

m) Scheduling: It is understood that this Subcontractor will cooperate with the Project Superintendent or Project Manager (s) in scheduling his installations to avoid unnecessary

delays to other trades. Time is of the essence regarding this scope of work and this Subcontractor shall exercise due diligence in expediting the work.

n) <u>Punch Work:</u> This Subcontractor shall provide their own full-time Quality Control manager to ensure work is completed pursuant to the plans and specifications. This Subcontractor shall also be responsible for completing all punch list work in a timely manner keeping this portion of his work on schedule just as he is required to do for all other phases of this contract. This item includes establishing a punch list crew and completing the punch lists for each building as prepared by the Quality Control Director and his Inspectors, as well as the Government Inspection firm.

o) <u>Submittals – Material:</u> This Subcontractor shall submit for approval shop drawings, brochures, certificates, licenses, etc., for all materials, fixtures, and equipment intended for use on the project using the manufacturers listed in the plans and specifications. All shop drawings and submittal literature shall be submitted together and not "piece mealed". Six (6) original copies shall be provided to Hunt-Yates. Submittals shall be provided in a neat, organized fashion so as to expedite the review and approval process. This shall be done in a prompt and timely manner so as not to delay the project construction schedule. Shop drawings must be approved by the Quality Control Director prior to this Subcontractor beginning work.

It is also understood that all material required for the O & M Manuals will be submitted to the CQC Director within ninety (90) days of approved submittals.

p) <u>Waivers:</u> Hunt Yates will require Waivers of Lien from this Subcontractor's material suppliers and Subcontractors as evidence of this Subcontractor having paid for all his material and labor with all taxes and fringes required thereto. These waivers will be required with each progress payment. No payment will be released until these waivers are properly executed and turned into the Hunt Yates field office.

q) <u>Hurricane Readiness:</u> Contractors shall submit a "Hurricane Action Plan" prior to starting work. Plan will be reviewed and approved by the Contractor and discussed at the preparatory meeting. In general, upon receipt by the Contractor of a severe weather warning with anticipated winds of +40mph, at Keesler Air Force Base, this Subcontractor will implement His action plan. At a minimum, He will be responsible for tying-down, removal, protection and/or securing all His materials, closing doors and windows in units, and evacuation of the area, as determined by Federal and Local authorities. The Contractor will inspect the material protection work performed by this Subcontractor in order to reasonable assure that property owned by the Contractor or the Air Force will not be damaged. If this Subcontractor fails or refuses to implement their action plan and/or refuses to secure their materials, the Contractor will perform this work on His behalf and charge the cost of this work to this Subcontractor pursuant to this Subcontractor.

5. The cost breakdown below will be used for payment purposes. It is understood that the contract amount of $9,438,600.00 includes all Mississippi state taxes. It is also understood that this Subcontractor will submit progress payment requests twice per month. Pay requests will be submitted to the Hunt-Yates field office the second and fourth weeks of each month. Specific dates that pay requests are due will be determined upon commencement of work but in all cases will coincide with other trades submitting by-monthly pay requests. It is understood that the first pay request of each month will be for labor only and the second pay request of each month will be for labor and materials combined.

Payment requests will only be accepted on the preprinted form as supplied by the Contractor and will be paid for as approved by the Project Superintendent. Retention will be released upon acceptance of this Subcontractors work by the Owner and the Contractor. This acceptance will

Include but shall not be limited to all as-built drawings, submittals, waivers, approved certified payrolls, etc.

OPTIONS:
As part of this Subcontract, excessive repairs to wall panels incorrectly constructed by the component company and or modifications made to adjust walls to incorrect concrete dimensions will be billed at a rate of $35.00/hr.  Signed work tickets detailing work performed and the number of man-hours must accompany any billing.  Lack of these documents will be cause for rejecting requested billings.

If the Contractor chooses to construct mechanical fur-downs out of wood, this Subcontractor will construct said fur-downs at a maximum rate of $200 per unit.

At the time of this contract, the loose lumber has not yet been finalized.  In the event this Subcontractor furnishes the lumber on a turn-key basis, this contract will be amended via a change order.

In the event this Subcontractor chooses to utilize the Hunt-Yates man-camp for His housing needs, a rental rate of $550/mos per lot will be charged.  This charge will be in the form of a back-charge on his monthly pay requests or some other mutually agreed method.

### SCHEDULE OF VALUES:

| Work Item | Quantity | Unit Cost | Total Cost |
|---|---|---|---|
| Mobilize | | | $       35,000.00 |
| First Fl Walls/Install | 569 Bldg | $3500 | $  1,991,500.00 |
| 2nd Fl Joist & Subfloor | 569 Bldg | $3250 | $  1,849,250.00 |
| 2nd Fl Walls/Installed | 569 Bldg | $3250 | $  1,849,250.00 |
| Trusses/Fascia | 569 Bldg | $3250 | $  1,849,250.00 |
| Roof Sheathing | 569 Bldg | $3150 | $  1,792,350.00 |
| Ext. Sheathing | 569 Bldg | $1350 | $     768,150.00 |
| Int. Pickup/Blk/Soffit | 569 Bldg | $950 | $     540,550.00 |
| Stairs | 569 Bldg | $328 | $     186,632.00 |
| Windows | 569 Bldg | $1800 | $  1,024,200.00 |
| Doors | 569 Bldg | $450 | $     256,050.00 |
| Unit/Trash Clean-up/Punch | 569 Bldg | $226.98 | $     129,150.00 |
| Stored Materials | | | $     243,668.00 |
| Demobilize | | | $       35,000.00 |

Contract Amount          $ 12,550,000.00

### A COMPLETE AND PROFESSIONAL JOB IS INTENDED!

****** END OF SUBCONTRACT *****

HBC FORM C205 7/2005



# MODU-TECH

## THE LEADING EDGE IN BUILDING TECHNOLOGY
### A DIVISION OF HEIL BUILDERS, INC.

7-25-07

Attachment #1 to the contract between Hunt/Yates and Modu Tech for the rough carpentry subcontract at Keesler AFB

Clarifications to the boiler-plate

*AD* 1)  1.7  72 hour's is requested to perform clean-up or punch-out
*AD* 2)  1.8 windows, panels, trusses and lumber will be delivered adjacent to buildings
*AD* 3)  2.0 payment and performance bond is not required
4)  ~~4.0 this subcontractor has not agreed to liquidated damages~~ *AD*
*AD* 5)  4.1 Subcontractor will not pay General contractor unabsorbed home office overhead, indirect expenses of whatever nature and attorney fees in the event of a subcontractor caused delay
*AD* 6)  4.1 schedules should be mutually agreed to
7)  ~~5.0 In the event of a termination contractor may not take subcontractors tools and equipment~~
*AD* 8)  6.2 A Mississippi contractor's license is not required for worked performed on this project
*AD* 9)  7.4 retention is 10% held until 50% complete then no more retention will be held
*AD* 10) Bi-monthly payment applications will be made on the 10ᵗʰ and 20thj of each month  ⌐*AS MUTUALLY AGREED UPON AD*
11) 10.2 Subcontractor will not be held responsible for the cost of mold remediation *AS LONG AS* and testing on the lumber products this subcontractor is installing. Subcontractor *THIS AD* will make efforts to correctly store materials and identify mold whenever it arises
⌐*MAKES EVERY AD*

Clarifications to the Scope Issues

*AD* 1)  Subcontractor shall provide labor and equipment necessary to receive unload distribute and properly store and protect from the weather all materials. Hunt will supply any required coverings i.e. Plastic tarps
2)  Garage to unit door: Hunt will pre-rock the door on the unit side within 5 days of the roof install so Modu Tech can install the door unit in sequence with the other doors and window ⟶ *DE SHALL INSTALL THIS Door w/ OUT PRE-ROCK AFTER 5 DAYS (ADJUSTI-FIT JAMBS)*

3) Any wait time charges by delivery companies will be charged to this subcontractor. Hunt should control deliveries so the trucks do not stack up and Modu Tech should have at least one hour to unload before any charges are assessed.

4) Wall panels will be shipped with both top plates installed on the panel — *IF AGREED TO IN FIELD AD*

5) Subcontractor does not install blocking for ceiling fan

6) Any brick mold that is part of an exterior door installation is assumed to be installed on the door unit at the factory

7) ~~Subcontractor will furnish and install only the window sill and jamb flashing prior to the window install~~ *PER PLAN DETAILS, NO EXCEPTION AD*

8) Sub floor is nailed per plans and not screwed — *PER STRUCTURAL DRAWINGS AD*

9) Modu Tech does not supply strapping or wall bracing

10) Modu Tech assumes that if plumbing stacks are not installed prior to the floor truss and floor sheathing operation that plumber will cut the appropriate openings in the sub floor.

11) Modu Tech is not installing and party wall gypsum draft stopping material this will be installed by the drywall subcontractor.

12) Attachment 'A' 5. Contract amount is $12,550,000.00

# EXHIBIT C

## Assignment from Hunt Yates to Hunt Building

## ASSIGNMENT

For and in consideration of $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Hunt Yates, LLC (hereinafter "Hunt Yates") does hereby assign, convey, and transfer to Hunt Building Company, Ltd. (hereinafter "Hunt Building") any and all rights, claims, and causes of action that Hunt Yates has or may have against Ark-la Tex Companies, Modu-Tech, Heil Builders, Inc., and any and all of their parent companies, subsidiaries, and affiliates (hereinafter collectively "the Subcontractors"), as it relates to such entity's respective subcontract with Hunt Yates for the work performed at Keesler Airforce Base in Biloxi, Mississippi pursuant to the Order for Supplies and Services, Contract No. FA8903-04-D-8700, and any amendments thereto (hereinafter "the Work"), between Hunt Building and the Department of the Airforce. Hunt Yates expressly authorizes Hunt Building, and its insurer Chubb, to pursue any and all claims Hunt Yates has or may have against Ark-la Tex Companies, Modu-Tech, Heil Builders, Inc., and any and all of their parent companies, subsidiaries, and affiliates, as it relates to such entity's respective subcontract with Hunt Yates for the work performed at Keesler Airforce Base in Biloxi, Mississippi.

Pursuant to the Subcontract between Hunt Building and Hunt Yates for the Work, Hunt Building expressly authorizes Hunt Yates to assign any and all rights, claims, and causes of action to Hunt Building as stated herein.

Hunt Yates and Hunt Building agree and warrant that neither Hunt Yates, nor W.G. Yates & Sons Construction Company, shall be responsible for payment of any legal fees, costs, or expenses related to the pursuit of any rights, claims, or causes of actions against the Subcontractors or otherwise pursuant to this Assignment. Further, Hunt Yates and Hunt Building represent and warrant that neither of them, nor any of their respective insurance carriers, shall

bring any cause of action against W.G. Yates & Sons Construction Company or any of its insurers and affiliated companies that in any manner arises from or is in any way related to the rights, claims, and causes of action associated with this Assignment.

Hunt Yates represents that it owns any such rights, claims, and causes of action assigned herein.

If any portion of this Assignment or the application of this Assignment is found to be invalid or unenforceable, those portions shall be severable, and the remaining portions of this Assignment shall be valid and enforceable to the fullest extent permitted by applicable law.

This Assignment may be executed in any number of counterparts, all of which that constitute the same instrument.

This Assignment shall be governed by, and enforced according to, the laws of the State of Mississippi.

<div align="center">SIGNATURES BEGIN ON THE FOLLOWING PAGE</div>

2873542_1

2

ASSIGNOR:
Hunt Yates, LLC, a Mississippi limited liability company

By: Hunt Building Company, Ltd., a Texas limited liability partnership, Member Hunt Yates, LLC

By: _____

Sharyn Procaccio
Vice President/Asst. Gen. Counsel

STATE OF   ILLINOIS
COUNTY OF   COOK

     Personally appeared before me the undersigned authority in and for the jurisdiction aforesaid, Sharyn Procaccio_____, who acknowledged that he is a Member of Hunt Yates LLC that for and on behalf of said company and as its act and deed he executed the above and foregoing instrument after first having been duly authorized by said corporation so to do.

    This the 14th day of November, 2017.

_____ Notary Public

MY COMMISSION EXPIRES:  Mar 16, 2019

OFFICIAL SEAL
KENDRA GRAHAM
Notary Public - State of Illinois
My Commission Expires Mar 16, 2019

By: W.G. Yates & Sons Construction Company, a Mississippi corporation, Member Hunt Yates, LLC

By: _____
William G. Yates, III, President

STATE OF _Mississippi_
COUNTY OF _Neshoba_

    Personally appeared before me the undersigned authority in and for the jurisdiction aforesaid, _William Yates_, who acknowledged that he is the Member of Hunt Yates, LLC, that for and on behalf of said company and as its act and deed he executed the above and foregoing instrument after first having been duly authorized by said corporation so to do.

    This the 13th day of November, 2017.

_____ Notary Public

MY COMMISSION EXPIRES:

ID # 114210
MICHELLE M. RICHARDSON
Commission Expires
Oct. 27, 2019

4

2873542_1

ASIGNEE:

Hunt Building Company, Ltd., a Texas limited liability partnership, Member

By: _____

Sharyn Procaccio
Vice President/Asst. Gen. Counsel

STATE OF __ILLINOIS__

COUNTY OF __COOK__

Personally appeared before me the undersigned authority in and for the jurisdiction aforesaid, __Sharyn Procaccio__, who acknowledged that he is the __VP/Asst. Gen. Counsel__ of Hunt Building Company, Ltd. that for and on behalf of said company and as its act and deed he executed the above and foregoing instrument after first having been duly authorized by said corporation so to do.

This the _14th_ day of November, 2017.

_____ Notary Public

OFFICIAL SEAL
KENDRA GRAHAM
Notary Public · State of Illinois
My Commission Expires Mar 16, 2019

2573542_1

5

**COVER SHEET**

**Civil Case Filing Form**

*(To be completed by Attorney/Party Prior to Filing of Pleading)*

Mississippi Supreme Court — Form AOC/01
Administrative Office of Courts — (Rev 2009)

**Court Identification Docket #**

| Court | 2 4 | 1 2 | C I 1 |
|---|---|---|---|
| | County # | Judicial District | Court ID (CH, CI, CO) |

| Month | 0 9 | Date | 1 4 | Year | 1 8 |

**Case Year:** 2 0 1 8

**Docket Number:** 0 0 0 9 7

**Local Docket ID**

This area to be completed by clerk | Case Number if filed prior to 1/1/94

In the **CIRCUIT**   Court of **Harrison**   County — **SECOND** Judicial District

**Origin of Suit (Place an "X" in one box only)**

- [X] Initial Filing
- [ ] Remanded
- [ ] Reinstated
- [ ] Reopened
- [ ] Foreign Judgment Enrolled
- [ ] Joining Suit/Action
- [ ] Transfer from Other court
- [ ] Appeal
- [ ] Other

**Plaintiff - Party(ies) initially Bringing Suit Should be Entered First - Enter Additional Plaintiffs on Separate Form**

Individual

| Last Name | First Name | Maiden Name, if applicable | M.I. | Jr/Sr/III/IV |

___ Check ( x ) if Individual Plaintiff is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of _____

___ Check ( x ) if Individual Plaintiff is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency _____

Business **Chubb, as subrogee of Hunt Building Company, Ltd.**
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

___ Check ( x ) if Business Plaintiff is filing suit in the name of an entity other than the above, and enter below:
D/B/A _____

Address of Plaintiff **c/o Lloyd Gray Whitehead & Monroe, 800 Montclair Rd, Suite 100, Birmingham, Alabama 35213**

Attorney (Name & Address) **Patrick Patronas 880 Montclair Road, Ste 100, Birmingham, AL 35213**   **MS Bar No. 4043**

___ Check ( x ) if Individual Filing Initial Pleading is NOT an attorney

Signature of Individual Filing: _____

**Defendant - Name of Defendant - Enter Additional Defendants on Separate Form**

Individual

| Last Name | First Name | Maiden Name, if applicable | M.I. | Jr/Sr/III/IV |

___ Check ( x ) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:
Estate of _____

___ Check ( x ) if Individual Defendant is acting in capacity as Business Owner/Operator (d/b/a) or State Agency, and enter entity:
D/B/A or Agency _____

Business **Hell Builders, Inc.**
Enter legal name of business, corporation, partnership, agency - If Corporation, indicate the state where incorporated

X Check ( x ) if Business Defendant is acting in the name of an entity other than the above, and enter below:
D/B/A **Modu-Tech**

Attorney (Name & Address) - If Known _____   **MS Bar No.** _____

**Damages Sought:** Compensatory $ **4,000,000.00**   Punitive $ _____   Check ( x ) if child support is contemplated as an issue in this suit.*
*If checked, please submit completed Child Support Information Sheet with this Cover Sheet

**Nature of Suit (Place an "X" in one box only)**

| Domestic Relations | Business/Commercial | Children/Minors - Non-Domestic | Real Property |
|---|---|---|---|
| Child Custody/Visitation | Accounting (Business) | Adoption - Contested | Adverse Possession |
| Child Support | Business Dissolution | Adoption - Uncontested | Ejectment |
| Contempt | Debt Collection | Consent to Abortion Minor | Eminent Domain |
| Divorce:Fault | Employment | Removal of Minority | Eviction |
| Divorce: Irreconcilable Diff. | Foreign Judgment | Other | Judicial Foreclosure |
| Domestic Abuse | Garnishment | **Civil Rights** | Lien Assertion |
| Emancipation | Replevin | Elections | Partition |
| Modification | Other | Expungement | Tax Sale: Confirm/Cancel |
| Paternity | **Probate** | Habeas Corpus | Title Boundary or Easement |
| Property Division | Accounting (Probate) | Post Conviction Relief/Prisoner | Other |
| Separate Maintenance | Birth Certificate Correction | Other | **Torts** |
| Termination of Parental Rights | Commitment | **Contract** | Bad Faith |
| UIFSA (eff 7/1/97; formerly URESA) | Conservatorship | [X] Breach of Contract | Fraud |
| Other | Guardianship | Installment Contract | Loss of Consortium |
| **Appeals** | Heirship | Insurance | Malpractice - Legal |
| Administrative Agency | Intestate Estate | Specific Performance | Malpractice - Medical |
| County Court | Minor's Settlement | Other | Mass Tort |
| Hardship Petition (Driver License) | Muniment of Title | **Statutes/Rules** | Negligence - General |
| Justice Court | Name Change | Bond Validation | Negligence - Motor Vehicle |
| MS Dept Employment Security | Testate Estate | Civil Forfeiture | Product Liability |
| Worker's Compensation | Will Contest | Declaratory Judgment | Subrogation |
| Other | Other | Injunction or Restraining Order | Wrongful Death |
| | | Other | [X] Other Subrogation |

IN THE _____ Circuit _____ COURT OF _Harrison_ _____ COUNTY, MISSISSIPPI

_____ Second _____ JUDICIAL DISTRICT, CITY OF

Docket No. _____ - _____ _____ _____   Docket No., If Filed
       File Yr    Chronological No    Clerk's Local ID    Prior to 1/1/94 _____

**DEFENDANTS IN REFERENCED CAUSE · Page __ of __ Defendants Pages**
**IN ADDITION TO DEFENDANT SHOWN ON CIVIL CASE FILING FORM COVER SHEET**

Defendant # __1__ :

Individual: _____  _____  ( _____ )  _____  _____
          Last Name          First Name          Maiden Name, if Applicable    Middle Init.    Jr/Sr/III/IV

__ Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

    Estate of _____

__ Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

    D/B/A _____

Business  Ark-La-Tex Companies, Inc.
          Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

__ Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:

    · D/B/A _____

ATTORNEY FOR THIS DEFENDANT: _____  Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

---

Defendant # __2__ :

Individual: _____  _____  ( _____ )  _____  _____
          Last Name          First Name          Maiden Name, if Applicable    Middle Init.    Jr/Sr/III/IV

__ Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

    Estate of _____

__ Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

    D/B/A _____

Business _____
          Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

__ Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below:

    D/B/A _____

ATTORNEY FOR THIS DEFENDANT: _____  Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

---

Defendant # __ :

Individual: _____  _____  ( _____ )  _____  _____
          Last Name          First Name          Maiden Name, if Applicable    Middle Init.    Jr/Sr/III/IV

__ Check (✓) if Individual Defendant is acting in capacity as Executor(trix) or Administrator(trix) of an Estate, and enter style:

    Estate of _____

__ Check (✓) if Individual Defendant is acting in capacity as Business Owner/Operator (D/B/A) or State Agency, and enter that name below:

    D/B/A _____

Business _____
          Enter legal name of business, corporation, partnership, agency - if Corporation, indicate state where incorporated

__ Check (✓) if Business Defendant is being sued in the name of an entity other than the name above, and enter below

    D/B/A _____

ATTORNEY FOR THIS DEFENDANT: _____  Bar # or Name: _____ Pro Hac Vice (✓)___ Not an Attorney(✓)___

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,                            **PLAINTIFF**

**VERSUS**                                        **CASE NO.:**
                                                  **24CI2:18-cv-00097**

ARK-LA-TEX COMPANIES, INC.
HEIL BUILDERS, INC., d/b/a MODU-TECH,
UNKNOWWN JOHN AND JANE DOES A
THROUGH M, AND UNKNOWN CORPORATE
ENTITIES N THROUGH Z                              **DEFENDANTS**

### SUMMONS

**To:**   Heil Builders, Inc, d/b/a Modu-Tech
          c/o J. Scott Stevens
          2617 Chestnut Woods Court
          Reisterstown, Maryland 21136

### NOTICE TO DEFENDANT

**THE COMPLAINT, WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the **Complaint** to Patrick Patronas, Lloyd Gray Whitehead & Monroe, 880 Montclair Road, Suite 100, Birmingham, Alabama 35213, the attorney for the Plaintiff.   Your response must be mailed or delivered within **thirty (30) days** from the date of delivery of this Summons and Complaint or a judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court with a reasonable time after afterward.

Issued under by hand and seal of said Court this, the 21 day of September 2018.

Harrison County Circuit Clerk- Judicial 2
730 Dr. Martin Luther King, Jr. Blvd.
Biloxi, Mississippi 39530

By _____

3101553_1

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

**CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,**                                  **PLAINTIFF**

**VERSUS**                                                **CASE NO.:
                                                          24CI2:18-cv-00097**

**ARK-LA-TEX COMPANIES, INC.
HEIL BUILDERS, INC., d/b/a MODU-TECH,
UNKNOWWN JOHN AND JANE DOES A
THROUGH M, AND UNKNOWN CORPORATE
ENTITIES N THROUGH Z**                                    **DEFENDANTS**

### SUMMONS

**To:**   Ark-la-Tex Companies, Inc.
         c/o Gary Teston, Registered Agent
         6504 Highway 98, Suite E
         Hattiesburg, Mississippi 39402

### NOTICE TO DEFENDANT

**THE COMPLAINT, WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT
AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the **Complaint** to Patrick Patronas, Lloyd Gray Whitehead & Monroe, 880 Montclair Road, Suite 100, Birmingham, Alabama 35213, the attorney for the Plaintiff.   Your response must be mailed or delivered within **thirty (30) days** from the date of delivery of this Summons and Complaint or a judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court with a reasonable time after afterward.

Issued under by hand and seal of said Court this, the 21 day of September, 2018.

Harrison County Circuit Clerk- Judicial 2
730 Dr. Martin Luther King, Jr. Blvd.
Biloxi, Mississippi 39530

By: _____

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,                              **PLAINTIFF**

**VERSUS**                                          **CASE NO.:**

                                                    **24CI2:18-cv-00097**

ARK-LA-TEX COMPANIES, INC.
HEIL BUILDERS, INC., d/b/a MODU-TECH,
UNKNOWWN JOHN AND JANE DOES A
THROUGH M, AND UNKNOWN CORPORATE
ENTITIES N THROUGH Z                               **DEFENDANTS**

---

**PLAINTIFF CHUBB O/B/O HUNT YATES, LLC'S MOTION FOR ADMISSION OF
DANIEL ROBERT PICKETT AS COUNSEL *PRO HAC VICE***

---

Plaintiff Chubb o/b/o Hunt Yates, LLC, pursuant to Mississippi Rules of Appellate
Procedure, Rule 46(a), moves for the admission of Daniel R. Pickett of the law firm of Lloyd,
Gray, Whitehead & Monroe, P.C. as counsel *pro hac vice* for the purpose of participating in this
action as counsel for Chubb o/b/o Hunt Yates, LLC.  In support of its Motion, Chubb o/b/o Hunt
Yates, LLC shows the Court as follows:

1.      As set forth in the Application attached hereto as Exhibit "A", Daniel Robert
Pickett ("Mr. Pickett") is engaged in the practice of law in the State of Alabama, is in good
standing to practice law as set forth in Exhibit "B" attached hereto, and is admitted to practice
law in the following jurisdictions and courts:

-   U.S. District Court for the Middle District of Alabama (2001)

-   U.S. District Court for the Northern District of Alabama (2001)

-   U.S. Court of Appeals for the Eleventh Circuit (2004)

-   Alabama State Bar (2001)

2.      Mr. Pickett is not a resident of the State of Mississippi and does not maintain an office in Mississippi. However, the undersigned counsel is licensed to practice law in Mississippi.

3.      Mr. Pickett has not been admitted *pro hac vice* in the State of Mississippi within the preceding twelve months.

4.      Mr. Pickett has not been publicly disciplined by any jurisdiction in which he has been admitted to practice law and has no pending disciplinary proceedings in any jurisdictions.

5.      All applicable provisions of the <u>Mississippi Rules of Civil Procedure</u>, <u>Mississippi Rules of Appellate Procedure</u>, and the <u>Uniform Rules of Circuit and County Court Practice</u> have been read by Mr. Pickett, and this Motion for *pro hac vice* complies with those rules.

6.      The undersigned counsel certifies that she is a member in good standing of the Mississippi Bar.

WHEREFORE, Chubb o/b/o Hunt Yates, LLC requests this Court enter an Order permitting Mr. Pickett to appear in this matter *pro hac vice* as counsel for Chubb o/b/o Hunt Yates, LLC.

DATED: 1st day of October, 2018.

Respectfully submitted,

By: */s Patrick Patronas*
Patrick Patronas, Esq. (MS Bar #4043)
Attorney for Plaintiff Chubb o/b/o Hunt Yates, LLC

**OF COUNSEL:**
LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35223
Telephone:    (205) 967-8822
Facsimile:     (205) 967-2380
ppatronas@lgwmlaw.com

## CERTIFICATE OF SERVICE

I, Patrick Patronas, hereby certify that on this 1st day of October, 2018, a true and correct copy of the foregoing was electronically filed with the Court's ECF System, and that I understand service on all parties to this action was accomplished by transmission of the "Notice of Electronic Filing" by the ECF System or the Court Clerk.

/s *Patrick Patronas*
OF COUNSEL

# EXHIBIT

# "A"

### IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

**CHUBB, as subrogee of HUNT**
**BUILDING COMPANY, LTD.,**                                      **PLAINTIFF**

**VERSUS**                                                                         **CASE NO.:**
                                                                                            <u>24CI2:18-cv-00097</u>

**ARK-LA-TEX COMPANIES, INC.**
**HEIL BUILDERS, INC., d/b/a MODU-TECH,**
**UNKNOWWN JOHN AND JANE DOES A**
**THROUGH M, AND UNKNOWN CORPORATE**
**ENTITIES N THROUGH Z**                                        **DEFENDANTS**

---

### VERIFIED APPLICATION OF DANIEL ROBERT PICKETT
### FOR ADMISSION *PRO HAC VICE*

---

**STATE OF ALABAMA**
**COUNTY OF JEFFERSON**

**PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for the aforesaid jurisdiction, Daniel Robert Pickett, who after being duly shown, states under oath as follows:

1.      I desire to appear as co-counsel for Chubb o/b/o Hunt Yates, LLC *pro hac* vice before the Circuit Court of the Second Judicial District of Harrison County, Mississippi in the above-styled case.

2.      This Verified Application for Admission Pro Hac Vice is being submitted in compliance with <u>Mississippi Rules of Appellate Procedure</u>, Rule 46(b)(5).

3.      My full name is Daniel Robert Pickett. My office address is 880 Montclair Road, Suite 100, Birmingham, Alabama 35213. My office phone number is (205) 967-8822, and my facsimile number is (205) 402-4054.   My email address is dpickett@lgwmlaw.com. My residential address is 3733 Crestbrook Road Mountain Brook, Alabama 35223.

4.     I have been admitted to practice law in the following jurisdictions and courts:

- U.S. District Court for the Middle District of Alabama (2001)

- U.S. District Court for the Northern District of Alabama (2001)

- U.S. Court of Appeals for the Eleventh Circuit (2004)

- Alabama State Bar (2001)

5.     I do not maintain an office in Mississippi. However, co-counsel Patrick Patronas is licensed to practice law in Mississippi.

6.     I have not engaged in the practice of law in the State of Mississippi without being properly admitted and licensed to practice law in the State of Mississippi.

7.     I am currently licensed in good standing to practice law in each jurisdiction in which I have previously been admitted.

8.     I have never been suspended or disbarred in any jurisdiction in which I have been admitted.

9.     I have not been the subject of any public disciplinary action by the bar or courts of any jurisdiction.

10.     I am of good moral character and I am familiar with the ethics, principles, practices, customs, and usages of the legal profession in the State of Mississippi.

11.     During the preceding twelve (12) months, I have not appeared, am not presently appearing and do not have a request pending for admission to appear as counsel *pro hac vice* within this state.

12.     Unless I am permitted to withdraw by order of the Circuit Court of Harrison County, Mississippi, I will continue to represent Chubb o/b/o Hunt Yates, LLC in this action until the final determination of this action, and with reference to all matters incident to this

action, I consent to the jurisdiction of the courts of the State of Mississippi, of the disciplinary tribunals of the Mississippi Bar, and of the Mississippi Board of Bar Admissions in all respects as if I were a regularly admitted and licensed member of the Mississippi Bar.

13.     I have not been found, in an appropriate disciplinary proceeding, to have advertised services in violation of Mississippi Rules of Professional Conduct, Rule 7.2, nor am I employed by or am a member of a firm which has been so found.

14.     I hereby certify that simultaneously herewith:

    a.  I will cause a copy of this Verified Application to be served on the Clerk of the Supreme Court of Mississippi, and upon all counsel of record in this cause.

    b.  I will cause the required fee to be forwarded to the Clerk of the Supreme Court of Mississippi.

    c.  I will cause the required payment to be forwarded to the Mississippi Bar.

15.     The following is the name and office address of the member in good standing of the Mississippi Bar with whom I am associated in this cause:

    Patrick Patronas, Esq. (MS Bar #4043)
    Lloyd, Gray, Whitehead & Monroe, P.C.
    880 Montclair Road, Suite 100
    Birmingham, Alabama 35213

I declare under penalty of perjury that the foregoing is true and correct.

Dated this the 1st day of October, 2018.

_____
Daniel Pickett

**STATE OF ALABAMA**
**COUNTY OF JEFFERSON**

I, Virginia Wooten _____, a notary public in and for said county in said state, hereby certify that Daniel Robert Pickett, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this date that, being informed of the contents thereof, she executed the same voluntarily.

Subscribed and sworn to before me this the 1st day of Oct, 2018.

_____
Notary Public
My Commission Expires: 8-30-20

**PERSONALLY APPEARED BEFORE ME** the undersigned authority in and for the state and county aforesaid, Patrick Patronas, Esq. who, being first by me duly sworn, states that he agrees to have Daniel Robert Pickett, Esq. associated with him in the above-styled case as local counsel and that the matters and facts set forth in the foregoing Application and Motion are true and correct as therein stated.

_____
Patrick Patronas

**STATE OF ALABAMA**
**COUNTY OF JEFFERSON**

I, Virginia Wooten _____, a notary public in and for said county in said state, hereby certify that Patrick Patronas, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this date that, being informed of the contents thereof, he executed the same voluntarily.

Subscribed and sworn to before me this the 1st day of Oct, 2018.

_____
Notary Public
My Commission Expires: 8-30-20

4
2996034_1

# EXHIBIT

# "B"



# ALABAMA STATE BAR

415 Dexter Avenue · Post Office Box 671 · Montgomery, Alabama 36101
Telephone: 334/269-1515 · Fax: 334/261-6310
www.alabar.org

*STATE OF ALABAMA*

*COUNTY OF MONTGOMERY*

I, Phillip W. McCallum, Secretary of the Alabama State Bar and custodian of its records, hereby certify that Daniel Robert Pickett has been duly admitted to the Bar of this State and is entitled to practice in all of the courts of this State including the Supreme Court of Alabama, which is the highest court of said state.

I further certify that Daniel Robert Pickett was admitted to the Alabama State Bar September 28, 2001.

I further certify that the said Daniel Robert Pickett is presently a member in good standing of the Alabama State Bar, having met all licensing requirements for the year ending September 30, 2018.

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Alabama State Bar on this the 18th day of June, 2018.

*Phillip W. McCallum, Secretary*





## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
## SECOND JUDICIAL DISTRICT

**CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,**                                    **PLAINTIFF**

**VERSUS**                                                  **CASE NO.:**
                                                            **24CI2:18-cv-00097**

**ARK-LA-TEX COMPANIES, INC.
HEIL BUILDERS, INC., d/b/a MODU-TECH,
UNKNOWWN JOHN AND JANE DOES A
THROUGH M, AND UNKNOWN CORPORATE
ENTITIES N THROUGH Z**                                      **DEFENDANTS**

---

### PLAINTIFF CHUBB O/B/O HUNT YATES, LLC'S MOTION FOR ADMISSION OF
### JAMES COULSON GRAY III AS COUNSEL *PRO HAC VICE*

---

Plaintiff Chubb o/b/o Hunt Yates, LLC, pursuant to Mississippi Rules of Appellate Procedure, Rule 46(a), moves for the admission of James C. Gray III of the law firm of Lloyd, Gray, Whitehead & Monroe, P.C. as counsel *pro hac vice* for the purpose of participating in this action as counsel for Chubb o/b/o Hunt Yates, LLC. In support of its Motion, Chubb o/b/o Hunt Yates, LLC shows the Court as follows:

1.      As set forth in the Application attached hereto as Exhibit "A", James C. Gray III ("Mr. Gray") is engaged in the practice of law in the State of Alabama, is in good standing to practice law as set forth in Exhibit "B" attached hereto, and is admitted to practice law in the following jurisdictions and courts:

- U.S. District Court for the Middle District of Alabama (August 26, 1986)

- U.S. District Court for the Northern District of Alabama (April 5, 1984)

- U.S. District Court for the Southern District of Alabama (December 8, 2010)

- Alabama Supreme Court (September 27, 1983)

- Alabama State Bar (September 27, 1983)

2.     Mr. Gray is not a resident of the State of Mississippi and does not maintain an office in Mississippi. However, the undersigned counsel is licensed to practice law in Mississippi.

3.     Mr. Gray has not been admitted *pro hac vice* in the State of Mississippi within the preceding twelve months.

4.     Mr. Gray has not been disciplined in any manner by any jurisdiction in which he has been admitted to practice law and has no pending disciplinary proceedings in any jurisdictions.

5.     All applicable provisions of the Mississippi Rules of Civil Procedure, Mississippi Rules of Appellate Procedure, and the Uniform Rules of Circuit and County Court Practice have been read by Mr. Gray, and this Motion for *pro hac vice* complies with those rules.

6.     The undersigned counsel certifies that he is a member in good standing of the Mississippi Bar.

WHEREFORE, Chubb o/b/o Hunt Yates, LLC requests this Court enter an Order permitting Mr. Gray to appear in this matter *pro hac vice* as counsel for Chubb o/b/o Hunt Yates, LLC.

Dated this the 2nd day of October, 2018.

Respectfully submitted,

By:  *Patrick Patronas*
     Patrick Patronas, Esq. (MS Bar #4043)
     Attorney for Plaintiff Chubb o/b/o Hunt Yates, LLC

2996036_1

**OF COUNSEL:**
LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35223
Telephone:     (205) 967-8822
Facsimile:     (205) 967-2380
ppatronas@lgwmlaw.com

### CERTIFICATE OF SERVICE

I, Patrick Patronas, hereby certify that on this 2nd day of October, 2018, a true and correct copy of the foregoing was electronically filed with the Court's ECF System, and that I understand service on all parties to this action was accomplished by transmission of the "Notice of Electronic Filing" by the ECF System or the Court Clerk.

*/s Patrick Patronas*
OF COUNSEL

# EXHIBIT "A"

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
## SECOND JUDICIAL DISTRICT

| | |
|---|---|
| **CHUBB, as subrogee of HUNT BUILDING COMPANY, LTD.,** | **PLAINTIFF** |
| **VERSUS** | **CASE NO.: 24CI2:18-cv-00097** |
| **ARK-LA-TEX COMPANIES, INC. HEIL BUILDERS, INC., d/b/a MODU-TECH, UNKNOWWN JOHN AND JANE DOES A THROUGH M, AND UNKNOWN CORPORATE ENTITIES N THROUGH Z** | **DEFENDANTS** |

---

### VERIFIED APPLICATION OF JAMES COULSON GRAY III
### FOR ADMISSION *PRO HAC VICE*

---

**STATE OF ALABAMA**
**COUNTY OF JEFFERSON**

  **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for the aforesaid jurisdiction, James Coulson Gray III, who after being duly shown, states under oath as follows:

  1. I desire to appear as co-counsel for Chubb o/b/o Hunt Yates, LLC *pro hac* vice before the Circuit Court of the Second Judicial District of Harrison County, Mississippi in the above-styled case.

  2. This Verified Application for Admission Pro Hac Vice is being submitted in compliance with <u>Mississippi Rules of Appellate Procedure</u>, Rule 46(b)(5).

  3. My full name is James Coulson Gray III. My office address is 880 Montclair Road, Suite 100, Birmingham, Alabama 35213. My office phone number is (205) 967-8822, and my facsimile number is (205) 967-2350.   My email address is jgray@lgwmlaw.com. My residential address is 3090 Sterling Road Birmingham, Alabama 35213.

4.    I have been admitted to practice law in the following jurisdictions and courts:

- U.S. District Court for the Middle District of Alabama (August 26, 1986)

- U.S. District Court for the Northern District of Alabama (April 5, 1984)

- U.S. District Court for the Southern District of Alabama (December 8, 2010)

- Alabama Supreme Court (September 27, 1983)

- Alabama State Bar (September 27, 1983)

5.    I do not maintain an office in Mississippi. However, co-counsel Patrick Patronas is licensed to practice law in Mississippi.

6.    I have not engaged in the practice of law in the State of Mississippi without being properly admitted and licensed to practice law in the State of Mississippi.

7.    I am currently licensed in good standing to practice law in each jurisdiction in which I have previously been admitted.

8.    I have never been suspended or disbarred in any jurisdiction in which I have been admitted.

9.    I have not been the subject of any disciplinary action by the bar or courts of any jurisdiction.

10.    I am of good moral character and I am familiar with the ethics, principles, practices, customs, and usages of the legal profession in the State of Mississippi.

11.    During the preceding twelve (12) months, I have not appeared, am not presently appearing and do not have a request pending for admission to appear as counsel *pro hac vice* within this state.

12.    Unless I am permitted to withdraw by order of the Circuit Court of Harrison County, Mississippi, I will continue to represent Chubb o/b/o Hunt Yates, LLC in this action

until the final determination of this action, and with reference to all matters incident to this action, I consent to the jurisdiction of the courts of the State of Mississippi, of the disciplinary tribunals of the Mississippi Bar, and of the Mississippi Board of Bar Admissions in all respects as if I were a regularly admitted and licensed member of the Mississippi Bar.

13.     I have not been found, in an appropriate disciplinary proceeding, to have advertised services in violation of Mississippi Rules of Professional Conduct, Rule 7.2, nor am I employed by or am a member of a firm which has been so found.

14.     I hereby certify that simultaneously herewith:

    a.  I will cause a copy of this Verified Application to be served on the Clerk of the Supreme Court of Mississippi, and upon all counsel of record in this cause.

    b.  I will cause the required fee to be forwarded to the Clerk of the Supreme Court of Mississippi.

    c.  I will cause the required payment to be forwarded to the Mississippi Bar.

15.     The following is the name and office address of the member in good standing of the Mississippi Bar with whom I am associated in this cause:

> Patrick Patronas, Esq. (MS Bar #4043)
> Lloyd, Gray, Whitehead & Monroe, P.C.
> 880 Montclair Road, Suite 100
> Birmingham, Alabama 35213

I declare under penalty of perjury that the foregoing is true and correct.

Dated this the 2nd day of October, 2018.

_____
James C. Gray III

**STATE OF ALABAMA**
**COUNTY OF JEFFERSON**

I, Virginia C Wooten , a notary public in and for said county in said state, hereby certify that James C. Gray III, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this date that, being informed of the contents thereof, he executed the same voluntarily.

Subscribed and sworn to before me this the 2nd day of October, 2018.

Notary Public
My Commission Expires: 8-30-20

**PERSONALLY APPEARED BEFORE ME** the undersigned authority in and for the state and county aforesaid, Patrick Patronas, Esq. who, being first by me duly sworn, states that he agrees to have James Coulson Gray III, Esq. associated with him in the above-styled case as local counsel and that the matters and facts set forth in the foregoing Application and Motion are true and correct as therein stated.

Patrick Patronas

**STATE OF ALABAMA**
**COUNTY OF JEFFERSON**

I, Virginia C. Wooten, a notary public in and for said county in said state, hereby certify that Patrick Patronas, whose name is signed to the foregoing instrument and who is known to me, acknowledged before me on this date that, being informed of the contents thereof, he executed the same voluntarily.

Subscribed and sworn to before me this the 2nd day of October, 2018.

Notary Public
My Commission Expires: 8-30-20

2996038_1

# EXHIBIT "B"



# ALABAMA STATE BAR

415 Dexter Avenue · Post Office Box 671 · Montgomery, Alabama 36101
Telephone: 334/269-1515 · Fax: 334/261-6310
www.alabar.org

*STATE OF ALABAMA*

*COUNTY OF MONTGOMERY*

*I, Phillip W. McCallum, Secretary of the Alabama State Bar and custodian of its records, hereby certify that James C. Gray III has been duly admitted to the Bar of this State and is entitled to practice in all of the courts of this State including the Supreme Court of Alabama, which is the highest court of said state.*

*I further certify that James C. Gray III was admitted to the Alabama State Bar September 23, 1983.*

*I further certify that the said James C. Gray III is presently a member in good standing of the Alabama State Bar, having met all licensing requirements for the year ending September 30, 2018.*

*IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Alabama State Bar on this the 18th day of June, 2018.*

*Phillip W. McCallum, Secretary*





**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Heil Builders, Inc.
d/b/a Modu Teck
c/o J. Scott Stevens
2617 Chestnut Woods Court
Reisterstown, Maryland 21136

9590 9402 3215 7196 3649 08

2. Article Number (Transfer from service label)

7016 0600 0000 1752 2025

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____  ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
                                9-11-2018

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ured Mail
☐ ured Mail Restricted Delivery
   (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☑ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                Domestic Return Receipt

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,                                    **PLAINTIFF**

**VERSUS**                                                 **CASE NO.:**
                                                             **24CI2:18-cv-00097**

ARK-LA-TEX COMPANIES, INC.
HEIL BUILDERS, INC., d/b/a MODU-TECH,
UNKNOWWN JOHN AND JANE DOES A
THROUGH M, AND UNKNOWN CORPORATE
ENTITIES N THROUGH Z                                       **DEFENDANTS**

---

### ORDER GRANTING ADMISSION OF JAMES C. GRAY III
### AS COUNSEL *PRO HAC VICE*

---

This cause having come before the Court on Plaintiff, Chubb o/b/o Hunt Yates, LLC's

Motion for Admission of James C. Gray III as Counsel *Pro Hac Vice* (Doc. 76).  Having

reviewed the Motion, the Court finds the Motion is well taken and due to be granted.

**IT IS THEREFORE ORDERED AND ADJUDGED** that James C. Gray III may

appear as additional counsel for Chubb o/b/o Hunt Yates, LLC in the above-styled cause of

action.

**SO ORDERED AND ADJUDGED** this the _5_ day of _October_ , 2018.

_Roger T. Clark_

~~Robert~~ T. Clark
CIRCUIT COURT JUDGE

**FILED**
OCT 10 2018
CONNIE LADNER
CIRCUIT CLERK

10-10-18
man

2996037_1

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,                              **PLAINTIFF**

**VERSUS**                                           **CASE NO.:**
                                                     **24CI2:18-cv-00097**

ARK-LA-TEX COMPANIES, INC.
HEIL BUILDERS, INC., d/b/a MODU-TECH,
UNKNOWWN JOHN AND JANE DOES A
THROUGH M, AND UNKNOWN CORPORATE
ENTITIES N THROUGH Z                                 **DEFENDANTS**

---

## ORDER GRANTING ADMISSION OF DANEL R. PICKETT
## AS COUNSEL *PRO HAC VICE*

---

This cause having come before the Court on Plaintiff, Chubb o/b/o Hunt Yates, LLC's

Motion for Admission of Daniel R. Pickett as Counsel *Pro Hac Vice* (Doc. 76).  Having

reviewed the Motion, the Court finds the Motion is well taken and due to be granted.

**IT IS THEREFORE ORDERED AND ADJUDGED** that Daniel R. Pickett may appear

as additional counsel for Chubb o/b/o Hunt Yates, LLC in the above-styled cause of action.

**SO ORDERED AND ADJUDGED** this the _5_ day of _October_, 2018.

Roger T. Clark
Robert T. Clark
CIRCUIT COURT JUDGE

FILED
OCT 10 2018
CONNIE LADNER
CIRCUIT CLERK

IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

CHUBB, as subrogee of HUNT
BUILDING COMPANY, LTD.,                                    PLAINTIFF

VERSUS                                         CAUSE NO.:   24CI2:18-cv-00097

ARK-LA-TEX COMPANIES, INC.
HEIL BUILDERS, INC., d/b/a MODU-TECH,
UNKNOWWN JOHN AND JANE DOES A
THROUGH M, AND UNKNOWN CORPORATE
ENTITIES N THROUGH Z                                      DEFENDANTS

---

## NOTICE OF SERVICE OF DISCOVERY DOCUMENTS

---

Please take notice that this day, the undersigned served on counsel for all parties, the

following:

1.   Plaintiff's First set of Requests for Production to Heil Builders, Inc. d/b/a Modu-Tech

2.   Plaintiff's First Set of Interrogatories to Heil Builders, Inc. d/b/a Modu-Tech

Dated this the 15th day of October, 2018.

Respectfully Submitted,

**CHUBB**

*s/ Patrick Patronas*
Patrick Patronas (MS. Bar No. 4043)
Attorney for Plaintiff, CHUBB

OF COUNSEL:
LLOYD, GRAY, WHITEHEAD & MONROE, P.C.
880 Montclair Road, Suite 100
Birmingham, Alabama 35213
Telephone: (205) 967-8822
Email: ppatronas@lgwmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of October, 2018, a true and correct copy of the foregoing has been furnished either by filing electronically with the Clerk of Court or by U.S. Mail, postage prepaid, upon the following parties:

Ark-la-Tex Companies, Inc.
c/o Gary Teston, Registered Agent
6504 Highway 98, Suite E
Hattiesburg, Mississippi 39402

Heil Builders, Inc, d/b/a Modu-Tech
c/o J. Scott Stevens
2617 Chestnut Woods Court
Reisterstown, Maryland 21136

*s/ Patrick Patronas*
OF COUNSEL

2